## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INTERNATIONAL ACADEMY OF | ) | |
| ORAL MEDICINE & TOXICOLOGY, | ) | |
| INC., an Oklahoma non-profit corporation; | ) | |
| MOMS AGAINST MERCURY, INC., | ) | |
| a North Carolina non-profit corporation; | ) | |
| COMED, INC., a Delaware non-profit | ) | |
| Corporation; DAMS, INC., a New Mexico | ) | |
| non-profit corporation; AMY M. CARSON, | ) | |
| guardian ad litem for KIT D. CARSON; | ) | |
| REV. LISA SYKES, guardian ad litem | ) | |
| for WESLEY SYKES; LINDA BROCATO; | ) | |
| KRISTIN HOMME, PE, MPP, MPH; | ) | |
| MICHAEL G. BURKE; | ) | |
| HOLLIS HUGHES | ) | |
| ROGER WALLER; KENNARD W. | ) | |
| WELLONS; DAVID BARNES, DDS; | ) | |
| PAULA KAVANAGH; ROBERTA VOSS; | ) | |
| JOY CHMIELENSKI, RN;  DORICE | ) | |
| A. MADRONERO; ERIC EDNEY; | ) | |
| KAREN PALMER; and KAREN BURNS, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | CASE NO.:    1:14-cv-00356 |
| | ) | |
| THE U.S. FOOD  AND DRUG | ) | |
| ADMINISTRATION | ) | |
| 10903 New Hampshire Avenue | ) | |
| Silver Spring, MD 20993; | ) | |
| | ) | |
| | ) | |
| DR. STEPHEN OSTROFF, M.D., | ) | |
| Acting  Commissioner of the U.S. | ) | |
| Food and Drug Administration | ) | |
| 10903 New Hampshire Avenue | ) | |
| Silver Spring, MD 20993 | ) | |
| | ) | |
| THE U.S. DEPARTMENT OF HEALTH | ) | |
| AND HUMAN SERVICES, | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201 | ) | |
| | ) | |
| SYLVIA MATHEWS BURWELL | ) | |

| Secretary of Health and Human Services | ) |
| U.S. Department of Health and Human | ) |
| Services | ) |
| 200 Independence Avenue, S.W. | ) |
| Washington, D.C. 20201 | ) |
| | ) |
| *Defendants.* | ) |

## SUPPLEMENTAL COMPLAINT REQUESTING JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT AND FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, the International Academy of Oral Medicine & Toxicology, Inc., an Oklahoma non-profit corporation and others,[1] allege and state as follows:

## NATURE OF THE ACTION

1.      This is an action to review and set aside a final action of the United States Food and Drug Administration ("FDA") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 et seq., and for related declaratory relief under 28 U.S.C. § 2201-02 and an injunction.

2.      This Complaint supplements Plaintiffs' action for declaratory and injunctive relief filed on March 5, 2014.  The action arose out of the failure of the FDA to respond within a reasonable time to three separate citizens' petitions[2] concerning mercury fillings challenging the

---

[1] Moms Against Mercury, Inc., a North Carolina non-profit corporation; CoMeD, Inc., a Delaware non-profit corporation; DAMS, Inc., a New Mexico non-profit corporation; Amy M. Carson, guardian ad litem for Kit D. Carson; Rev. Lisa Sykes, guardian ad litem for Wesley Sykes; Linda Brocato; Kristin Homme, PE, MPP, MPH; Michael G. Burke; Hollis Hughes; Roger Waller; Kennard W. Wellons; David Barnes, DDS; Paula Kavanagh; Roberta Voss; Joy Chmielenski, RN; Dorice A. Madronero; Eric Edney; Karen Palmer; and Karen Burns, for their claims against the Defendants, the U.S. Food and Drug Administration, ("FDA" or "the Agency"), Margaret A. Hamburg, M.D., Commissioner of the FDA, and Kathleen Sebelius, Secretary the U.S. Department of Health and Human Services ("HHS").

[2] A supplemental petition was filed in March 2013 that updated the administrative record with relevant new science that had been published since the 2009 Petitions were filed.

FDA's August 4, 2009, Final Order classifying mercury amalgam dental filling material as a Class II device.

3.      The Plaintiffs' Petitions requested that FDA provide the following relief: (1) formally ban the use of dental amalgam as a dental restorative material pursuant to section 516 of the Medical Device Amendments of 1976 (21 U.S.C. § 360f) and 21 C.F.R. § 895, or in the alternative; (2) place encapsulated dental amalgam into Class III pursuant to section 513(3) of the Medical Device Amendments; (3) demonstrate proof of safety and effectiveness; (4) promulgate restrictions for the use of dental amalgam in certain individuals; (5) require that an Environmental Impact Statement ("EIS") or at the least an Environmental Assessment ("EA") be prepared pursuant to 21 C.F.R. § 25.40  and challenged the application of FDA law to the subject final order; and (6) Provide meaningful informed consent to dental patients, or their parents, of the amalgam mercury content and potential risks associated with mercury exposure from amalgam fillings.  (The citizens' petitions and supplemental petition at issue are referred to below as the "Petitions.")

## SUPPLEMENTAL INFORMATION

4.      On January 27, 2015, after an order was entered imposing a stay on this litigation, the FDA submitted three individual responses to the Petitions and essentially rejected all of the actions/remedies sought by Plaintiffs.  The 2015 FDA Responses are attached hereto as Exhibit A1, 2 and 3.

5.      Pursuant to the APA, Plaintiffs now seek an order enjoining the enforcement of the August 4, 2009, Final Order of FDA, as modified and further explained by the  information contained in the 2015 Responses to the Petitions on mercury amalgam fillings, as arbitrary, capricious, an abuse of discretion, and not in accordance with law, and in excess of statutory

jurisdiction, authority and limitations, within the meaning of 5 U.S.C. § 706(2)(A) through (F), and declaring that the Class II classification of mercury amalgams is unlawful and a nullity. Further, Complainants seek injunctive relief from the Court to require FDA to obey its laws and regulations insofar as they apply to the classification status of mercury amalgam fillings, and to enjoin the release of information about the "safety" of mercury fillings based on the absence of evidence of harm.

## REGULATORY FRAMEWORK

6.    Under the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), devices are classified into one of three regulatory classes that describe the controls necessary *to provide reasonable assurance of safety and effectiveness*.  *See* 5 U.S.C. § 513(a)(l)(A)-(C) (21 U.S.C. § 360c(a)( l)(A)-(C)).  Class I devices are the least risky and the FD&C Act's general misbranding and adulteration controls are adequate to provide such an assurance. Class II devices range from the most risky to those of considerably less risk for which Class I controls are inadequate and *sufficient information exists to establish special controls to reasonably  assure safety and effectiveness*.  Class III devices represent the most risky devices, *i.e*., those devices that are life-supporting or life-sustaining, of substantial importance in preventing impairment of human health, or present a potential unreasonable risk of illness or injury, and *for which not enough is known to place them into Class II to provide a reasonable assurance of safety and effectiveness*. All three classes require an FDA finding of reasonable assurance of safety and effectiveness. Plaintiffs assert that the 2015 FDA Responses violate this framework.

## SUPPLEMENTAL FACTS

7.    History leading to this lawsuit: The legal controversy underlying this lawsuit commenced in 1992 when several parties represented by attorneys Robert Reeves and James

Turner, including some parties to this case, sued FDA seeking an order compelling FDA to classify mercury fillings. These parties requested that the Circuit Court of Appeals for the District of Columbia accept original jurisdiction and issue a writ of mandamus compelling FDA to classify dental amalgam fillings. (*Foundation for Toxic Free Dentistry. et al. v. David Kessler, Commissioner of the FDA*, Case No. 92-1469.) The Court accepted original jurisdiction but ultimately dismissed the case on the basis that the plaintiffs had not exhausted their administrative remedies.

8. In 2008, some of these same parties sued FDA again demanding that FDA classify mercury fillings. (*Moms Against Mercury, et al. v. Andrew Von Eschenbach, Commissioner of the FDA*, in the United States District Court for the District of Columbia, Case No. 1:07-cv-02332-ESH-JMP.) The case settled when FDA agreed to classify the restorative material within one year of the date of the settlement. As part of the settlement, FDA also agreed to post a warning on its website providing the following warning: "[D]ental amalgams contain mercury, which may have neurotoxic effects on the nervous systems of developing children and fetuses." This settlement agreement led to the August 4, 2009, FDA Final Order classifying mercury fillings in Class 2, which was challenged by the Petitions.

9. The Honorable Ellen Huevel was assigned to the *Moms Against Mercury* case and found that the plaintiffs in that case had standing to bring their lawsuit. (*See* Transcript of hearing, Exhibit D.) The parties to this case continued to press FDA to classify mercury amalgam fillings finally receiving classification on August 4, 2009. It is this classification, later discussed in the FDA's 2015 Responses to the Petitions, that is the subject of this lawsuit.

10. The Plaintiffs' original Complaint details how two FDA advisory committees on mercury amalgam refused to endorse the safety and efficacy of mercury fillings. (Complaint at

6.)  The chief device regulator at the FDA publicly and privately assured Plaintiffs and the public

that a decision on mercury amalgam in response to the Petitions that are the subject of this action

would be forth coming by December 31, 2011, but no decision was forthcoming until January

27, 2015.  Contemporaneously with the issuance of its Final Rule, FDA removed the warning

that it agreed to post as part of the settlement of the *Moms Against Mercury* litigation.

11.     Sometime in 2011, FDA completed its scientific review of the amalgam literature

presented by the Plaintiffs, drafted a response to Plaintiffs' Petitions bearing a January 2012 date.

(The "2012 Response," attached as Exhibit B.)   FDA forwarded the 2012 Response to the

Department of Health and Human Services ("DHHS.")  Based on the science available to it at

that time—significantly less than is currently available—the 2012 Response found that

significant restrictions were to be placed on amalgam use.  Amalgam use was forbidden in the

following subpopulations:  pregnant and nursing women; infants and children under the age of

six; people with neurological disease; people with kidney disease; people with allergy or

sensitivity to mercury  (hereinafter, the "Protected Subpopulations.")

12.     In its 2015 Responses, FDA repeatedly argued that Plaintiffs failed to demonstrate

reliable evidence of harm caused by mercury fillings while acknowledging a dearth of evidence

on certain issues associated with mercury amalgam safety and efficacy.  The record demonstrates

that FDA failed to present substantial evidence of safety or make a required finding that

scientific evidence demonstrated a reasonable assurance of safety and effectiveness in various

health related particulars.  The 2015 Responses differed significantly from FDA's December

2012 Response.  The 2015 Responses removed the restrictions on the use of mercury fillings in

the formerly protected subpopulations.   It also explicitly shifted the FDA's legislatively

mandated burden to demonstrate safety.  The burden to demonstrate harm now rested on the Plaintiffs.

13.     The 2015 Responses clearly placed the burden of proof on the Plaintiffs to demonstrate that amalgam fillings pose a "substantial deception or an unreasonable and substantial risk of illness or injury."  [Exh. A1 at 5]  For example, Plaintiffs presented a study demonstrating that amalgam fillings increase the risk of hearing loss.  FDA rejected the study because it did not have enough study subjects, but FDA did not cite a study demonstrating that amalgam fillings do not cause hearing loss.  Additionally, FDA admitted that there were "limited to no clinical information concerning the effects of prenatal exposure from maternal sources of mercury vapor at relevant concentrations."  [Exh. A1 at 18]  Despite the evident and admitted lack of data demonstrating safety, FDA took no steps to legally restrict the use of dental amalgam in pregnant women or inform them of the potential risks.  Moreover, if amalgam use is inappropriate in pregnant women, as FDA admits, it is also inappropriate for use in women of child-bearing age.  Obviously, women of child-bearing age can quickly become pregnant after mercury fillings are placed.  These are only a few examples of FDA's arbitrary and capricious conduct in responding to the Petitions.

14.     Despite multiple admissions concerning health risks associated with amalgam fillings in its 2015 Responses, and despite its previous findings that amalgam use was inappropriate in the Protected Subpopulations, FDA declined to restrict dental amalgam in any meaningful way, failed to place mercury fillings in Class III, and failed to provide meaningful and relevant information to the general public so that dental patients could make informed decisions.  (The FDA admissions concerning mercury fillings are summarized in Exhibit C.)

15.     The Petitions requested that sufficient information be provided to dental patients who were candidates for dental amalgam therapy so that they could make a reasonably informed decisions concerning this treatment.  Despite making all of the admissions set forth in Exhibit C, FDA declined to require that this information be made available to dental patients.

## JURISDICTION AND VENUE

16.     This Court's jurisdiction and the propriety of this Court providing a proper venue were established in the original Complaint, and that discussion is hereby incorporated into this Supplemental Complaint.

## CLAIMS FOR RELIEF

17.     Plaintiffs incorporate by reference all allegations contained in paragraph 1 through 14 herein.

18.     The Administrative Procedure Act, 5 U.S.C. § 553(3), requires agencies to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule."  *See also* 5 U.S.C. § 551(4) (defining "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").  The APA right to petition encompasses the right to petition for a new, revised, or final rule, or repeal thereof, concerning FDA's regulation of mercury fillings.

19.     The APA, 5 U.S.C. § 702, grants a right of judicial review to "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  Plaintiffs, including the named individuals, entities, and members of those entities, are adversely affected by FDA's rule-making and 2015 Responses.

## FIRST CLAIM FOR RELIEF

***FDA impermissibly shifted the burden of proof to require plaintiffs to demonstrate that amalgams were unsafe for use.***

20.    Plaintiffs incorporate by reference all allegations contained in paragraph 1 through 19 herein and all allegations in the original complaint.

21.    The FDA is charged with ensuring the safety of medical and dental devices. Mercury amalgams are regulated by FDA as a dental device.

22.    In its 2015 Responses, FDA imposed the burden of proof on the Plaintiffs, expressly requiring them to demonstrate that "dental amalgam presents a substantial deception or an unreasonable and substantial risk of illness or injury."

23.    Plaintiffs presented numerous published and peer-reviewed studies demonstrating the substantial risks of illness or injury posed by mercury fillings.  For various reasons, the FDA dismissed these studies but did not identify studies demonstrating that the opposite conclusion could and should be reached.  For example, Plaintiffs cited to Rothwell, J., *et al.*, *Amalgam dental fillings and hearing loss*, Int J Audiol. 2008 Dec., 47(12):770-6, for the proposition that amalgam fillings had the potential to cause hearing loss.  In response, FDA stated that a larger study was needed to corroborate the effects seen in this study.  FDA did not cite to a study demonstrating that mercury fillings do not cause hearing loss.

24.    FDA concedes that "[v]ery limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed."  Nevertheless, FDA has not provided any meaningful controls requiring patients to be informed that there are very limited to no clinical information on which to reach a conclusion that amalgam fillings are safe for a developing fetus or a child under the age of six.

25.     The instances described below further illustrate the FDA's pattern of rejecting the Plaintiffs' proffered studies and reaching an opposing conclusion without identifying scientific studies or evidence to support its position:

a.     In the "Information for Use" section for recommended professional labeling for dental amalgam, the FDA admitted that "the developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor."  Despite acknowledging this risk of harm, the FDA did not contraindicate against implanting amalgams in pregnant women and young children, even though FDA explicitly admitted that "very limited to no clinical information is available regarding the long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed." [Exh. A1 at 18]  However, Plaintiffs presented at least three published studies demonstrating that mercury from maternal dental amalgam fillings places developing fetuses and infants at risk.  [Exh. A1 at 17]

b.     The FDA agreed that the one study offered by Plaintiffs relating to genetic polymorphisms indicated that the "calculated exposure limits may be insufficient to protect individuals with genetic polymorphism to relevant enzymes involved in the toxicodynamics of mercury." [Exh. A1 at 18-19]  However, the FDA refused to issue any contraindication, and instead stated that more studies were needed.

c.     The FDA concluded that there are "few studies that evaluate a link between dental amalgam and Multiple Sclerosis."  However, Plaintiffs proffered five such studies linking dental amalgams with MS.  The FDA refused to accept any of

Plaintiffs studies, and without the support of any single study, concluded that there was no like between amalgams and MS.  [Exh. A1 at 23-25]

        d.      The FDA concluded that there are "few, if any, controlled studies that evaluate a link between dental amalgam and ALS."  Plaintiffs proffered five such studies linking dental amalgams with ALS.  However, similar to MS, the FDA refused to accept any of Plaintiffs' studies, and without the support of any single study, concluded that there was no link between amalgams and ALS.  [Exh. A1 at 25-26]

        e.      Plaintiffs offered nine studies supporting proposition that amalgams contribute to kidney dysfunction.  FDA concedes that the evidence indicates that mercury exposure from dental amalgams result in increased mercury levels in kidneys that, at high levels, can result in adverse health effects. However, on the basis of two studies, the FDA concluded that the risks posed to kidneys from mercury amalgams are not unreasonable or substantial.  [Exh. A1 at 28-30]

        f.      Plaintiffs identified five studies indicating that a significant percentage of the population is at risk for hypersensitive reactions to amalgams.  The FDA acknowledged that some individuals are hypersensitive or allergic to mercury, but believes that such reactions are rare.  However, the FDA did not identify any of the studies it relied on to reach such a conclusion.  [Exh. A1 at 31-33]

WHEREFORE, the Plaintiffs pray for the relief hereinafter requested.

## SECOND CLAIM FOR RELIEF

### *The FDA acted arbitrarily and capriciously in refusing to adopt the conclusions reached in 2012 FDA Draft*.

26.    Plaintiffs incorporate by reference all allegations contained in paragraph 1 through 25 herein and all allegations in the original complaint.

27.    As stated above, the FDA agreed to provide responses to the Petitions by the end of 2011 or early 2012.  FDA made a final determination that was based on all of the science it reviewed, proceeded to prepare the 2012 Response, and forwarded it to HHS. This document represented the last word from the FDA on the dental amalgam issue in 2012.

28.    Despite reaching its conclusions regarding dental amalgam in late 2011, the FDA made the decision to not release its findings and conclusions to the public.  Instead, the FDA remained silent for three years until it issued its 2015 Responses.

29.    The 2015 Responses removed protections for the Protected Subpopulations and eliminated the call to use mercury fillings only as a secondary treatment material.   However, during the three-year period between the 2012 Response and the 2015 Responses, FDA did not review or consider any additional evidence that would have altered its findings and opinions on mercury fillings.  Therefore, it was arbitrary and capricious for the FDA to reach a different conclusion in 2015 based on the same science it reviewed for its initial decision in 2012.

30.    The following list of the discrepancies between the published responses and the 2012 Response is extensive and concerning:

a.    Most noteworthy, the 2012 Response admits that the use of alternative materials (*i.e*., non-mercury containing fillings) should be best offered as "the first line of restorative care." [Exh. B at 4]  This restriction was eliminated from the 2015 Responses.

b.    The 2012 Response stated that it recommended against the removal of functional amalgam fillings in any individual, including pregnant women, unless deemed medically necessary by a physician in consultation with the patient's treating dentist. [Exh. B at 4]    However, in the 2015 Responses, FDA did not recommend against removal.  Indeed, the 2015 Responses admit that dental amalgam releases mercury vapor during placement and removal, but found that "these levels do not present a substantial and unreasonable risk of illness." [Exh. A1 at 7]

c.    The 2012 Response stated that although there was "no direct evidence of harm from dental amalgam in the general population, information reviewed by FDA over the past year presents concern for certain sensitive subpopulations, such as pregnant women and their developing fetuses, children under six years old and other higher risk subgroups who may be more susceptible to potential adverse effects of mercury exposure."  Based on this information, the FDA declared that amalgams should not be placed in any of the Protected Subpopulations.  [Exh. B at 3-4]  However, in 2015, the FDA completely changed course, and stated that the available scientific evidence relating to potentially sensitive subpopulations did not reveal a risk that the use of dental amalgam clearly outweighs the benefit in any patient population such that a contraindication is warranted, except in persons with a known mercury allergy, for which the FDA has already recommended a contraindication.  [Exh. A2 at 5]

31.    The contradictory conclusions reached in the 2012 and 2015 Responses based on identical evidence demonstrates that FDA's 2015 Responses were arbitrary and capricious and and not supported by substantial evidence.  Therefore, this Court should deem the FDA's 2015 Responses to be unlawful under 5 U.S.C. § 706(2)(A).

WHEREFORE, the Plaintiffs pray for the relief hereinafter requested.

### THIRD CLAIM FOR RELIEF

***The FDA acted arbitrarily and capriciously in its 2015 Responses by determining that the established minimum safety limits may be exceeded by a factor of ten.***

32.    Plaintiffs incorporate by reference all allegations contained in paragraph 1 through 31 herein and all allegations in the original complaint.

33.    FDA  touted risk assessment principles in its 2009 Responses and argued that the mercury absorbed by amalgam bearers was below the safety limits established by the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") (called a "minimum risk level" or "MRL") and by the U.S. Environmental Protection Agency ("EPA") (called a reference concentration or "RfC").  In their Petitions, Plaintiffs identified twenty-seven points of error in the risk assessment promulgated by FDA regarding amalgam fillings.  In its 2012 Response, FDA did not respond to these allegations of error and abandoned any discussion of risk assessment principles, opting instead to limit the use of amalgam in the Protected Subpopulations.

34.    In its 2015 Responses, FDA again changed course by removing the restrictions on the use of amalgam in treating the Protected Subpopulations and claiming for the first time that it was acceptable for the safety limits to be exceeded by a factor of ten.  FDA offered no evidence demonstrating that it was safe for dental patients, and particularly the Protected Subpopulations, to be exposed to mercury in quantities up to ten times the safety limits established by ATSDR and EPA that FDA endorsed in 2009.  Indeed, the EPA and ATSDR documents that establish the safety limits endorsed by the FDA do not allow the published mercury safety limits to be exceeded.  FDA's conclusion that the ATSDR and EPA safety limits may be exceeded by a factor of ten is arbitrary and capricious and is not based on substantial evidence.

## FOURTH CLAIM FOR RELIEF

***Patients receiving amalgam fillings are entitled to information explaining the potential risks involved and alternative treatment options.***

35.     Plaintiffs incorporate by reference all allegations contained in paragraph 1 through 34 herein and allegations in the original Complaint.

36.     FDA's current position is that patients are not required or entitled to receive warning information regarding the safety of amalgams prior to receiving amalgam implants.  The 2015 Responses state that:

> [The recommended labeling statements in the special controls guidance document will provide dentists with important information that will improve their understanding of the devices and help them make appropriate treatment decisions with their patients.  In addition, FDA notes that dental amalgam is a prescriptive device and, therefore, patients cannot receive the device without the involvement without a learned intermediary, the dental professional. [Thus,] FDA has concluded that it is unnecessary to require that dentists provide [the warning] information to patients in order to provide reasonable assurance of the safety and effectiveness of the device.

[Exh. A2 at 11]

37.     Plaintiffs requested that FDA change its policy and provide warnings and information directly to dental patients (and parents of young dental patients) detailing the potential health risks posed by exposure to mercury.  In support, Plaintiffs set forth specific and compelling reasons why patients are entitled to such information.  FDA declined to provide dental patients with information concerning these fillings.

a.     Despite expressly and implicitly admitting that it does not have substantial evidence of safety, FDA concludes that it is not necessary for dentists to discuss potential risks of mercury fillings with dental patients or to discuss the availability of alternative restorative materials.  Instead, the special controls that FDA imposed on mercury fillings

will provide information that is disseminated only to dentists.  Despite the absence of substantial evidence of safety, FDA has denied informed consent to dental patients.

b.      The 2015 Responses and the Final Rule is contrary to FDA's mission to provide the public with accurate, science-based information.

c.      FDA declines to assure that patients will be provided with accurate and factual information regarding mercury fillings.  As a result, patients and parents are likely to become confused.  Roughly fifty percent of dentists do not use mercury fillings any more, many citing the health risks associated with those fillings.  (Plaintiff IAOMT's organizational mission is to eliminate the use of these fillings because of the documented health risks associated with their use.)

d.      Neither the 2015 Responses nor the Final Rule require dentists to inform their patients that mercury fillings contain mercury that is emitted in significant quantities over the life of the filling, and that eighty percent of the mercury inhaled into the lungs is absorbed into the bloodstream.

e.      The Final Rule fails to respect patients' right to make their own decisions about their bodies and their health.  Rather, the Final Rule leaves those decisions to dentists.

38.      In the 2015 Responses, FDA acknowledged most of the above arguments, yet stopped short of directly addressing any of Plaintiffs' arguments.  It is apparent that the FDA has no reasonable explanation for not providing dental patients with warning information before receiving treatment with amalgam fillings.   Moreover, it is completely illogical for the FDA to conclude that patients are not entitled to receive the information necessary to give adequate

informed consent prior to being implanted with amalgam fillings, a device the FDA concedes emits toxic mercury vapors.

WHEREFORE, the Plaintiffs pray for the relief hereinafter requested.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

(1)    Enjoining the enforcement of FDA's 2009 Final Rule, as further explained by the FDA's 2015 Responses, on mercury fillings;

(2)    Enjoining the use of mercury fillings in the human subpopulations in which the use of mercury fillings was prohibited by the FDA's 2012 Response unless and until such time as FDA convenes a fact-finding proceeding wherein it identifies substantial evidence that mercury amalgams are safe for use in these subpopulations;

(3)    Requiring FDA to instruct the dental profession to minimize the use of mercury amalgams in favor of alternative restorative materials, which should be used as the first line of restorative care, as advocated by FDA in its 2012 Response;

(4)    Mandating that FDA provide appropriate warning information to patients, and parents of minor patients, explaining the potential harms and risks associated with mercury amalgams and the availability of alternative restorative devices;

(5)    Awarding the Plaintiffs' a reasonable attorneys' fee and all other court costs incurred in pursuit of this action; and,

(6)      Granting other such relief as this Court deems just and proper.

Respectfully submitted,

_____

James S. Turner, DC Bar #82479
Swankin & Turner
1400 16th Street, NW, Suite 101
Washington, DC 20036
202-462-8800
Email:  jim@swankin-turner.com

Of Counsel

_____

James M. Love
Titus Hills Reynolds Love
Dickman & McCalmon, P.C.
3700 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma 74103-4334
918-587-6800
E-mail:  jlove@titushillis.com

**TABLE OF EXHIBITS**

EXHIBIT A1 – FDA Response to Citizen Petition Docket No. FDA-2009-P-0610

EXHIBIT A2 – FDA Response to Citizen Petition Docket No. FDA-2014-P-0907

EXHIBIT B – 2012 FDA Response

EEXHIBIT C – Summary of Admissions for FDA Responses

EXHIBIT D – Transcript of Hearing Before Honorable Ellen Segal Huvelle

**EXHIBIT A1 - Case No. 1:14-cv-00356**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

---

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993-0002

January 27, 2015

James M. Love
TITUS HILLIS REYNOLDS LOVE
DICKMAN & McCALMON, P.C.
3700 First Place Tower
Tulsa, OK 74103-4334

Robert E. Reeves
REEVES & ASSOCIATES
1310 First National Building
167 West Main Street
Lexington, KY  40507

Re:  Citizen Petition Docket No. FDA-2009-P-0610 (formerly FDA-2008-N-0163)

Dear Mr. Love and Mr. Reeves:

This letter responds to your above referenced citizen petition (the petition) submitted to the
Food and Drug Administration ("FDA" or "agency") on June 18, 2014. The petition was
converted from a petition for reconsideration that was originally submitted on September 3,
2009 and supplemented with additional information in a submission on March 7, 2013.[1]

The agency provided an interim response to your original petition on June 10, 2010.  FDA has
now completed its review and is denying your petition under 21 CFR 10.30(e)(3).  As
discussed further below in the sections on genetic polymorphism and risk assessment, FDA is
continuing to evaluate available information and will consider what actions, if any, might be
warranted.  Below, we summarize the background on dental amalgam, your petition and its
requests, and the reasons for FDA's decision.

## A. BACKGROUND

How best to regulate dental amalgam is a complex question of risk and benefit.  Dental
amalgam has several advantages as a restorative material.  It has a broad range of applicability
in clinical situations, is easy to use, and is relatively insensitive to variations in handling
technique and oral conditions.  It also provides high strength, durability, and marginal

---

[1] This petition was originally received in docket number FDA-2008-N-0163, the docket that FDA opened in 2008 to
receive additional comments on the proposed classification rule for dental amalgam.  The petition has since been
given its own docket number, FDA-2009-P-0610.

Page 2 – Mr. Love and Mr. Reeves

integrity – features that may help prevent recurrent decay.[2]  However, dental amalgam contains elemental mercury and releases mercury vapor.  At high enough levels, mercury vapor is a neurotoxicant and can have adverse health effects.  A central question in assessing the risk of dental amalgam is whether the levels of mercury vapor released from dental amalgam are harmful or are associated with adverse health effects and, if so, to what extent.  FDA has taken several actions in recent years to ensure a reasonable assurance of safety and effectiveness for dental amalgam.  In 2002, FDA issued a proposed rule (67 FR 7621) that proposed reclassification of dental amalgam and its components into class II, subject to a special controls guidance document entitled "Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy."  Following the proposed rule, FDA published a White Paper[3] in 2006 that reviewed the literature on the safety of mercury vapor exposure from dental amalgam.  Later in 2006, FDA sought the advice of external experts at a joint meeting of the Dental Products Panel and the Peripheral and Central Nervous System Drugs Advisory Committee.  In response to the recommendations of the 2006 panel and a review of over 1,800 public comments regarding dental amalgam (Docket FDA 2006-N-0352), FDA updated its White Paper with an addendum in 2009,[4] and found no new information that would change the conclusions of earlier FDA assessments, that exposures to mercury vapor from dental amalgam are not associated with adverse health effects.  However, FDA acknowledges that review is limited to no clinical information available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed.  There is, however, information that indicates that certain individuals with a pre-existing hypersensitivity or allergy to mercury may be at risk for adverse health effects from mercury vapor released from dental amalgam.  FDA's findings were presented in the preamble to the final rule reclassifying dental amalgam into class II that was issued on August 4, 2009 (74 FR 38686).  In conjunction with the final rule, FDA published the Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy – Guidance for Industry and FDA Staff, on July 28, 2009.  In the final rule, FDA concluded that the special controls sufficiently mitigate the risks of dental amalgam such that the special controls and the general controls provide a reasonable assurance of the safety and effectiveness of dental amalgam.

Shortly before and following issuance of the 2009 final rule, FDA received several petitions (dockets FDA-2009-P-0610, FDA-2009-P-0357, and FDA-2010-P-0056), including this one, requesting that the agency take several additional actions on dental amalgam.[5]  After receiving the petitions, FDA began a plan of evaluating the concerns raised, which included review of these petitions and the information they provided the agency, directed agency assignments with experts in toxicology and risk assessment, review of the mercury allergy

---

[2] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.
[3] FDA draft White Paper,
http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/ucm171117.htm.
[4] Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf.
[5] FDA is issuing responses to each of these petitions simultaneously today.

literature, reviews of the amalgam literature, and an advisory committee meeting. In December 2010, FDA convened a meeting of the Dental Products Panel to gather input from the panel on exposure assessments for mercury vapor from dental amalgam, reference exposure levels (RELs) for mercury vapor, and the adequacy of the clinical studies on dental amalgam.[6] In general, the panel discussed uncertainties with current risk assessments for dental amalgam and believed it would be helpful to have RELs that included data from the most recent studies. The panel also discussed that there may be certain populations that are more sensitive to mercury exposure than the general population. In addition, the panel found that a review of the available literature showed there is no causal link between the use of dental amalgam and various clinical diseases in the general population.

In responding to the citizen petitions regarding dental amalgam, FDA has considered the information presented in the petitions, as well its previous literature reviews and the panel deliberations. While FDA does not believe additional action is warranted at this time for the reasons explained below, the agency continues to evaluate the literature on dental amalgam and any other new information it receives in light of the 2010 panel recommendations, and will take further action on dental amalgam as warranted.

## B. PETITION SUMMARY

Your petition requests that FDA take one or more of the following actions: ban the use of "encapsulated mercury fillings" (dental amalgam) as a dental restorative material or, alternatively, place dental amalgam into Class III with restrictions on use in young children, women and particularly women of childbearing age, males, those with compromised kidney, immune, and neurological function, those hypersensitive to mercury, those who test positive for apolipoprotein E4 or coproporphyrinogen oxidase (CPOX4), and other persons within susceptible populations. In addition, your petition requests under any of the proposed actions that an Environmental Impact Statement (EIS) or an Environmental Assessment (EA) be prepared pursuant to 21 CFR 25.40 and the National Environmental Policy Act of 1969 (NEPA).

To provide support for your requested actions on dental amalgam, you provide arguments that may be summarized as follows:

- Dental amalgam presents an unreasonable, direct, and substantial risk of illness or injury to patients and dental personnel,

- Mercury has been identified as being a likely cause of neurological disorders such as Alzheimer's disease, Parkinson's disease, multiple sclerosis, amyotrophic lateral sclerosis, severe autism, kidney dysfunction, hearing loss, allergy to mercury, and other adverse effects including periodontal disease, inflammation, idiopathic dilated cardiomyopathy, and bone loss.

- FDA's estimation that allergic reaction to mercury is rare is unfounded,

---

[6] Panel meeting transcripts and meeting materials,
http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory
Committee/DentalProductsPanel/ucm235085.htm.

**EXHIBIT A1 - Case No. 1:14-cv-00356**

Page 4 – Mr. Love and Mr. Reeves

- Special controls cannot provide a reasonable assurance of safety for all sectors of the general population,

- Dental amalgam is an implant and must be classified as Class III,

- FDA is required by NEPA to prepare an EIS for dental amalgam,

- The risk assessment for mercury vapor exposure in the final rule issued on August 4, 2009 (74 FR 38686) is inadequate or flawed for numerous reasons including reliance on the Environmental Protection Agency's (EPA) Reference Concentration (RfC) and the Agency for Toxic Substances and Disease Registry's (ATSDR) Minimal Risk Level (MRL) for elemental mercury, failure to quantify the full range of mercury vapor exposure across the entire population in all relevant age groups, failure to identify the proportion of the amalgam-bearing population that exceeds reference exposure levels (RELs), and computational errors concerning absorbed dose and body weight,

- The final rule for dental amalgam is based on an inadequate review of the toxicological literature and fails to identify a methodical analysis of the "weight of the evidence,"

- There are health and environmental benefits of removal of dental amalgam.

## C. DECISION SUMMARY

21 CFR 10.20(c) requires that information referred to or relied upon in a submission is to be included in full and may not be incorporated by reference, unless previously submitted in the same proceeding, and that a copy of an article or other reference or source cited must be included except where the reference or source is a reported Federal court case, a Federal law or regulation, an FDA document that is routinely publicly available, or a recognized medical or scientific textbook that is readily available to the agency. 21 CFR 10.20(c)(6) states that the failure to comply with any of the requirements of 21 CFR 10.20 will result in exclusion from consideration of any portion that fails to comply.

FDA reviewed the references cited in your March 7, 2013 supplement ("your supplement") to your September 3, 2009 petition because copies of the references were included as exhibits. Your original petition, dated September 3, 2009, and filed on September 9, 2009, however, did not contain any exhibits for FDA to consider but referenced numerous studies as support for your claims.   Accordingly, FDA did not affirmatively review these references to those studies for the specific purpose of responding to this petition. Additionally, we did not consider the summaries of study conclusions in your petition where you did not provide the underlying studies as exhibits because, without the exhibits, FDA could not independently assess the merits of the studies. We note, however, that FDA did review and consider many of the references in your petition when it addressed similar issues in promulgating its August 4, 2009 final rule[7] (referred to throughout this response as the "final rule," "rule," or "rulemaking") which classified dental amalgam into class II and established special controls

---

[7] 74 FR 38686.

to provide a reasonable assurance of its safety and effectiveness. Additionally, although FDA was not required to consider the information submitted with your previous July 25, 2009 petition in issuing this response, FDA took that information into account when responding to your requests in this petition. Moreover, in our response issued today to your July 25, 2009 citizen petition, we provided a comprehensive summary of our analysis of the additional scientific literature that you submitted as exhibits with that petition.

In the Statement of Grounds for your petition, you assert that there are "several obvious flaws" in FDA's final rule. To the extent that these assertions about flaws in the final rule relate to your requested actions or to other issues raised in the petition, we respond to these in the associated sections below.

After careful consideration of your petition and the information submitted with it, at this time, we are denying your requests for the reasons stated below. Even so, FDA continues to evaluate the safety of dental amalgam and will take any further actions that are warranted.

### 1. Request to Ban the Use of Dental Amalgam as a Dental Restorative Material

In your petition, you request that FDA ban the use of encapsulated mercury fillings (dental amalgam). Your petition claims that exposure to mercury from dental amalgam is harmful and is a likely cause of various health effects such as Alzheimer's disease, severe autism, multiple sclerosis (MS), amyotrophic lateral sclerosis (ALS), and Parkinson's disease, and also causes kidney dysfunction, hearing loss, allergy to mercury, and periodontal disease, and other adverse health effects including inflammation, bone loss, and idiopathic dilated cardiomyopathy (IDCM). FDA disagrees with your request and does not find your claims to be supported by the weight of currently available data and information. The Federal Food, Drug, and Cosmetic Act (the "FD&C Act" or the "Act") authorizes FDA to ban a device only where, on the basis of all available data and information, FDA finds that the device "presents substantial deception or an unreasonable and substantial risk of illness or injury." *See* Section 516(a)(1) of FD&C Act, 21 U.S.C. 360f(a)(1); 21 CFR 895.21(a). FDA finds that the information you submitted, as well as other information that we have reviewed, does not support a finding that dental amalgam presents a substantial deception or an unreasonable and substantial risk of illness or injury. For the most part, the additional scientific references you cite in your petition provide similar information to the information on which FDA relied for its final rule in which it determined that dental amalgam should be in Class II and thus not banned. Currently available data and information, as well as several comprehensive reviews of the scientific literature, safety reviews, air monitoring standards for mercury vapor, biological monitoring standards for urinary mercury, and clinical studies, have not found an association between exposures to mercury vapor from dental amalgam and mercury-associated adverse health effects that would support a ban of dental amalgam. FDA's comments on your claims of unreasonable and substantial risk of illness or injury stemming from the use of dental amalgam follow.

### a. Mercury Vapor Released from Dental Amalgam

Your petition claims that mercury is released from dental amalgam at levels that are not safe. To the extent that your petition, as originally filed, references studies to support this claim,

Page 6 – Mr. Love and Mr. Reeves

you did not provide the studies as exhibits for FDA to review. Your supplement included the following exhibits to support your claim that mercury vapor released from dental amalgam is unsafe: Babina et al. (Ex. 17) and Takahashi et al. (2012) (Ex. 14). FDA has reviewed these exhibits and finds that they do not provide new information for FDA to consider. Babina et al. (Ex. 17) is an unpublished report that you claim shows that ingestion of elemental mercury vapor from dental amalgam is a significant health concern. This report provides limited information because it is based on mathematical modeling and fails to account for clinically relevant parameters such as the poor absorption of elemental mercury through the gastrointestinal tract. Takahashi et al. (2012) (Ex. 14) is cited to support a claim that mercury from dental amalgam can affect gene expression. This study was conducted in rats and provides no directly relevant information with regards to whether this finding is applicable to human exposures to mercury from dental amalgam.

Your claim that mercury vapor released from dental amalgam is unsafe was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Friberg et al. (1992) (Ex. 92), Kudsk (1965) (Ex. 2), Richardson (2003) (Ex. 30), Richardson (1998) (Ex. 95), Abraham et al. (1984) (Ex. 23), Svare et al. (1981) (Ex. 24), Snapp et al. (1981) (Ex. 28), Li et al. (2009), Dispersalloy® Material Safety Data Sheet (Ex. 58), Schubert (1978) (Ex. 86), and Haley (2006) (Ex. 87). FDA has reviewed these exhibits and finds that, to the extent they are relevant to this issue, they are similar to information FDA reviewed[8] at the time of its rulemaking and they do not provide any new information for FDA to consider. FDA agrees with your claim that some mercury vapor is released from dental amalgam but disagrees with your claim that this exposure presents a substantial and unreasonable risk of illness or injury that would support a ban of dental amalgam. You assert that FDA has ignored the research of many top scientists and you quote Dr. Lars Friberg as stating his opinion that "mercury from dental amalgam is not safe to use for anyone," and you reference Friberg, et. al. (1992) (Ex. 92). This exhibit, however, is not a scientific study but rather a summary of a conference proceeding. Therefore, it contains no new scientific information for FDA to evaluate. You cite Abraham et al. (1984) (Ex. 23) and Svare et al. (1981) (Ex. 24) as establishing that mercury is released from dental amalgam fillings as vapor and enters the bloodstream and exists in expired air. These articles did not contain any new scientific information for FDA to evaluate. FDA reviewed similar information found in the 1993 U.S. Public Health Service (PHS) report[9] on dental amalgam at the time of rulemaking. You reference Kudsk (1965) (Ex. 2) to support your claim that eighty percent of the mercury inhaled into the lungs is absorbed into the bloodstream. This article did not provide any new scientific information for FDA to evaluate. FDA acknowledged the absorption rate of elemental mercury through inhalation in its final rule (74 FR 38687).

Your July 25th petition includes a reference to a Dispersalloy® Material Safety Data Sheet (Ex. 58) from an amalgam manufacturer, Dentsply Caulk, with an original date of September, 20, 1995, and revised on September, 24, 1997. It contains a warning about the use of dental amalgam in certain populations (children, people with kidney disease) and warns against

---

[8] *See*, for example "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/
[9] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.

removal of dental amalgam fillings from pregnant women due to an increased spike in mercury exposure. It reviews the hazards of mercury exposure, in general, from very high exposures. It does not, however, include an exposure assessment of the mercury patients were exposed to from dental amalgam. Therefore, this reference did not provide FDA with any directly relevant scientific information to evaluate. You cite Snapp et al. (1981) (Ex. 28) to support your claim that the majority of mercury in the blood originates from dental amalgam. The findings of Snapp et al. (1981) (Ex. 28) are not consistent with other reports documented in the 1993 PHS report[10] that found moderate blood mercury values in subjects without any amalgam restorations. You cite Schubert (1978) (Ex. 86) and Haley (2006) (Ex. 87) to support your claim that two or more heavy metals act synergistically to enhance the toxicity of mercury. This did not provide any new scientific information for FDA to evaluate, as FDA was aware[11] of this information at the time of rulemaking. Schubert (1978) (Ex. 86) is a study involving rats given two non-lethal doses of mercury and lead. While the study provides some insights into possible synergistic effects between exposures to lead and mercury, the doses of lead and mercury injected into animals are not directly relevant to human exposures to these elements and the endpoint evaluated – death – is not an appropriate endpoint to assess the potential for adverse responses at low doses. The issue of mixtures risk assessment is complex. FDA does not discount the possibility of synergism or additivity when patients are simultaneously exposed to more than one chemical or drug, but the study discussed in the petition is of little value for estimates of risk to patients with amalgam. Specifically, Haley (2006) (Ex. 87) is a memorandum and does not present scientific information for FDA to evaluate. You cite Richardson (2003) (Ex. 30) and Richardson (1998) (Ex. 95) to support your claim that the placement and removal of amalgam restorations results in a release of high levels of mercury vapor. These references did not provide any new information for FDA to evaluate. FDA reviewed similar information[12] at the time of its rulemaking and indeed included the following statement in the "Information for Use" section of the recommended professional labeling for dental amalgam: *"Mercury vapor concentrations are highest immediately after placement and removal of dental amalgam but decline thereafter."*[13]

For the reasons described above, none of the information you submitted regarding mercury vapor released from dental amalgam warrants a ban. FDA acknowledges that dental amalgam releases mercury vapor, notably during placement and removal of dental amalgam (74 FR 38687), but finds these levels do not present a substantial and unreasonable risk of illness or injury to patients. As is discussed in the final rule (74 FR 38689), the PHS reviewed several studies estimating the daily dose of elemental mercury from dental amalgam.[14] In some of the studies, investigators measured the mercury concentration of intraoral and exhaled air in small

---

[10] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993, Appendix III-12.

[11] This concept is commonly known in the field of toxicology.  See, for example, the following reference cited in the final rule: Liu, J. et al., "Toxic effects of metals,"Casarett & Doull's Toxicology: The Basic Science of Poisons, Chapter 23, pp. 931–979, McGraw-Hill Medical, New York,New York, 2008.

[12] See, for example "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/

[13] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm

[14] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.

Page 8 – Mr. Love and Mr. Reeves

populations of individuals with and without amalgams. In these studies, estimates of the daily intake (exposure dose) of mercury from dental amalgams ranged from 1.2-29 µg/day. However, the reliability of these studies is questionable as it is very difficult to make accurate quantitative estimates of mercury release from dental amalgam and the amount absorbed by the body. Problems have been cited with the instruments used to measure mercury vapor in the oral cavity. Questions have also been raised about whether the small size of the oral cavity is appropriate for accurately measuring vapor concentrations, and about how to control for variable factors such as the dilution of vapor with inhaled air within the oral cavity and inhalation/exhalation rates, analytical quality control, and differences in sampling methodology.[15] According to the PHS Report, the best estimates of daily intake of mercury from dental amalgam restorations have come from measurements of mercury in blood among subjects with and without amalgam restorations, and subjects before and after amalgams were removed. Blood mercury levels attributed to dental amalgam were found to range from 0.4 to 1.13 µg/L. PHS concluded that the daily mercury dose is 1-5 µg/day[16] higher in subjects with an average number of amalgam restorations (7-10) than for subjects without amalgam restorations. This range of exposures was confirmed in another report from an analysis of 17 studies,[17] which included many studies evaluated in the 1993 PHS Report. While the exposures in these studies ranged from 1.2-29 µg/day, the average doses in many of the studies were in the 1-5 µg/day range or slightly higher. FDA stated in the final rule (74 FR 38691) that, *"in light of the evidence from air monitoring, biological monitoring, and clinical studies, FDA concludes that exposures to mercury vapor from dental amalgam are not associated with adverse health effects in the population age six and older."*

In summary, FDA finds that the information you have provided regarding your claim that mercury vapor released from dental amalgam is unsafe and results in adverse health effects does not support the conclusion that dental amalgam presents a substantial and unreasonable risk of illness or injury that would justify a ban.

**b. Bioaccumulation of Mercury**

Your petition does not point to the bioaccumulation of mercury as a health risk; however, your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), claims that mercury bioaccumulates in the body and is stored in various tissues and that this accumulation eventually leads to adverse health effects. You submitted the following exhibits with your July 25, 2009 petition to support your claim: Clarkson (1988) (Ex. 5), Skare (1992) (Ex. 74), Nylander (1987) (Ex. 75), Eggleston et al. (1987) (Ex. 7, 125), and Hahn (1990) (Ex. 54). FDA has reviewed these exhibits and finds that they are similar to information FDA

---

[15] World Health Organization, "Inorganic Mercury," Environmental Health Criteria Document 118, Geneva, Switzerland, 1991.

[16] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993, Appendix III, page 29.

[17] See "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/ and Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.

Page 9 – Mr. Love and Mr. Reeves

reviewed[18] at the time of rulemaking. They do not provide any new scientific information for FDA to evaluate. FDA agrees with your claim that mercury bioaccumulates in certain tissues of the body but disagrees that the accumulation from dental amalgam causes adverse health effects that would support a ban on these devices. Clarkson (1988) (Ex. 5), Skare (1992) (Ex. 74), and Nylander (1987) (Ex. 75) did not provide any new scientific information for FDA to evaluate. This information is similar to comments found in docket FDA-2008-N-0163 and other information[19] which FDA considered and relied on for its rulemaking. Eggleston et al. (1987) (Ex. 7, 125), which provided information regarding a correlation between the number of amalgam fillings and mercury in cadaver brains, also did not provide any new scientific information for FDA to evaluate. FDA considered similar information as a comment to docket FDA-2008-N-0163[20] at the time of the 2009 rulemaking. Hahn (1990) (Ex. 54) is a study of mercury distribution in primates that received dental amalgam fillings. This study confirms mercury distribution patterns that were found in other studies on sheep,[21] but provides no new scientific information for FDA to evaluate.

For the reasons described above, none of the information you submitted with your July 25, 2009 petition regarding bioaccumulation of mercury warrants a ban. FDA acknowledged mercury bioaccumulation in the preamble to the final rule, stating that mercury bioaccumulates in the kidneys, brain, and fetus[22] (74 FR 38690) and that the kidneys accumulate the highest organ concentration of mercury (as $Hg^{2+}$) following exposure to mercury vapor. The concentration of mercury in the kidneys has been associated with the number of dental amalgams placed.[23] Despite mercury accumulation in the kidneys, FDA's review of the literature in the final rule did not find adverse health effects associated with bioaccumulation of mercury from dental amalgam. In the preamble to the final rule (74 FR 38691), FDA stated that two prospective trials of amalgam in children aged six and older demonstrated that kidney injury is not associated with exposure to dental amalgam. In the New England trial,[24] groups of children had amalgam or composite restorations placed at ages 6-8 and were followed for 5 years. Results showed that, although microalbuminuria levels were higher in the amalgam treatment group, the levels of three other biomarkers of kidney injury were not different between the amalgam versus composite restoration groups. The

---

[18] See, for example "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/
[19] See, for example, Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.
[20] See, for example, comment FDA-2008-N-0163-0133.1. FDA considered this information prior to issuing the final rule.
[21] "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/
[22] Maas, C. et al., "Study on the significance of mercury accumulation in the brain from dental amalgam fillings through direct mouth-nose-brain transport," Zentralbl. Hyg. Umweltmed, Vol. 198, pp. 275-291, 1996. and U.S. Agency for Toxic Substances and Disease Registry, "ToxFAQs for Mercury," U.S. Department of Health and Human Services, April 1999.
[23] Barregard, L. et al., "Tissue levels of mercury determined in a deceased worker after occupational exposure," International Archives Occupational Environmental Health, Vol. 72, pp. 169-173, 1999 and Maas, C. et al., "Study on the significance of mercury accumulation in the brain from dental amalgam fillings through direct mouth-nose-brain transport," Zentralbl. Hyg. Umweltmed, Vol. 198, pp. 275-291, 1996.
[24] Barregard, L. et al., "Renal Effects of Dental Amalgam in Children: The New England Children's Amalgam Trial," Environmental Health Perspectives, Volume 116, 394-399, 2008.

Page 10 – Mr. Love and Mr. Reeves

authors of the study noted that they were unable to determine whether the increase in microalbuminuria was related to treatment or may have occurred by chance, because albuminuria may be caused by strenuous physical exercise, urinary tract infections, or other conditions with fever, or be related to orthostatic proteinuria. In another prospective trial of children[25] (Casa Pia), groups of children had amalgam or composite restorations placed at ages 6-10 and were followed for 7 years. There were no differences between the amalgam and composite groups with respect to the urinary excretion of microalbumin or albumin, a biomarker of renal glomerular injury, and GST-$\alpha$ and GST-$\pi$, two biomarkers of renal proximal and distal tubule injury, respectively.[26]

With regard to the fetus, FDA in the preamble to the final rule stated that very few well-controlled animal studies or human epidemiological studies have evaluated the potential effect of low-level mercury vapor exposure on fetal development, especially at exposures experienced by dental amalgam bearers. In one retrospective study,[27] no association was found between the number of amalgam fillings in women and low birth weight of their babies. However, there is limited to no clinical information concerning the effects of prenatal exposure from maternal sources of mercury vapor at relevant concentrations. Although the data are limited, FDA concluded when issuing the final rule (74 FR 38691) that *"the existing data do not suggest that fetuses are at risk for adverse health effects due to maternal exposure to mercury vapors from dental amalgam."* Even so, FDA did include the following language in the "Information for Use" section in the recommended professional labeling for dental amalgam: *"The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed."*[28]

With regard to autopsy studies, FDA believes retrospective studies, such as Eggleston et al. (1987), of elevated mercury levels in cadaver brains attributed to the release of dental amalgam mercury are not conclusive in demonstrating causation because it is not possible to determine whether the mercury contributed to the disease versus whether the disease resulted in elevated mercury levels in the brain. In issuing the final rule (74 FR 38702) FDA concluded the following regarding these studies, *"FDA is aware that, in autopsy studies, mercury has been found to accumulate in the brain. However, it is difficult to draw conclusions from autopsy studies regarding a potential association between exposure to dental amalgam and adverse health outcomes without information concerning the individual's lifetime history of exposure to mercury from fish and other environmental sources."*

---

[25] De Rouen, T. et al., "Neurobehavioral Effects of Dental Amalgam in Children, A Randomized Clinical Trial," Journal of the American Medical Association, Vol. 295, 1784-1792, 2006.
[26] Woods, J.S. et al., "Biomarkers of Kidney Integrity in Children and Adolescents with Dental Amalgam Mercury Exposure: Findings from the Casa Pia Children's Amalgam Trial," Environmental Research, Vol. 108, pp. 393-399, 2008.
[27] Hujoel, P.P. et al., "Mercury exposure from dental filling placement during pregnancy and low birth weight risk," American Journal of Epidemiology, Vol. 161(8), pp. 734-740, 2005.
[28] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm

**EXHIBIT A1 - Case No. 1:14-cv-00356**

Page 11 – Mr. Love and Mr. Reeves

In summary, FDA finds that the information you have provided regarding your claim in your July 25, 2009 petition that the accumulation of mercury in the body as a result of the presence of dental amalgam results in adverse health effects does not support the conclusion that dental amalgam presents a substantial and unreasonable risk of illness or injury that would justify a ban.

### c. Risks to Dental Professionals

Your petition claims that occupational exposure to mercury causes adverse health effects in dental personnel. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement included the following exhibit to support your claim that occupational exposure to mercury causes adverse health effects in dental personnel: Duplinsky & Cicchetti (2012) (Ex. 6). FDA has reviewed this exhibit and finds that it does not provide any new scientific information for FDA to evaluate. Duplinsky & Cicchetti (2012) (Ex. 6) is a study of pharmacy utilization data of 600 dentists and infers that the increased use of prescription medications of dental personnel compared to the control is the result of exposure to dental amalgam. It is difficult to draw clinical conclusions from this study because there are many covariables other than dental amalgam that may affect the health of dental personnel, such as occupational exposures to other chemicals, stress, and dietary influences. These were not factored into an assessment of their health status in this study.

Your claim that occupational exposure to mercury causes adverse health effects in dental personnel was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Jones et al. (2007) (Ex. 12), Nixon et al. (1971) (Ex. 14), Cutright et al. (1973) (Ex. 15), Gronka et al. (1970) (Ex. 16), Roydhous et al. (1985) (Ex. 17), Maytyla et al. (1976) (Ex. 18), Gordon et al. (1978) (Ex. 19), Schulein et al.(1984) (Ex. 20), Shapiro et al. (1995) (Ex. 33), Harrison's Principles of Internal Medicine, 14th ed. (Ex. 34), Uzzell et al. (1986) (Ex. 36), Cook et al. (1969) (Ex. 44), Gelbier et al. (1989) (Ex. 45), Shapiro et al. (1982) (Ex. 33), and Nylander (1986) (Ex. 50). FDA has reviewed these exhibits and finds that they are similar to information[29] FDA reviewed at the time of the rulemaking and they do not provide any new scientific information for FDA to evaluate. FDA believes these studies are limited because they are cross-sectional in nature, small in sample size, and lack information on individual exposure to mercury and other neurotoxins in the workplace. Many of the claimed deficits, e.g., neurological symptoms, psychosomatic symptoms, memory loss, concentration difficulties, fatigue, and sleep disturbance are also self-reported, and lack an objective clinical assessment.

For the reasons described above, none of the information you submitted regarding risks to dental professionals warrants a ban. FDA acknowledges that dental professionals may be exposed to mercury vapor in the workplace during the preparation, placement, and removal of dental amalgam, but FDA disagrees with your claim that dental professionals using proper

---

[29] See, for example, Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.

Page 12 – Mr. Love and Mr. Reeves

occupational workplace controls, such as proper handling, vacuum, and ventilation, experience neurobehavioral deficits as a result of exposure to dental amalgam. As noted by the Dental Products Panel prior to the rulemaking, improper use of dental amalgam exposes dental professionals to risks associated with mercury toxicity. Improper storage, trituration, and handling contribute to this risk.[30] Dental professionals, however, are generally exposed to lower levels of mercury vapor than those that have been reported in industrial settings, and they have urinary mercury concentrations approaching those observed in non-occupationally-exposed populations. In the final rule (74 FR 38693), FDA described a study[31] in which 230 dentists (data was pooled from six previous studies) had urinary mercury concentrations ranging from less than 1 µg Hg/L (~ 0.8 µg Hg/g Cr) to greater than 50 µg Hg/L (~ 38 µg Hg/g Cr); 50% subjects had urine concentrations less than 3 µg Hg/L (~ 2 µg Hg/g Cr) and 30% had concentration greater than 20 µg Hg/L (~ 15 µg Hg/g Cr). Dentists were stratified into three urine mercury concentration groups: less than 1 µg Hg/L (~ 0.8 µg Hg/g Cr), 1-20 µg Hg/L (~ 0.8-15 µg Hg/g Cr) and greater than 20 µg Hg/L (~ 15 µg Hg/g Cr). An association of urine mercury concentrations to a hand steadiness test was highly significant; however, associations with motor function tests were not significant. Two other studies[32,33] evaluated 194 dentists (average exposure of 26 years; average amalgam surfaces = 16; urine mercury = 3.32 +/- 4.87 µg/L, [approx.] 2.6 µg/g Cr) and 233 hygienists (average exposure of 15 years; average amalgam surfaces = 12; urine mercury = 1.98 +/- 2.29 µg/L, [approx.] 1.48 µg/g Cr) for neurological effects. Significant correlations with urine mercury concentrations were found on nine measures in dentists and eight measures in hygienists, including visual discrimination, hand steadiness, finger tapping and trail making tests; however, no effects were observed on verbal intelligence and reaction time; however, a weakness of these studies is that a control group of non-mercury-exposed dental professionals was not studied so it is uncertain whether the effects seen are attributable to mercury from dental amalgam. Given the mixed results of the first study (i.e., the results of the hand steadiness test versus the results of motor function tests) and the lack of appropriate controls in the other two studies, FDA finds that these studies do not conclusively support the claim that dental professionals are presented with an unreasonable and substantial risk of illness or injury with respect to mercury exposure from dental amalgam. This finding is also supported by an independent investigation in the European Union (EU) by the Scientific Committee on Emerging and Newly Identified Health (SCENIHR),[34] which stated in 2014 that, *"No clear association has been detected between mercury exposure and negative health effects in dentists, although their mercury blood level is higher than in a control population. The life span of dentists was shown to be three years greater than that for a control non-dentist group. The same type of*

---

[30] Transcript from Meeting of the Food and Drug Administration Dental Products (Advisory) Panel, December 3, 1993, and transcript from Meeting of the Food and Drug Administration Dental Products (Advisory) Panel, June 29, 1994.

[31] Bittner, A.C., et al., "Behavioral effects of low-level exposure to Hg[0] among dental professionals: a cross-study evaluation of psychomotor effects," Neurotoxicology and Teratology, Vol. 20 (4), pp. 429-439, 1998.

[32] Echeverria, D. *et al.,* "Chronic low-level mercury exposure, BDNF polymorphism, and associations with cognitive and motor function," *Neurotoxicology and Teratology,* Vol. 27, pp. 781-796, 2005.

[33] Echeverria, D. *et al.,* "The association between a genetic polymorphism of coproporphyrinogen oxidase, dental mercury exposure and neurobehavioral response in humans," *Neurotoxicology and Teratology,* Vol. 28, pp. 39-48, 2006.

[34] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion Report, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & and Consumers Directorate Protection DG, 2014.

*effect was seen with many other parameters, indicating that the general health of dentists is good (McComb 1997).*[35] When FDA issued the final rule, FDA concluded that, *"existing data indicate that dental professionals are generally not at risk for mercury toxicity except when dental amalgams are improperly used, stored, triturated, or handled."* (74 FR 38693)

Regarding reproductive effects on dental professionals, FDA in the final rule stated that very few available studies have evaluated the effects of elemental mercury exposure on pregnancy outcomes in humans. Although mercury has the ability to cross the placental barrier, the limited human data do not demonstrate an association between exposure to the mercury from dental amalgam and adverse reproductive outcomes such as low birth weight babies or increased rates of miscarriage. In a retrospective study,[36] no strong association or clear dose-response relationship between occupational exposure to chemical agents or restorative materials and the risk of miscarriage was observed. A slight but non-significant increase in risk was found for exposure to some acrylate compounds, mercury amalgam, solvents and disinfectants leading the authors to conclude that they could not rule out the possibility of a slightly increased risk of miscarriage among exposed dental workers. In a study of female factory workers[37] exposed to a median air concentration of 90 µg $Hg/m^3$ (maximum 600 µg/m$^3$), no significant differences in stillborn or miscarriage rates were observed between exposed and unexposed subjects. The mercury vapor concentrations to which these workers were exposed were over an order of magnitude higher than those associated with dental amalgam.

In summary, FDA finds that the information you have provided regarding your claim that dental professionals experience adverse health effects as a result of exposure to mercury vapor from dental amalgam does not support the conclusion that dental amalgam presents a substantial and unreasonable risk of illness or injury that would justify a ban, especially when dental amalgam is properly used, stored, triturated, and handled.

### d. Neurological Effects

Your petition claims that mercury exposure from dental amalgam is associated with "irreversible" neurological effects. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Accordingly, your petition provides no new scientific information for FDA to evaluate regarding this claim.

Your claim that mercury exposure from dental amalgam is associated with irreversible neurological effects was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Sharma et al. (1981) (Ex. 11), Weening et al. (1980) (Ex. 38), Fiskesjo (1970) (Ex. 42), Wedeen (1983) (Ex. 143), Weening et al. (1983) (Ex. 151), Koller (1980) (Ex. 39), Koller

---

[35] McComb D. Occupational exposure to mercury in dentistry and dentist mortality. J Can Dent Assoc 1997; 63:372-76.
[36] Lindbohm, M.L. *et al.,* "Occupational exposure in dentistry and miscarriage,' *Occupational Environmental Medicine,* Vol. 64 (2), pp. 127–133, 2007.
[37] Elghany, N.A. *et al.,* "Occupational exposure to inorganic mercury vapour and reproductive outcomes," *Occupational Medicine,* Vol. 47 (6), pp. 333–336. 1997.

Page 14 – Mr. Love and Mr. Reeves

(1973) (Ex. 40), Koller (1986) (Ex. 41), and Gerstner et al. (1977) (Ex. 43). FDA has reviewed these exhibits and finds that, to the extent they are relevant to this issue, they are similar to information FDA reviewed at the time of rulemaking. FDA reviewed similar information in the 1993 PHS report,[38] the 1997 Update report,[39] and in the White Paper and Addendum on dental amalgam[40] at the time of rulemaking. Sharma et al. (1981) (Ex. 11), Weening et al. (1980) (Ex. 38), and Fiskesjo (1970) (Ex. 42) are in vitro studies that provide information about mechanisms of mercury-induced cell injury, but do not provide any information on how their results might relate to mercury exposure from dental amalgam. Weening et al. (1983) (Ex. 151) is a single paragraph reference that indicates that mercury can exacerbate immune reactions in some subjects, which FDA acknowledges (74 FR 38693); however, the article offers little information on how to assess this health risk in dental amalgam patients. Koller (1980) (Ex. 39) discusses that mercury is immunotoxic in animal studies, but does not, however, discuss how these data are relevant to patient exposures to mercury from dental amalgam. Wedeen (1983) (Ex. 143) is a review article that provides a general, brief review of the nephrotoxicity of three metals – lead, cadmium, and mercury. For mercury, the article does not attempt to put mercury nephrotoxicity into the context of clinically relevant exposures to mercury from dental amalgam. Thus, the review provides no new information to FDA to consider. Koller (1973) (Ex. 40) is an article regarding an animal study of chronic exposure of $HgCl_2$ in drinking water. This study is not directly relevant to mercury exposure from dental amalgam because the mercury type studied, inorganic ionic mercury ($Hg^{2+}$), is not the type of mercury in dental amalgam (elemental mercury vapor, $Hg^0$), exhibits different toxicokinetic behavior than mercury vapor, and the exposure route is not clinically relevant (oral exposure via drinking water). It is also not clear how to extrapolate patient exposure to mercury from dental amalgam using the data presented in this study. Koller (1986) (Ex. 41) is irrelevant as it is a study involving selenium. It does not provide any information on mercury exposure from dental amalgam. Gerstner et al. (1977) (Ex. 43) is a journal review article regarding mercury metabolism and toxicology. It does not provide any additional information on adverse health effects from mercury in dental amalgam. While FDA acknowledges that mercury exposure at high levels can result in adverse health effects to the neurological system, the agency finds that the information you have provided does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

For the reasons described above, none of the information you submitted with your July 25 petition regarding neurological effects warrants a ban. FDA acknowledged in the final rule (74 FR 38687) that mercury toxicity has been demonstrated in a variety of organ systems in laboratory studies and that the central nervous system (CNS) and the kidneys are both target

---

[38] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.
[39] Dental Amalgam and Alternative Restorative Materials: An Update Report to the Environmental Health Policy Committee, U.S. Department of Health and Human Services, Public Health Service, September 1997.
[40] FDA's draft White Paper is available at
http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/ucm171117.htm. The Addendum to FDA's Draft White Paper is available at
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf.

organs sensitive to mercury vapor.[41] FDA further stated in the final rule (74 FR 38700), *"FDA recognizes that dental amalgam releases low levels of mercury, and that there are scientific data showing mercury vapor, at high enough exposures, to be a neurotoxicant and nephrotoxicant."* However, studies have shown a lack of association between amalgam exposure and neuropsychological and neurobehavioral deficits. In a retrospective study[42] of 550 adults, no significant associations between neuropsychological function and indices of cumulative amalgam exposure over many years were found. In a report[43] evaluating 1,127 men, no effects on tremor, coordination, gait, strength, sensation, muscle stretch, or peripheral neuropathy were associated with amalgam exposure. Based on the weight of the available evidence, FDA concluded (74 FR 38694) and continues to hold the view that exposures to mercury vapor from dental amalgam do not put individuals age six and older at risk for mercury-associated adverse health effects.

In summary, FDA finds that the information you have provided regarding your claim that mercury exposure from dental amalgam has toxic effects on the neurological system does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### e. Reproductive Effects

Your petition claims that exposure to mercury from dental amalgam fillings can affect male fertility. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement included the following exhibit to support your claim of male reproductive effects from the use of dental amalgam: Podzimek et al. (2005) (Ex. 15). FDA has reviewed this exhibit and finds that it does not provide any new scientific information for FDA to evaluate. Podzimek et al. (2005) (Ex. 15) is a study that shows the production of antisperm antibodies in lymphocyte supernatants exposed to mercury ions. This study is an *in vitro* study, which provides limited information from which to draw clinical conclusions. Additionally, FDA previously reviewed this information in several comments to docket FDA-2008-N-0163 at the time of rulemaking. The final rule did not explicitly address the issue of male reproductive effects. However, the 2014 SCENIHR[44] report found no association between the use of dental amalgam and infertility. The SCENIHR report concluded that *"there is very little data available on this subject. There is no evidence of any association between amalgam restorations and either male or female fertility or obstetric parameters. One study[45] that attempted to examine the question of fertility in detail failed to show any correlation between the mercury burden from amalgam restorations and male fertility disorders."*

---

[41] Liu, J. et al., "Toxic effects of metals," Casarett & Doull's Toxicology: The Basic Science of Poisons, Chapter 23, pp. 931–979, McGraw-Hill Medical, New York, New York, 2008.

[42] Factor-Litvak, P. et al., "Mercury derived from dental amalgams and neuropsychologic function," Environmental Health Perspectives, Vol. 111, pp. 719-723, 2003.

[43] Kingman, A. et al., "Amalgam exposure and neurological function," Neurotoxicology, Vol. 26, pp. 241-255, 2005.

[44] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users——Preliminary Opinion Report, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & and Consumers Directorate Protection DG, 2014.

[45] Hanf V, et al., Mercury in urine and ejaculate in husbands of barren couples. Toxicol Lett 1996; 88:227-31.

In summary, FDA finds that the information you have provided regarding your claim that mercury from dental amalgam fillings can affect male fertility does not support the conclusion that dental amalgam presents a substantial and unreasonable risk of illness or injury that would justify a ban.

### f.  Risks to Developing Fetuses and Infants

Your petition claims that exposure to mercury from maternal dental amalgam fillings places developing fetuses and infants at risk.  To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review.  Your supplement included the following exhibit to support your claim of risks to infants from the use of dental amalgam: Norouzi et al. (2011) (Ex. 16).  FDA has reviewed this exhibit and finds that it does not provide any new scientific information for FDA to evaluate.  Norouzi et al. (2011) (Ex. 16) is a study that finds a positive correlation between mercury levels in breast milk and the number of amalgam fillings of the mother.  You claim that the study results suggest that the presence of mercury in breast milk poses a threat to the health of breastfeeding infants.  FDA disagrees with this claim.  In the final rule (74 FR 38692), FDA considered the potential health effects of dental amalgam on breastfed infants.  FDA acknowledged that mercury present in a nursing mother's body is transmitted to her infant through breast milk.[46]  Several studies reviewed in the 2004 Life Sciences Research Office Report (LSRO)[47] evaluated concentrations of total mercury in breast milk.  In some of the reviewed studies the number of amalgams correlated with the concentration of total mercury in breast milk.[48]  However, the LSRO report concluded from its review that inorganic mercury absorption through breast milk is not a significant source of mercury exposure to infants.  One study[49] determined the concentration of ionic mercury ($Hg^{2+}$) in human breast milk attributable to dental amalgam. In this study, the concentration of mercury in subjects with dental amalgam restorations was subtracted from the level in subjects without dental amalgam restorations. The level of mercury attributable to amalgam was 0.09 µg Hg/L. A standard value used in risk assessment for daily breast milk consumption is 0.85 L/day (74 FR 38692). Based on this value, the typical daily dose of inorganic mercury from breastfeeding in an individual with dental amalgam restorations would be 0.075 µg Hg/day. For a 5 kg infant,

---

[46] Maternal exposure to elemental mercury vapor is expected to affect the concentration of inorganic mercury in breast milk. The EPA has set a Reference Dose (RfD) for oral exposure to inorganic mercury at 0.3 µg Hg/kg/day. (United States Environmental Protection Agency (EPA), "Integrated Risk Information System (IRIS) Screening-Level literature Review" – Mercuric chloride, 2002).  This value represents the daily exposure to inorganic mercury that is likely to be without an appreciable risk of deleterious health effects during a lifetime. Reference values are derived to be protective against adverse health effects in sensitive subpopulations, such as developing fetuses and children.

[47] Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.

[48] Drexler, H. et al., "The mercury concentration in breast milk resulting from amalgam fillings and dietary habits," Environmental Research, Vol. 77, pp. 124-129, 1998. Drasch, G. et al., "Mercury in human colostrum and early breast milk. Its dependence on dental amalgam and other factors," J. Trace Elem. Med. Biol., Vol.12, pp. 23-27, 1998. Oskarsson A. et al., "Total and inorganic mercury in breast milk in relation to fish consumption and amalgam in lactating women," Archives of Environmental Health, Vol. 51 (3), pp. 234-241, 1996.

[49] Vimy M.J. et al., "Mercury from maternal "silver" tooth fillings in sheep and human breast milk: A source of neonatal exposure," Biol. Trace Elem. Res., Vol. 56 (2), pp.143-152, 1997.

the daily exposure to inorganic mercury from breastfeeding would be 0.015 µg Hg/kg/day. The estimated concentration of mercury in breast milk attributable to dental amalgam exposure is low and is an order of magnitude below the EPA RfD, a health-based exposure reference value for oral exposure to inorganic, ionic mercury established to protect the health of adults and children. Therefore, FDA concludes that the existing data do not support a finding that infants are at risk for adverse health effects from the breast milk of women exposed to mercury vapors from dental amalgam.

Your claim that mercury from maternal dental amalgam fillings places developing fetuses and infants at risk was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Palkovicaova (2008) (Ex. 8), Centers for Disease Control and Prevention (CDC) Morbidity and Mortality Weekly Report (MMWR) Blood Mercury Levels in Young Children and Childbearing-Aged Women (2004) (Ex. 21), and U.S. EPA Mercury Health Effects Update, Final Report (1984) (Ex. 142). FDA has reviewed these exhibits and finds that they are similar to information FDA reviewed[50] at the time of rulemaking and they do not provide any new scientific information for FDA to evaluate. Palkovicaova (2008) (Ex. 8) is a study of 99 mother-child pairs that found a positive correlation between maternal mercury levels and cord blood mercury levels. This study provides limited information because of its small sample size, because no mercury speciation was done, and because patients self-reported information about their fillings. You reference CDC MMWR Blood Mercury Levels in Young Children and Childbearing-Aged Women (2004) (Ex. 21) to support the claim that one in twelve women have elevated blood mercury levels. This information is inconclusive because it is not possible to attribute this finding to mercury released from dental amalgam alone as opposed to other sources of mercury, such as from occupational or dietary exposures. You reference the U.S. EPA Mercury Health Effects Update, Final Report (1984) (Ex. 142) to claim that the EPA states that "*Women chronically exposed to mercury vapor experience increased frequency of menstrual disturbances and spontaneous abortions; also a high mortality rate was observed among infants born to women who displayed symptoms of mercury poisoning.*" However, the quote that your petition attributes to EPA is not in the EPA report. EPA summarized the literature on the effects of mercury vapor on human health and stated, "A number of case reports have also related exposure to mercury vapor with menstrual disturbances and spontaneous abortions (Baranski and Szymczyk. 1973; Derobert and Tara. 1950)." These studies are of older dental offices with very high air mercury concentrations. FDA does not believe these air mercury concentrations would be found in offices today because amalgam is now encapsulated and proper amalgam handling (mercury hygiene) techniques significantly minimize mercury exposure. Also, the EPA report does not discuss your claim that "*a high mortality rate was observed among infants born to women who displayed symptoms of mercury poisoning.*" As such, your petition's references to EPA's 1984 report as the source of these claims appear to be misplaced.

FDA concluded in the final rule (74 FR 38691) that very few well-controlled animal studies or human epidemiological studies have evaluated the potential effect of low-level mercury vapor exposure on fetal development, especially at exposures experienced by dental amalgam

---

[50] See, for example "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/.

Page 18 – Mr. Love and Mr. Reeves

bearers. In one retrospective study,[51] no association was found between the number of amalgam fillings in women and low birth weight of their babies. However, there is limited to no clinical information concerning the effects of prenatal exposure from maternal sources of mercury vapor at relevant concentrations. Although the data are limited, FDA concluded that the existing data do not suggest that fetuses are at risk for adverse health effects due to maternal exposure to mercury vapors from dental amalgam. Even so, FDA did include the following language in the "Information for Use" section in the recommended professional labeling for dental amalgam: *"The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed."[52]*

In summary, FDA finds that the information you have provided regarding your claim that developing fetuses and infants are at risk from maternal dental amalgam fillings does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### g. Gender Differences and Genetic Polymorphisms

Your petition claims that there are gender differences in mercury pharmacokinetics and that studies have shown an association between mercury exposure and neurobehavioral performance in boys with a coproporphyrinogen oxidase (CPOX4) genetic variant. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement included the following exhibit to support your claim of gender and genetic differences: Woods et al. (2012) (Ex. 1). Woods et al. (2012) (Ex. 1) is an analysis of the data from the Casa Pia[53] cohort of the Children's Amalgam Trial (CAT) and finds certain deficits in neurobehavioral functions associated with chronic mercury exposure and the CPOX4 genetic variant among children, especially boys. FDA has reviewed this exhibit and finds that the study was well-conducted and provides evidence that individuals with certain genetic polymorphisms may be at a higher risk for adverse health effects due to mercury from dental amalgam. FDA does not believe, however, that the evidence you have provided and the evidence it has evaluated demonstrate an unreasonable and substantial risk of illness or injury that would justify a ban of dental amalgam. The agency agrees with the 2014 SCENIHR report,[54] which examined Woods et al. (2012) (Ex. 1) and concluded that further research on this issue is needed. The report stated: *"The studies presented above seem to indicate that genetic variation may have an influence also on responses to mercury-induced toxicity. In this case, calculated exposure limits will protect the average subject, but may be insufficient to protect*

---

[51] Hujoel, P.P. et al., "Mercury exposure from dental filling placement during pregnancy and low birth weight risk," American Journal of Epidemiology, Vol. 161(8), pp. 734-740, 2005.

[52] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm

[53] De Rouen, T. et al., "Neurobehavioral Effects of Dental Amalgam in Children, A Randomized Clinical Trial," Journal of the American Medical Association, Vol. 295, 1784-1792, 2006.

[54] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & Consumers Directorate, 2014.

*those with genetic polymorphism to relevant enzymes involved in the toxicodynamics of mercury. However, no prospective clinical studies clearly showing the influence of genetic variations on the occurrence of adverse effects due to mercury from dental amalgam are available. Therefore, especially in this area further research is needed before clinical conclusions could be drawn."* The agency agrees that further information is needed, however, it will continue to consider this information and any other information that becomes available to determine whether any further action is warranted. Regarding the effects of gender differences, your petition acknowledges that "the available data, however, are limited and inadequate to reliably quantify gender-related differences in toxicity."

You also claimed in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), that individuals with genetic polymorphisms, such as CPOX4 or apolipoprotein E4, are more susceptible to the harmful effects of mercury exposure. You submitted Wojcik et al. (2006) (Ex. 104) to support your claim. Wojcik et al. (Ex. 104) is a study of patients that attributes chronic fatigue, memory impairment, and depression as symptoms of mercury toxicity and concludes that patients with a genetic polymorphism (apolipoprotein E-4) are more susceptible to mercury toxicity. FDA considered this reference in the FDA White Paper and Addendum[55] prior to the rulemaking and found that, because symptom improvement was only seen in groups with combined amalgam removal and substantial concomitant therapy, which was not well defined, it is not possible to determine if mercury exposure from amalgam was the source of symptoms. The apolipoprotein E4 findings are clearly suggestive of an association with specific clinical entities, but their relationship to mercury exposure remains unclear.

In summary, FDA finds that, at this time, the information you have provided regarding your claim that boys or individuals with genetic polymorphisms are especially at risk from mercury exposure from dental amalgam is limited and does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

**h.  Alzheimer's Disease**

Your petition claims that mercury exposure is associated with Alzheimer's disease. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement included the following exhibit to support your claim of an association between mercury exposure and Alzheimer's disease: Mutter et al. (2010) (Ex. 8). FDA has reviewed this exhibit and finds that it does not provide any new scientific information for FDA to evaluate. Mutter et al. (2010) (Ex. 8) is a literature review that examined the relationship between inorganic mercury and Alzheimer's disease. This literature review is inconclusive. The authors themselves acknowledge that although animal and *in vitro* studies strongly suggest inorganic mercury has

---

[55] FDA Update/Review of Potential Adverse Health Risks Associated with Exposure to Mercury in Dental Amalgam, National Center for Toxicological Research, Food and Drug Administration, August 2006; Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf

Page 20 – Mr. Love and Mr. Reeves

effects on the nervous system, clinical and epidemiological studies fail to find an association between dental amalgam use and adverse neurological effects.

Your claim that mercury from dental amalgam is associated with Alzheimer's disease was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Moscavitch et al. (2009) (Ex. 97), Ehmann et al. (1986) (Ex. 59), Thompson et al. (1988) (Ex. 60), Vance et al. (1988) (Ex. 61), Wenstrup et al. (1990) (Ex. 62), Duhr et al. (1991) (Ex. 98),[56] Mutter et al. (2001) (Ex. 150),[57] Olivieri et al. (2002) (Ex. 103), Pendergrass et al. (1995) (Ex. 104),[58] David et al. (1997) (Ex. 108), Duhr et al. (1993) (Ex. 148), and Gerhardsson et al. (Ex. 124). FDA has reviewed these exhibits and finds that, to the extent that they are relevant to this issue, they are similar to information FDA reviewed[59] at the time of the rulemaking and they do not provide any new scientific information for FDA to evaluate. Moscavitch et al. (2009) is a journal review article regarding the interrelationship between the olfactory and immune systems and the occurrence of neurological diseases. This review has limited value to understanding the risks from amalgam exposure because it focuses on possible links between smell perception, auto-immune diseases, and neurological diseases but does not discuss mercury exposure. Gerhardsson et al. discusses elevated blood mercury levels in Alzheimer's patients, but the results are inconclusive, as the stated conclusion is that there was no consistent metal pattern in plasma or cerebrospinal fluid (CSF) for patients with Alzheimer's disease. Ehmann et al., Thompson et al., Vance et al., and Wenstrup et al. show differences in some trace element brain concentrations, including mercury, between Alzheimer's patients and control patients; however, it is difficult to determine from the results whether the disease caused the imbalance of the trace elements or vice versa. The study authors conclude that this is an open question and that these results are not conclusive in demonstrating causation. Duhr et al. (1993) and Pendergrass et al. (1995) are well-conducted mechanistic studies of how certain mercury complexes interfere with brain microtubule formation; however, the studies do not demonstrate a relationship of these findings to patient exposure to mercury from dental amalgam. Pendergrass et al. (1995) provides evidence that the brain microtubule effects seen in rats exposed to high doses of mercury vapor are similar to changes observed in cadaver brains of Alzheimer's disease patients. This exhibit does not provide any new scientific information for FDA to evaluate because FDA evaluated a similar study[60] in the White Paper and Addendum. Olivieri et al. (2002) is an in vitro mechanistic study showing that ionic forms of mercury ($HgCl^{2+}$) and cobalt can produce reactive oxidative species (which can cause cell injury) and beta-amyloid (deposits associated with neurodegeneration in diseases like Alzheimer's disease) in neuronal cells in culture. The study is of limited scientific value for assessing health risks of dental amalgam because it used an ionic form of mercury, did not indicate whether clinically relevant levels of mercury were used, and the biological processes

---

[56] Duhr et al. 1991 is a misprint. This should be Duhr et al. 1993.

[57] Although Footnote 107 of the petition identifies Mutter et al. 2001 as a scientific reference at Exhibit 150, the exhibit itself appears to contain a letter about mercury in water to a metropolitan sewer agency.

[58] Pendergrass is Ex. 105 in the docket, not 104.

[59] See, for example, Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.

[60] Pendergrass JC, Haley BE, Vimy MJ, Winfield SA, Lorscheider FL. Mercury vapor inhalation inhibits binding of GTP to tubulin in rat brain: similarity to a molecular lesion in Alzheimer diseased brain. *Neurotoxicology* 1997; 18(2):315-24.

present in vivo were not represented because it was an *in vitro* study about cellular interactions with mercury. David et al. is a study of autopsied brains of Alzheimer's patients showing aberrant metabolic enzyme activity and key structural proteins compared to non-Alzheimer's patients. This study is not relevant because there is no evaluation of mercury exposure and no causal link between dental amalgam and Alzheimer's disease. Accordingly, FDA does not believe the information you have provided supports your claim that mercury exposure from dental amalgam is linked to Alzheimer's disease.

For the reasons given above, none of the information you submitted regarding Alzheimer's disease warrants a ban. Prior to issuing the final rule, FDA completed a comprehensive review of the scientific literature. FDA's findings, based on the weight of the available scientific evidence, are summarized in its White Paper and Addendum from July, 2009.[61] Included in that review were several studies relevant to the issue of dental amalgam's connection to Alzheimer's disease. For example, in a retrospective study of 550 adults, no significant associations between neuropsychological function and indices of cumulative amalgam exposure over many years were found.[62] Also, in a report evaluating 1,127 men,[63] no effects on tremor, coordination, gait, strength, sensation, muscle stretch, or peripheral neuropathy were associated with amalgam exposure. In a study of aging and Alzheimer's disease evaluating 129 Catholic nuns, aged 75-102, no effect of dental amalgam number and surfaces was observed for eight tests of cognitive function.[64] In a study conducted by the same investigators, regional brain levels of mercury were determined at autopsy in the nuns and other subjects with Alzheimer's disease and compared to cognitive and neurological normal controls.[65] No significant association was observed between Alzheimer's disease and the number of amalgams or the duration after placement, and no differences were observed in brain mercury levels between the Alzheimer's disease and control groups.[66] In another study, the mean number of dental amalgam surfaces and urinary mercury concentrations for Alzheimer's disease patients were not different from those of control patients.[67] These findings do not support the hypothesis that mercury from dental amalgam plays a role in the pathogenesis of Alzheimer's disease. Therefore, FDA concluded in the final rule that the existing data support a finding that exposures to mercury vapor at levels associated with dental amalgams do not result in neurological deficits, tremors, peripheral neuropathies, or

---

[61] FDA Update/Review of Potential Adverse Health Risks Associated with Exposure to Mercury in Dental Amalgam, National Center for Toxicological Research, Food and Drug Administration, August 2006; Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf

[62] Factor-Litvak, P. *et al.,* "Mercury derived from dental amalgams and neuropsychologic function," *Environmental Health Perspectives,* Vol. 111, pp. 719-723, 2003. (74 FR 38686, 38690).

[63] Kingman, A. *et al.,* "Amalgam exposure and neurological function," *Neurotoxicology,* Vol. 26, pp. 241-255, 2005. (74 FR 38686, 38690).

[64] Saxe S.R. et al., "Dental Amalgam and cognitive function in older women: findings from the Nun Study." *Journal of the American Dental Association,* Vol. 126, pp. 1495-1501, 1995.

[65] Saxe S.R. *et al.,* "Alzheimer's disease, dental amalgam, and mercury," *Journal of the American Dental Association,* Vol. 130, pp. 191-199, 1999. (74 FR 38686, 38690).

[66] FDA acknowledges that your July 25th petition disputes the findings of this study; FDA addresses this issue in Section 4.a.i. of the July 25th petition response.

[67] Fung F. *et al.,* "Neurotoxicity of mercury in dental amalgam," *Journal of the American Medical Association,* Vol. 296 (12), pp. 1462-1463, 2006. (74 FR 38686, 38690).

**EXHIBIT A1 - Case No. 1:14-cv-00356**

Page 22 – Mr. Love and Mr. Reeves

Alzheimer's disease in the population age six and older. FDA's finding is consistent with the Life Sciences Research Office (LSRO) report[68] that concludes, *"Studies in the area of neuropsychological function were primarily negative or reported conflicting findings. Some raised concerns regarding experimental control of relevant confounding variables. In total, these studies failed to support the hypothesis that $Hg^0$ exposure, at the levels released by dental amalgam, interferes with human neuropsychological function or acts as an etiologic factor for the neurodegenerative diseases - Parkinson's disease and Alzheimer's disease."* More recently, the latest SCENIHR report[69] has confirmed these findings. The 2014 SCENIHR report states, *"Several studies have explored the possible association of mercury derived from dental amalgam with a variety of adverse effects, particularly neurological and psychological or psychiatric diseases, including Alzheimer's disease, Parkinson's disease, and multiple sclerosis as well as kidney diseases. The causality evidence for such effects due to dental amalgam is weak because of contradictory reports and major challenges in exposure assessment, which is generally expressed as total mercury in body fluids (mainly urine), without differentiating between organic vs. inorganic forms as well as between sources (dietary vs. dental amalgam or others)."*

In summary, FDA finds that the information you have provided regarding your claim that mercury exposure from dental amalgam is associated with Alzheimer's disease does not support the conclusion that dental amalgam presents a substantial and unreasonable risk of illness or injury that would justify a ban.

### i.  Parkinson's Disease

Your petition claims that mercury exposure from dental amalgam is associated with neurological diseases such as Parkinson's disease. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Accordingly, your petition provides no new scientific information for FDA to evaluate regarding this claim.

Your claim that mercury exposure from dental amalgam is associated with Parkinson's disease was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibit to support your claim: Ngim (1989) (Ex. 55). FDA has reviewed this exhibit and finds that it is similar to information FDA reviewed[70] at the time of rulemaking and does not provide any new scientific information for FDA to evaluate.

For this reason, none of the information you submitted regarding Parkinson's disease warrants a ban. As is stated in the final rule, there are few studies that evaluate a link between

---

[68] Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.
[69] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & Consumers Directorate, 2014.
[70] See, for example, Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.

dental amalgam and Parkinson's disease. In general, data on this disease are combined with other various neurological or neurodegenerative diseases, such as Alzheimer's disease, multiple sclerosis, amyotrophic lateral sclerosis, and autism. In general, these studies are inconclusive because the findings are limited by a number of concerns. Most importantly, mercury speciation was not done in the studies, as biologic measurements were captured as total mercury exposure from all sources rather than just from dental amalgam. Many are single studies with small sample sizes, were comparisons on the same cohort, or only studied subjects who had an adverse health effect. FDA concluded in the final rule (74 FR 38690) that the existing data do not support a finding that exposures to mercury vapor at levels associated with dental amalgams result in neurological deficits, tremors, peripheral neuropathies, or Alzheimer's disease in the population age six and older. As is stated above, FDA's finding is consistent with the LSRO report[71] that concludes, *"Studies in the area of neuropsychological function were primarily negative or reported conflicting findings. Some raised concerns regarding experimental control of relevant confounding variables. In total, these studies failed to support the hypothesis that $Hg^0$ exposure, at the levels released by dental amalgam, interferes with human neuropsychological function or acts as an etiologic factor for the neurodegenerative diseases - Parkinson's disease and Alzheimer's disease."* Also, the latest SCENIHR report[72] confirms these findings and states, *"Several studies have explored the possible association of mercury derived from dental amalgam with a variety of adverse effects, particularly neurological and psychological or psychiatric diseases, including Alzheimer's disease, Parkinson's disease, and multiple sclerosis as well as kidney diseases. The causality evidence for such effects due to dental amalgam is weak because of contradictory reports and major challenges in exposure assessment, which is generally expressed as total mercury in body fluids (mainly urine), without differentiating between organic vs. inorganic forms as well as between sources (dietary vs. dental amalgam or others)."*

In summary, FDA finds that the information you have provided regarding your claim that mercury exposure from dental amalgam is associated with Parkinson's disease does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### j. Multiple Sclerosis (MS)

Your petition claims that mercury exposure from dental amalgam is associated with neurological diseases such as multiple sclerosis. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Your petition provides no new scientific information for FDA to evaluate regarding this claim.

---

[71] Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.

[72] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & Consumers Directorate, 2014.

Page 24 – Mr. Love and Mr. Reeves

Your claim that mercury exposure from dental amalgam is associated with multiple sclerosis was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Craelius (1978) (Ex. 68), Ingalls (1983) (Ex. 69), Ingalls (1986) (Ex. 111), Ahlrot-Westerlund (1987) (Ex. 113), and The Encyclopedia of Occupational Health and Safety (1983) (Ex. 67). FDA has reviewed these exhibits and finds that, to the extent that they are relevant to this issue, they are similar to information FDA reviewed[73] as part of rulemaking and they do not provide any new scientific information for FDA to evaluate. Craelius (1978) (Ex. 68) is an article regarding an epidemiology study of the association between dental caries and multiple sclerosis. The authors conclude that the association of caries and multiple sclerosis is related to dietary fat and vitamin D intake. The study does not consider the exposure of mercury from dental amalgam. As such, this study does not provide any relevant scientific information for FDA to evaluate. Ingalls (1983) (Ex. 69) is an article in which the author uses several epidemiology studies, including Craelius (1978), to show a relationship between caries and multiple sclerosis, and hypothesizes that mercury from dental amalgam fillings may be a factor. Ingalls (1986) (Ex. 111) is a letter to the editor by the same author, where the author recounts his personal experience, attributing dental amalgam fillings to his own multiple sclerosis. However, it is not possible from the data contained in these exhibits to determine whether other causative factors and exposures may have contributed to the author's MS. Ahlrot-Westerlund (1987) (Ex. 113) is a study of trace elements (essential elements such as zinc and calcium and non-essential elements such as mercury) in blood and their association with symptoms such as general malaise, burning sensations, headache, skin symptoms, anxiety, depression, and lack of concentration, etc. This study associates mercury with these symptoms and MS, but the study was poorly controlled, and does not demonstrate a causal link between mercury and MS. It is undetermined whether the symptoms and disease are caused by the trace elements or vice versa. The Encyclopedia of Occupational Health and Safety (1983) (Ex. 67) is quoted for its discussion of the symptoms of chronic mercury poisoning, saying that "[t]he most frequently encountered symptoms resemble those presented by persons with multiple sclerosis…." However, this reference does not provide any assessment of exposures to mercury from dental amalgams and its relationship to multiple sclerosis. Therefore, it does not provide any relevant scientific information for FDA to evaluate. Accordingly, FDA does not believe the information you have provided supports your claim that the mercury from dental amalgam is linked to multiple sclerosis.

For the reasons described above, none of the information you submitted with your July 25 petition regarding multiple sclerosis warrants a ban. As is stated in the preamble to FDA's final rule, there are few studies that evaluate a link between dental amalgam and MS. In general, data on this disease are combined with other various neurological or neurodegenerative diseases, such as Alzheimer's disease, Parkinson's disease, amyotrophic lateral sclerosis, and autism. In general, these studies are inconclusive because the findings are limited by a number of concerns. Most importantly, mercury speciation was not done in the studies as biologic measurements were captured as total mercury exposure from all sources. Many are single studies with small sample sizes, were comparisons on the same cohort, or only studied subjects who had an adverse health effect. FDA concluded in the

---

[73] See, for example, Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.

final rule (74 FR 38690) that the existing data do not support a finding that exposures to mercury vapor at levels associated with dental amalgams result in neurological deficits, tremors, peripheral neuropathies, or Alzheimer's disease in the population age six and older. As is stated above, FDA's finding is consistent with other scientific reviews of the literature such as the LSRO report that concludes, "*Studies in the area of neuropsychological function were primarily negative or reported conflicting findings. Some raised concerns regarding experimental control of relevant confounding variables. In total, these studies failed to support the hypothesis that $Hg^0$ exposure, at the levels released by dental amalgam, interferes with human neuropsychological function or acts as an etiologic factor for the neurodegenerative diseases - Parkinson's disease and Alzheimer's disease.*" Also, the latest SCENIHR report[74] confirms these findings and states, "*Several studies have explored the possible association of mercury derived from dental amalgam with a variety of adverse effects, particularly neurological and psychological or psychiatric diseases, including Alzheimer's disease, Parkinson's disease, and multiple sclerosis as well as kidney diseases. The causality evidence for such effects due to dental amalgam is weak because of contradictory reports and major challenges in exposure assessment, which is generally expressed as total mercury in body fluids (mainly urine), without differentiating between organic vs. inorganic forms as well as between sources (dietary vs. dental amalgam or others).*"

In summary, FDA finds that the information you have provided regarding your claim that mercury exposure from dental amalgam is associated with MS does not support the conclusion that dental amalgam presents a substantial and unreasonable risk of illness or injury that would justify a ban.

### k. Amyotrophic Lateral Sclerosis (ALS)

Your petition claims that mercury exposure from dental amalgam is associated with neurological diseases such as amyotrophic lateral sclerosis. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Your petition thus provides no new scientific information for FDA to evaluate regarding this claim.

Your claim that mercury exposure from dental amalgam is associated with ALS was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357) where you submitted the following exhibits to support your claim: Kantarjian (1961) (Ex. 114), Barber (1978) (Ex. 72), Adams et al. (1983) (Ex. 73), Schwarz et al. (1996) (Ex. 79), and Khare et al. (1990) (Ex. 76). FDA has reviewed these exhibits and finds that they are similar to information FDA reviewed[75] at the time of rulemaking and they do not provide any new scientific information for FDA to evaluate. Kantarjian (1961) (Ex. 114) is a review and

---

[74] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & Consumers Directorate, 2014.

[75] See, for example, The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users – Preliminary Report, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health and Consumer Protection DG, 2007.

Page 26 – Mr. Love and Mr. Reeves

analysis of several clinical cases of exposure to organic mercury compounds and muscular wasting. However, the form of mercury associated with dental amalgam is elemental mercury, not organic mercury. The body metabolizes these two forms of mercury differently with unique cell uptake mechanisms and tissue disposition patterns; therefore, the results of this study do not necessarily apply to dental amalgam and so the results are of limited relevance. Barber (1978) (Ex. 72), Adams et al. (1983) (Ex. 73), and Schwarz et al. (1996) (Ex. 79) are case studies of patients who were occupationally exposed to high levels of mercury and developed ALS-like symptoms. The patients in Barber worked in a mercuric oxide manufacturing plant, the patient in Adams spent two and a half days salvaging liquid mercury from industrial thermometers, and the patient in Schwarz was accidentally injected with liquid mercury from a medical glass thermometer. These studies do not provide FDA with any new scientific information to evaluate. It has been previously documented that exposure to high levels of mercury vapor can cause neurologic adverse health effects. Khare et al. (1990) (Ex. 76) is a study of autopsied brains and spinal cords of ALS patients and controls. The studies showed differences in concentration of approximately a dozen trace elements, including an elevation of mercury in the ALS subjects. The study does not, however, determine whether the brain disease was caused by the trace elements or vice versa. Because the results of the studies are not conclusive in determining causation, they do not provide any useful information to FDA regarding whether exposure to mercury vapor from dental amalgam causes ALS. Accordingly, FDA finds that the information you have provided does not support your claim that the mercury from dental amalgam is linked to ALS.

For the reasons described above, none of the information you submitted with your July 25 petition regarding ALS warrants a ban. As is stated in the final rule, there are few, if any, controlled studies that evaluate a link between dental amalgam and ALS. In general, data on this disease are often combined with data for other various neurological or neurodegenerative diseases, such as Alzheimer's disease, Parkinson's disease, MS, and autism. These studies are generally inconclusive because the findings are limited by a number of concerns. Most importantly, mercury speciation (organic vs. elemental mercury) was not done in the studies, as biologic measurements were captured as total mercury exposure from all sources. Many of the studies are single studies with small sample sizes, and comparisons were made on the same cohort, or they only studied subjects who had an adverse health effect. FDA concluded in the final rule (74 FR 38690) that the existing data do not support a finding that exposures to mercury vapor at levels associated with dental amalgams result in neurological deficits, tremors, peripheral neuropathies, or Alzheimer's disease in the population age six and older. FDA's finding is consistent with the latest SCENIHR report[76] that states, "*For the neurological system, there is no clear evidence for an increased risk for Alzheimer's disease, Parkinson's disease or amyotrophic lateral sclerosis associated with amalgam fillings.*"

In summary, FDA finds that the information you have provided regarding your claim that mercury exposure from dental amalgam is associated with ALS does not support the

---

[76] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & Consumers Directorate, 2014.

conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### l.   Severe Autism

Your petition claims that prenatal mercury exposure from dental amalgam is strongly associated with severe autism. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Your petition thus provides no new scientific information for FDA to evaluate regarding this claim.

Your claim that mercury exposure from dental amalgam is strongly associated with severe autism was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibit to support your claim: Geier (2009) (Ex. 115). FDA has reviewed this exhibit and disagrees with your claim that the study demonstrates that maternal dental amalgam is strongly associated with autism or that higher numbers of maternal dental amalgam restorations increase the severity of autism. In the Geier study (Ex. 115), patients with autism whose mothers had six or more amalgams had 3.2 times greater odds of being diagnosed with severe autism than patients whose mothers had five or fewer amalgams. This study is about whether mercury exposure in general is a cause of autism. Moreover, sources of maternal and child mercury exposure other than dental amalgams, including maternal and child fish consumption and both maternal and child environmental sources of mercury, were not assessed. Nor were details provided as to how the number of maternal amalgams were verified, e.g., by clinical exam or by self-reporting based on recollection during a past pregnancy. Additionally, a recent study[77] of 452 2-to-5-year-old children with autism or autism spectrum disorders did not show any difference in current blood mercury concentrations in patients compared to controls. Accordingly, FDA finds that the information you have provided does not support your claim that prenatal mercury exposure from maternal dental amalgam is strongly associated with severe autism.

For the reasons described above, none of the information you submitted with your July 25 petition regarding severe autism warrants a ban. With regard to autism, the final rule (74 FR 38690) combines conclusions of this condition with other neurological and neurodegenerative diseases and states, "*It has been suggested that exposure to mercury vapor from dental amalgam may be linked to various neurological or neurodegenerative diseases, such as Parkinson's disease, Alzheimer's disease, multiple sclerosis, amyotrophic lateral sclerosis, and autism. There is a paucity of studies that evaluate a link between dental amalgam and these conditions.*" The final rule also directs readers to FDA's Addendum to the White Paper,[78] which provide further analysis of the literature and states, "*the weight of evidence would suggest dental amalgam exposures do not contribute to autism.*"

---

[77] Hertz-Picciotto I, Green PG, Delwiche L, Hansen R, Walker C, Pessah IN. Blood mercury concentrations in CHARGE Study children with and without autism. Environ Health Perspect. 2010 Jan;118(1):161-6.
[78] Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf

In summary, FDA finds that the information you have provided regarding your claim that prenatal mercury exposure from maternal dental amalgam is strongly associated with severe autism does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### m. Kidney Dysfunction

Your petition claims that exposure to mercury from dental amalgam results in adverse effects on kidney function. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement included the following exhibits to support your claim of adverse effects on kidney function from the use of dental amalgam: Al-Saleh & Al-Sedairi (2011) (Ex. 5), Al-Saleh et al. (2012) (Ex. 7), Geier et al. (2012) (Ex.11), Geier et al. (2011) (Ex. 12), Geier et al. (2012) (Ex. 13). FDA has reviewed these exhibits and finds that they either do not provide any new scientific information for FDA to evaluate or do not provide sufficient evidence to support your request for a ban. Al-Saleh & Al-Sedairi (2011) (Ex. 5) studied a cohort of healthy children and showed that the children with amalgam fillings had more mercury in their urine and hair samples than did the children without amalgam fillings. The study also found a positive correlation between the number of amalgams and the presence of poor oral health, such as ulcers, white patches, and burning sensations within the oral cavity. Both the increased urinary levels of Hg and the adverse oral symptoms information is not new information and FDA has previously considered such information from other studies.[79,80] In a study of 182 healthy children, Al-Saleh et al. (2012) (Ex. 7) evaluate the relationship between urinary Hg concentrations, number of amalgams and several biomarkers of kidney injury and oxidative cell stress. Of six urinary biomarkers of kidney injury, only urinary N-acetyl-$\beta$-D-glucosaminidase (NAG) levels were higher in children with amalgam than children without amalgam. Other biomarkers of toxicity and oxidative cell stress, e.g., $\alpha$1 microglobulin ($\alpha$1-MG) and 8-hydroxy-2-deoxyguanosine (8-OHdG) levels, were found to be higher in children without amalgam or showed no correlation with the number of amalgam fillings. While the results cannot be discounted, they are inconclusive as the authors could not discount that the increase in urinary NAG levels was not exclusively due to Hg exposure from dental amalgam, and that exposure to other mercury sources might have also contributed to the body's total mercury burden. Geier et al. (2012) (Ex.11), Geier et al. (2011) (Ex. 12), and Geier et al. (2012) (Ex. 13) re-analyzed data from the prospective Children's Amalgam Trials (CAT)[81] to find that urinary porphyrins and glutathione-S-transferases (GST-$\alpha$) levels increased with time in the children treated with dental amalgam, a finding not made in the original study. The Geier et al. studies were critiqued by DeRouen et al. in 2014.[82] DeRouen et al. highlighted

---

[79] Dye *et al.*, "Urinary mercury concentrations associated with dental restorations in adult women aged 16–49 years: United States, 1999–2000," *Occupational and Environmental Medicine*, Vol. 62, pp. 368–375, 2005.

[80] Laeijendecker R. *et al.*, "Oral lichen planus and allergy to dental amalgam restorations," *Archives of Dermatology,* Vol. 140 (12), pp. 1434–1438, 2004.

[81] Barregard, L. et al., "Renal Effects of Dental Amalgam in Children: The New England Children's Amalgam Trial," Environmental Health Perspectives, Volume 116, 394-399, 2008 and De Rouen, T. et al., "Neurobehavioral Effects of Dental Amalgam in Children, A Randomized Clinical Trial," Journal of the American Medical Association, Vol. 295, 1784-1792, 2006.

[82] DeRouen, T, Woods J, Leroux B, Martin M. Letter to the Editor. Critique of reanalysis of Casa Pia data on associations of porphyrins and glutathione-S-transferases with dental amalgam

statistical issues with the Geier et al. studies that the agency generally agrees with.  The re-analyses performed by Geier et al. introduce statistical issues of bias due to confounding and multiplicity, and, while those issues don't necessarily negate the findings of the studies, they are valid statistical issues that limit FDA's ability to interpret the findings.  For this reason, FDA believes that further independent study is necessary to confirm the Geier et al. findings.  FDA also believes that elevations in urinary biomarkers of kidney exposure do not necessarily indicate an adverse health outcome, especially at the small percent increase shown from the study's re-analyses of the data, without more conclusive evidence of an adverse clinical outcome related to kidney injury.

Your claim that exposure to mercury from dental amalgam results in adverse effects on kidney function was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: (Geier (2009) (Ex. 115), Boyd (1991) (Ex. 51), Hahn (1989) (Ex. 52) and Hahn (1990) (Ex. 54).  FDA has reviewed these exhibits and finds that they are similar to information FDA reviewed[83] at the time of rulemaking.  They do not provide any new information for FDA to consider.  In general, while FDA acknowledges that mercury exposure from dental amalgam results in increased mercury levels in tissues, including in the kidneys, and that exposure to mercury from various other sources at high levels can result in adverse health effects to the renal system, FDA finds that the information you have provided regarding your claim that the mercury exposure from dental amalgam has adverse effects on kidney function does not support a conclusion that dental amalgam should be banned.

For the reasons described above, none of the information you submitted with your July 25 petition regarding kidney dysfunction warrants a ban.  FDA acknowledged in the final rule (74 FR 38687) that mercury toxicity has been demonstrated in a variety of organ systems in laboratory studies and the central nervous system (CNS) and the kidneys are both target organs sensitive to mercury vapor.[84]  FDA further states in the final rule (74 FR 38700), *"FDA recognizes that dental amalgam releases low levels of mercury, and that there are scientific data showing mercury vapor, at high enough exposures, to be a neurotoxicant and nephrotoxicant."*  However, two prospective amalgam trials in children age six and older demonstrated that kidney injury is not associated with exposure to dental amalgam.  In the New England trial,[85] groups of children had amalgam or composite restorations placed at ages 6-8 and were followed for five years. Results showed that, although microalbuminuria levels were higher in the amalgam treatment group, the levels of three other biomarkers of kidney injury were not different between the amalgam versus composite restoration groups.  The authors of the study noted that they were unable to determine whether the increase in microalbuminuria was related to treatment or may have occurred by chance, because albuminuria may be caused by strenuous physical exercise, urinary tract infections, or other conditions with fever, or be related to orthostatic proteinuria. In another children's prospective

exposure. Hum Exp Toxicol, 2014 (pii: 0960327114542885).
[83] See, for example "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/
[84] Liu, J. et al., "Toxic effects of metals,"Casarett & Doull's Toxicology: The Basic Science of Poisons, Chapter 23, pp. 931–979, McGraw-Hill Medical, New York,New York, 2008.
[85] Barregard, L. et al., "Renal Effects of Dental Amalgam in Children:  The New England Children's Amalgam Trial," Environmental Health Perspectives, Volume 116, 394-399, 2008.

Page 30 – Mr. Love and Mr. Reeves

trial[86] (Casa Pia), groups of children had amalgam or composite restorations placed at ages 6-10 and were followed for seven years. There were no differences between the amalgam and composite groups with respect to the urinary excretion of microalbumin or albumin, a biomarker of renal glomerular injury, and GST-$\alpha$ and GST-$\pi$, two biomarkers of renal proximal and distal tubule injury, respectively.[87] FDA concluded in the final rule that the data from clinical and epidemiological studies do not support a finding that exposures to mercury vapor at levels associated with dental amalgams result in renal damage in the population age six and older.

In summary, FDA finds that the information you have provided regarding your claim that mercury exposure from dental amalgam has adverse effects on kidney function does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### n. Hearing Loss

Your petition claims that mercury exposure from dental amalgam is associated with hearing loss. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Your petition thus provides no new scientific information for FDA to evaluate regarding this claim.

Your claim that mercury exposure from dental amalgam is associated with hearing loss was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibit to support your claim: Rothwell et al. (2008) (Ex. 116). The Rothwell et al. (2008) (Ex. 116) study involved 39 female patients ages 40-45 and found a positive correlation between the number of amalgam fillings and a decline in hearing thresholds at higher frequencies (8-16 kHz). Subjects with composite resin restorations showed no hearing loss. This study provides limited information for FDA to evaluate because it is not possible to draw general conclusions from the patients selected for this study, i.e., a small sample size of female patients in a narrow age range. This study was also discussed at the FDA advisory committee meeting[88] held on December 14-15, 2010. The panel discussed that this finding may have significance but that other studies in a larger patient population are needed to corroborate the effects seen in this study. FDA agrees with this statement and finds that the information you have provided regarding your claim that dental amalgam fillings are associated with hearing loss does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### o. Allergy, Hypersensitivity, and Autoimmunity

---

[86] De Rouen, T. et al., "Neurobehavioral Effects of Dental Amalgam in Children, A Randomized Clinical Trial," Journal of the American Medical Association, Vol. 295, 1784-1792, 2006.
[87] Woods, J.S. et al., "Biomarkers of Kidney Integrity in Children and Adolescents with Dental Amalgam Mercury Exposure: Findings from the Casa Pia Children's Amalgam Trial," Environmental Research, Vol. 108, pp. 393-399, 2008.
[88] See http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/DentalProductsPanel/ucm235085.htm.

Page 31 – Mr. Love and Mr. Reeves

Your petition claims that mercury from dental amalgam places a significant percentage of the population at risk for hypersensitive reactions. To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Your petition thus provides no new scientific information for FDA to evaluate regarding this claim.

Your claim that that mercury from dental amalgam places a significant percentage of the population at risk for hypersensitive reactions was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Djerassi et al. (1969) (Ex. 117), North American Contact Dermatitis Group (Ex. 118), White et al. (1976) (Ex. 119), Taskinen et al. (1998) (Ex. 96), and Molin (1990) (Ex. 82). FDA has reviewed these exhibits and finds that they are similar to information FDA reviewed[89] at the time of rulemaking and they do not provide any new scientific information for FDA to evaluate. While FDA acknowledges that some individuals are hypersensitive or allergic to mercury and/or other metals, the agency's view is that such reactions are rare (see adverse event reports in the final rule at 74 FR 38698) and may be attributed to immediate type (Type I) allergic reactions to one or more components of dental amalgam other than mercury. Thus, FDA finds that the information you have provided does not support your claim that a significant percentage of the population is at risk for hypersensitive reactions to mercury derived from dental amalgam.

Your July 25, 2009, petition also claimed that exposure to mercury vapor is linked to autoimmunity. You cited the following exhibits to support your claim: Warfvinge et al. (1995) (Ex. 56) and Hultman et al. (1994) (Ex. 57). FDA has reviewed these exhibits and finds that they are similar to information FDA reviewed[90] at the time of rulemaking and they do not provide any new scientific information for FDA to evaluate. Warfvinge et al. (1995) (Ex. 56) and Hultman et al. (1994) (Ex. 57) discuss the autoimmune effects of mercury vapor in mice. These articles are of limited utility because they do not present human clinical evidence and do not demonstrate a causal relationship between dental amalgam and autoimmunity in humans. FDA finds that the information you have provided does not support your claim that mercury vapor is linked to autoimmunity.

For the reasons described above, none of the information you submitted with your July 25 petition regarding allergy, sensitivity, and autoimmunity warrants a ban. In the final rule, FDA reviewed several epidemiological and case studies related to the effects of mercury vapor exposure from dental amalgam on allergic individuals. According to some of the studies that were reviewed,[91] some patients develop adverse tissue reactions such as dermatological conditions or lesions of the skin, mouth, and tongue as a result of exposure to

---

[89] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.

[90] Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.

[91] Kanerva L. et al., "A multicenter study of patch test reactions with dental screening series," <u>Amer. J. Contact. and Dermat.</u> Vol. 12 (2), pp. 83-87, 2001 and Laeijendecker R. et al., "Oral lichen planus and allergy to dental amalgam restorations," <u>Archives of Dermatology</u>, Vol. 140 (12), pp. 1434-1438, 2004.

Page 32 – Mr. Love and Mr. Reeves

dental amalgam. In mercury-allergic individuals, clinical improvements were reported after dental amalgam restorations were removed. Other studies[92] reported that dental amalgam may exacerbate pre-existing autoimmune disease in mercury-allergic individuals. After dental amalgam restorations were removed, the health status of these patients reportedly improved.

FDA concluded in the preamble to the final rule that the existing data indicate that certain individuals with a pre-existing hypersensitivity or allergy to mercury may be at risk for adverse health effects from mercury vapor released from dental amalgam. In order to mitigate this risk, FDA established a Class II special controls guidance document.[93] FDA's special controls guidance on dental amalgam recommends[94] the following specific labeling: *"Contraindication: Do not use in persons with a known mercury allergy."* The recommended contraindication is designed to prevent exposure and resultant adverse tissue reactions in allergic individuals. Additionally, the special controls guidance recommends a performance test to assess the biocompatibility of a dental amalgam device. Specifically, the guidance recommends that devices be tested in conformance with the following consensus standard: "ISO 7405:1997(E), Dentistry--Preclinical evaluation of biocompatibility of medical devices used in dentistry--Test methods for dental materials." Biocompatibility refers to the appropriate interaction between the device and the human body, and the minimization of risk of rejection or toxicity. Conformance to the recommended consensus standard will minimize the potential of a dental amalgam device to cause toxic or injurious effects by ensuring that the device will have the appropriate biological response for its intended use.

Following publication of the final rule and prior to the advisory committee meeting held on December 14-15, 2010, FDA conducted a comprehensive review of the literature on mercury allergies. FDA's findings[95] confirmed earlier estimates, with FDA concluding that, *"overall, mercury allergy is a rare condition with no obvious risk factors."*

Regarding autoimmunity, the latest SCENIHR report[96] states the following: *"In conclusion, inorganic mercury exposure may cause adverse effects on the immune system. However,*

---

[92] Prochazkova J. et al., "The beneficial effect of amalgam replacement on health in patients with autoimmunity." Neuro. Endocrinol. Lett., Vol. 25 (3), pp. 211-218, 2004 and Yaqob A. et al., "Metal-specific lymphocyte reactivity is downregulated after dental metal replacement," Neuro. Endocrinol. Lett., Vol. 27 (1-2), pp. 189-197, 2006.
[93] *See* Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm.
[94] The classification regulation for dental amalgam, 21 CFR 872.3070, provides that the special control for dental amalgam is FDA's "Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy." Although the special controls listed in that guidance document are described as recommendations, the guidance document makes clear that "any firm currently marketing, or intending to market, dental amalgam, mercury, or amalgam alloy will need to address the issues covered in this special controls guidance. The firm must show that its device addresses the issues of safety and effectiveness identified in this guidance, either by meeting the recommendations of this guidance or by some other means that provides equivalent assurances of safety and effectiveness."
[95] *See* "CDER Mercury Allergy Consult" file at http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/DentalProductsPanel/ucm235085.htm.
[96] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & Consumers Directorate, 2014.

*there is no evidence that autoimmune disease is provoked in humans by mercury exposure from amalgam fillings. In some patients with allergy to mercury, clinical improvement is seen after removal of amalgam fillings. There is some evidence that exposure to mercury influences proinflammatory cytokine levels, but the clinical implications are not clear.*"

In summary, FDA finds that the information you have provided regarding your claim that a significant percentage of the population is at risk for hypersensitive reactions to mercury derived from dental amalgam does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would justify a ban.

### p. Other Adverse Health Effects

Your petition claims that mercury from dental amalgam has been linked to other adverse health effects including periodontal disease, inflammation, bone loss, and idiopathic dilated cardiomyopathy (IDCM). To the extent that your petition, as originally filed, references studies to support this claim, you did not provide the studies as exhibits for FDA to review. Your supplement also did not include any exhibits to support this claim. Your petition provides no new information for FDA to consider regarding this claim.

Your claim that mercury from dental amalgam has been linked to other adverse health effects including periodontal disease, inflammation, bone loss, and idiopathic dilated cardiomyopathy (IDCM) was also made in your citizen petition dated July 25, 2009 (Docket No. FDA-2009-P-0357), where you submitted the following exhibits to support your claim: Frustaci et al. (1999) (Ex. 81), Snapp et al. (1981) (Ex. 28), Molin et al. (1990) (Ex. 82), and Lorscheider et al. (1995) (Ex. 6). FDA has considered Lorscheider et al. (1995) (Ex. 6) in numerous comments to Docket FDA-2001-N-0067 and FDA has considered Frustaci et al. (1999) (Ex. 81) in previous literature reviews.[97] Lorscheider et al. (1995) (Ex. 6) represents a summary of several animal and clinical studies of tissue uptake and cellular effects of mercury and concludes that research evidence does not support the notion of amalgam safety. FDA disagrees with this conclusion because clinical studies[98] of dental amalgam have not found an association between use and adverse health effects. Frustaci et al. (1999) (Ex. 81) is a study that highlighted an association of high myocardial tissue levels of trace elements, including mercury, antimony, gold, chromium and cobalt, with IDCM in 13 patients, but no sources of mercury exposure were considered; thus, providing little, if any, value in understanding potential adverse health responses to mercury exposure from dental amalgam. The studies cited have been evaluated previously by FDA and do not represent new scientific information. You cite Snapp et al. (1981) (Ex. 28) to support your claim that the majority of blood mercury originates from dental amalgam. The findings of Snapp et al. (1981) (Ex. 28) and Molin et al. (1990) (Ex. 82) are not consistent with other reports documented in the 1993 PHS report[99] that

---

[97] See FDA White Paper and Addendum at
http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/ucm171115.htm
[98] Barregard, L. et al., "Renal Effects of Dental Amalgam in Children: The New England Children's Amalgam Trial," Environmental Health Perspectives, Volume 116, 394-399, 2008 and De Rouen, T. et al., "Neurobehavioral Effects of Dental Amalgam in Children, A Randomized Clinical Trial," Journal of the American Medical Association, Vol. 295, 1784-1792, 2006.
[99] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education

EXHIBIT A1 - Case No. 1:14-cv-00356

Page 34 – Mr. Love and Mr. Reeves

found moderate blood mercury values in subjects without any amalgam restorations. FDA finds that the information you have provided does not support your claim that mercury from dental amalgam has been linked to other adverse health effects including periodontal disease, inflammation, bone loss, and idiopathic dilated cardiomyopathy (IDCM).

FDA has reviewed[100] claims of systemic effects from dental amalgam and has not found an association between the use of dental amalgam and adverse health effects. FDA believes the scientific studies implicating mercury exposure from dental amalgam and systemic diseases/conditions such as inflammation, bone loss and IDCM are not sufficiently robust to draw definitive conclusions. Regarding periodontal disease, FDA stated in the final rule (74 FR 38702) that data do not support the claim that mercury from dental amalgam plays a role in the pathogenesis of periodontal disease. Based on its review of the scientific literature on this subject,[101] FDA has concluded that, *"mercury in dental amalgam is not an etiological or aggravating agent for the initiation, propagation, or aggravation of any form of periodontitis."* In the final rule (74 FR 38694) FDA concluded that *"exposures to mercury vapor from dental amalgam do not put individuals age six and older at risk for mercury-associated adverse health effects."* FDA's conclusions are also supported by the most recent literature review on dental amalgam, the SCENIHR report,[102] which states, *"It is generally concluded that no increased risks on adverse systemic effects have been documented in the general population as a whole and it is considered that the current use of dental amalgam does not pose any risk of systemic disease."*

In summary, FDA finds, at this time, that the information you have provided regarding your claim that dental amalgam has been linked to other adverse health effects including periodontal disease, inflammation, bone loss, and idiopathic dilated cardiomyopathy (IDCM) does not support the conclusion that dental amalgam presents an unreasonable and substantial risk of illness or injury that would support a ban.

### q. Summary

After a systematic review of the literature and public comments it received in response to its proposed rule, FDA concluded in the final rule that *"exposures to mercury vapor from dental*

---

and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993, Appendix III-12.

[100] See FDA White Paper and Addendum at http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/ucm171115.htm.

[101] McCullough, M.J. *et al.,* "Local Adverse Effects of Amalgam Restorations," *International Dental Journal,* Vol. 58, pp. 3-9, 2008; Prochazkova, J.J. *et al.,* "HLA-Association in Patients with Intolerance to Mercury and other Metals in Dental Materials," *Disease Markers,* Vol. 16, pp. 135-138, 2000; Henriksson, E. *et al.,* "Healing of Lichenoid Reactions Following Removal of Amalgam. A Clinical Follow-Up," *Journal of Clinical Periodontology,* Vol. 22, pp. 287-94, 1995; Swartzendruber, D.E., "The Possible Relationship Between Mercury from Dental Amalgam and Diseases. I: Effects within the Oral Cavity," *Medical Hypotheses,* Vol. 41, pp. 31-34, 1993; Siblerud, R.L., "The Relationship Between Mercury from Dental Amalgam and Oral Cavity Health," *Annals of Dentistry,* Vol. 49, pp. 6-10, 1990.

[102] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users—Preliminary Opinion, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health & Consumers Directorate, 2014.

Page 35 – Mr. Love and Mr. Reeves

*amalgam do not put individuals age six and older at risk for mercury-associated adverse health effects"* and that *"existing data indicate that dental professionals are generally not at risk for mercury toxicity except when dental amalgams are improperly used, stored, triturated, or handled."*[103] After reviewing the scientific information that you submitted with your petition, the supplement to your petition, and your July 25, 2009 petition, FDA continues to support its finding in the final rule that dental amalgam does not present a substantial and unreasonable risk of illness or injury. Accordingly, the statutory standard for a ban is not met and your request that the use of dental amalgam be banned as a dental restorative is therefore denied.

## 2. Request to Place Dental Amalgam into Class III and Place Restrictions on Use in Susceptible Subpopulations

In your petition, you request that, if FDA does not ban dental amalgam, it place dental amalgam into class III and seek strict proof of safety and effectiveness. According to section 513(a)(1)(C) of the FD&C Act, 21 U.S.C. 360c(a)(1)(C), a class III device is one which

(i)

    I.    cannot be classified as a class I device because insufficient information exists to determine that the application of general controls are sufficient to provide reasonable assurance of the safety and effectiveness of the device, and

    II.   cannot be classified as a class II device because insufficient information exists to determine that the special controls described in paragraph (B) would provide reasonable assurance of its safety and effectiveness, and

(ii) –

    I.    is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, or

    II.   presents a potential unreasonable risk of illness or injury

Your petition argues, in part, that dental amalgam is an implant in the human body and should therefore be placed in class III. FDA disagrees with your claim that dental amalgam is an implant and that implants must be placed into class III and subject to premarket approval. Pursuant to 21 CFR 812.3(d), an implant is "a device that is placed into a surgically or naturally formed cavity of the human body if it is intended to remain there for a period of 30 days or more." As previously explained in the Federal Register,[104] the Ophthalmic; Ear, Nose, Throat; and Dental Devices Panel identified a dental implant as "a device that is surgically placed into, or in opposition to, the maxilla or mandible and which protrudes through the mucosa of the oral cavity." FDA does not consider restorative materials placed in the teeth, such as dental amalgam, to be implants because restorative materials such as amalgam do not protrude through the mucosa of the oral cavity. Moreover, even if dental amalgam were considered to be an implant, FDA would not be required to classify it into class III. In accordance with Section 513(d)(2)(B) of the FD&C Act (21 U.S.C. § 360c(d)(2)(B))

---

[103] 74 FR at 38690, 38693
[104] 45 FR 85962, 85964.

Page 36 – Mr. Love and Mr. Reeves

and 21 CFR 860.93, an implant may be classified into class I or class II if FDA determines that premarket approval is not necessary to provide reasonable assurance of its safety and effectiveness. As explained in the final rule, FDA has made this determination with respect to dental amalgam. Accordingly, FDA rejects your claim that dental amalgam is a dental implant that should be in class III.

Your petition also claims that dental amalgam should be in class III because "no administrative record exists on which the FDA Commissioner or the Dental Device Panel could rationally conclude that there are demonstrable and reasonable assurances that mercury fillings are safe." On the contrary, the preamble to FDA's final rule provided a comprehensive rationale for FDA's decision to place amalgam in class II and included substantive responses to various comments on the proposed rule that similarly asked the agency to classify dental amalgam into class III.[105] Because FDA's final rule provides an extensive administrative record for FDA's decision to place dental amalgam into class II, we disagree with your claim that no administrative record exists on which FDA could rationally conclude that there are demonstrable and reasonable assurances that mercury fillings are safe.

We note that, in determining the appropriate classification for dental amalgam in the final rule, FDA considered the important public health benefits of dental amalgam and the advantages it presents as a restorative material. Among its advantages, dental amalgam may be placed quickly in a wet field while providing high strength, durability, and marginal integrity – features that may help prevent recurrent decay. Additionally, amalgam fillings offer a broad range of applicability in clinical situations, ease of use and relative insensitivity to variations in handling technique and oral conditions. FDA also considered the device's long history of use in tens of millions of procedures in the United States each year, as well as the information available regarding that use. FDA has additionally considered the fact that dental amalgam is a prescription device and, therefore, available to patients only with the involvement of a health care provider.

FDA also considered the potential risks of dental amalgam in classifying the device and its analysis focused on the risks associated with the presence of mercury in dental amalgam. In the final rule, FDA identified exposure to mercury, allergic response including adverse tissue reaction, contamination, mechanical failure, corrosion, and improper use as some of the potential risks to health associated with the use of dental amalgam devices. FDA established special controls to address and mitigate each of these risks described in the Class II Special Controls Guidance Document: *Dental Amalgam, Mercury, and Amalgam Alloy – Guidance for Industry and FDA Staff*, issued on July 28, 2009.[106] FDA concluded in the final rule that the special controls sufficiently mitigate the risks of dental amalgam such that the special controls and the general controls provide a reasonable assurance of the safety and effectiveness of dental amalgam.

After considering your petition and its supporting information, at this time, FDA continues to believe that the special controls established by the final rule below sufficiently mitigate the

---

[105] *See* 74 FR 38686, 38699-38700.
[106] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm

Page 37 – Mr. Love and Mr. Reeves

risks of dental amalgam such that there is a reasonable assurance of the safety and effectiveness of the device. Accordingly, FDA finds that the placement of dental amalgam into class III is not warranted, based on the information available to the agency at this time. Even so, FDA continues to evaluate the safety of dental amalgam and will take any further actions that are warranted.

Your petition points to several potential risks of dental amalgam. Although you do not raise these potential risks specifically in connection with your request that FDA place dental amalgam in class III, the special controls that are relevant to these potential risks are summarized below.[107]

### a. Risk of Exposure to Mercury

FDA's special controls to address the risk of exposure to mercury are recommendations for: (i) Specific labeling, (ii) an information for use statement, and (iii) a performance test for mercury vapor release.

#### i. Specific Labeling Recommendations

The special controls guidance recommends the following specific labeling:

- WARNING: CONTAINS MERCURY.
- Warning: May be harmful if vapors are inhaled.
- Precaution: Use with adequate ventilation.
- Precaution: Store in a cool, well ventilated place.
- Contains []% mercury by weight.

The recommended warning about the presence of mercury in dental amalgam and the recommended disclosure of mercury content by weight is intended to alert dental professionals of the potential for exposure to mercury vapor and to remind them of the need for protective measures, such as the use of gloves when handling the device. The recommended precautions about the need for adequate ventilation and the need to store in a cool, well ventilated place is intended to encourage professionals to ensure that there is adequate ventilation when in proximity to the device and to use a vacuum pump and adequate ventilation during placement of dental amalgams to minimize the amount of mercury vapor that they or their patients may inhale.

#### ii. Information for Use Recommendation

In order for dentists to make appropriate treatment decisions with their patients, it is important to provide information to help dentists understand the complexities of the science related to dental amalgam and its mercury content.

FDA's special controls guidance recommends the inclusion of an "information for use" statement in dental amalgam labeling:

Dental amalgam has been demonstrated to be an effective restorative material that has benefits in terms of strength, marginal integrity, suitability for large occlusal surfaces, and durability. Dental

---

[107] The final rule also established special controls for the risk of mercury contamination, risk of mechanical failure, and the risk of corrosion.

amalgam also releases low levels of mercury vapor, a chemical that at high exposure levels is well-documented to cause neurological and renal adverse health effects. Mercury vapor concentrations are highest immediately after placement and removal of dental amalgam but decline thereafter.

Clinical studies have not established a causal link between dental amalgam and adverse health effects in adults and children age six and older. In addition, two clinical trials in children aged six and older did not find neurological or renal injury associated with amalgam use.

The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed.

The Agency for Toxic Substances and Disease Registry's (ATSDR) and the Environmental Protection Agency (EPA) have established levels of exposure for mercury vapor that are intended to be highly protective against adverse health effects, including for sensitive subpopulations such as pregnant women and their developing fetuses, breastfed infants, and children under age six. Exceeding these levels does not necessarily mean that any adverse effects will occur.

FDA has found that scientific studies using the most reliable methods have shown that dental amalgam exposes adults to amounts of elemental mercury vapor below or approximately equivalent to the protective levels of exposure identified by ATSDR and EPA. Based on these findings and the clinical data, FDA has concluded that exposures to mercury vapor from dental amalgam do not put individuals age six and older at risk for mercury-associated adverse health effects.

Taking into account factors such as the number and size of teeth and respiratory volumes and rates, FDA estimates that the estimated daily dose of mercury in children under age six with dental amalgams is lower than the estimated daily adult dose. The exposures to children would therefore be lower than the protective levels of exposure identified by ATSDR and EPA.
In addition, the estimated concentration of mercury in breast milk attributable to dental amalgam is an order of magnitude below the EPA protective reference dose for oral exposure to inorganic mercury. FDA has concluded that the existing data support a finding that infants are not at risk for adverse health effects from the breast milk of women exposed to mercury vapors from dental amalgam.

The purpose of this information for use recommendation is to address potential misunderstandings about the risk of exposure to mercury from the device and to help dental professionals plan appropriate treatment recommendations for their patients by providing them with FDA's analysis of the most current, best available evidence regarding potential risks to health from mercury vapor released from dental amalgams.

iii. Performance Test Recommendation

FDA's special controls guidance recommends a performance test to determine the amount of mercury vapor released by a dental amalgam device during corrosion.

Dental amalgam releases the highest levels of mercury vapor when it corrodes. By measuring the amount of mercury vapor released during corrosion, the recommended performance test will quantify the highest levels of vapor release that can be expected from a dental amalgam device. The results of this test will enable FDA, through a premarket notification (510(k)) submission, to determine if these levels are acceptable and are comparable to legally marketed devices.

**b.  Risk of Allergic Response Including Adverse Tissue Reaction**

Dental amalgam is associated with a risk of adverse tissue reaction, particularly in individuals with a mercury allergy, who may experience additional allergic reactions.  The special controls to address this risk are recommendations for: (i) Specific labeling and (ii) biocompatibility testing.

i. Specific Labeling Recommendation
   FDA's special controls guidance recommends the following specific labeling:

   Contraindication: Do not use in persons with a known mercury allergy.

   The recommended contraindication is designed to prevent exposure and resultant adverse tissue reactions in allergic individuals.

ii. Biocompatibility Test Recommendation
    The special controls guidance recommends a performance test to assess the biocompatibility of a dental amalgam device. Specifically, the guidance recommends that devices be tested in conformance with the following consensus standard: "ISO 7405:1997(E), Dentistry--Preclinical evaluation of biocompatibility of medical devices used in dentistry--Test methods for dental materials."

    Biocompatibility refers to the appropriate interaction between the device and the human body, and the minimization of risk of rejection or toxicity. Conformance to the recommended consensus standard will minimize the potential of a dental amalgam device to cause toxic or injurious effects by ensuring that the device will have the appropriate biological response for its intended use.

**c.  Risk of Improper Use**

"Improper use" of a device can result from misuse of the device. The special controls to address the risk of improper use are recommendations for specific labeling, as follows:
   • *Contraindication:* Do not use in persons with a known mercury allergy.
   • *Precaution:* Single-use only.

The recommended labeling contraindication is intended to alert dental professionals of situations in which the use of a dental amalgam device is not recommended. The recommended labeling precaution will inform dental professionals that a dental amalgam device is not intended to be reused.

FDA's classification of dental amalgam into class II in the final rule reflected FDA's comprehensive review of the scientific literature and safety assessments related to dental amalgam's benefits and its potential risks.  After reviewing the scientific information that you have submitted with your petition, at this time, FDA continues to believe that, when subject to the general controls of the FD&C Act and the designated special controls described in

Page 40 – Mr. Love and Mr. Reeves

relevant part above, there is a reasonable assurance of the safety and effectiveness of dental amalgam.

Your petition also requests that FDA place restrictions on the use of dental amalgam in certain subpopulations[108] if FDA decides to place dental amalgam into class III. FDA has declined to place dental amalgam into class III, however, as stated above. The agency has considered the scientific information you have provided, and continues to believe that the general controls and the special controls described in FDA's special controls guidance on dental amalgam provide a reasonable assurance of safety and effectiveness for the general population. It is unclear what specific restrictions you propose for the subpopulations, but, for the reasons discussed in section C.1. about health risks, at this time, FDA does not believe that the scientific information you have provided supports restricting the use of amalgam in specific subpopulations. Your request for restrictions is therefore denied. FDA will, however, continue to evaluate the available information to determine whether any additional action is warranted.

### 3. Request that an EIS or EA be Prepared under a Ban or Reclassification

In your petition, you request that an Environmental Impact Statement or an Environmental Assessment be prepared "under any of the foregoing alternatives," that is, if FDA bans dental amalgam or if FDA places dental amalgam into class III. Because your request is contingent upon a decision by FDA to ban dental amalgam or place dental amalgam into class III and FDA has taken neither of these actions, your request is moot, and, accordingly, we do not need to reach the merits of this request.

### 4. Other Issues Raised in the Petition

To the extent that your petition requests additional agency actions that do not correspond to the specific actions requested in Section B of your petition, FDA's response to those requests can be found below. FDA has also responded to certain points raised in your petition that do not request a specific action.

#### a. Risk Assessment

Your petition claims that FDA's risk assessment in the final rule (74 FR 38688) was flawed for numerous reasons, including failure to quantify the full range of mercury vapor exposure across the entire population in all relevant age groups, failure to identify the proportion of the amalgam-bearing population that exceeds reference exposure levels, and computational errors concerning absorbed dose and body weight. Your petition also claims that FDA failed to recognize or rectify the "inadequacy and non-valid nature of the EPA RfC or the ATSDR MRL." You claim that the reviews by the Environmental Protection Agency (EPA) (1995)[109]

---

[108] Your petition describes these subpopulations as "young children, women and particularly women of childbearing age, males, patients with compromised kidney, immune, and neurological function, those who are hypersensitive to mercury, those who test positive for apolipoprotein E4 or coproporphyrinogen oxidase (CPOX4), and other persons within susceptible subpopulations…"

[109] See EPA RfC at http://www.epa.gov/iris/subst/0370.htm#refinhal.

Page 41 – Mr. Love and Mr. Reeves

and the Agency for Toxic Substance and Disease Registry (ATSDR) (1999)[110] are not recent and are "out-of-date." To the extent that your petition, as originally filed, references studies to support these claims, you did not provide the studies as exhibits for FDA to review. The exhibits submitted with your supplement are discussed below.

### 1. Computational errors concerning absorbed dose and body weight

Your petition claims that FDA's risk assessment in the final rule was flawed because it contained computational errors concerning absorbed dose and body weight for children and infants. FDA acknowledges that adjusting for percentage absorbed dose would provide precision. As mentioned above, FDA relied upon average exposure estimates across the general population and did not stratify exposures according to subpopulations, in which case body weight would have been a factor in the exposure estimate. FDA relied on an estimated average daily dose of mercury vapor from dental amalgam of 1-5 μg Hg/day. This range of exposures was derived from an analysis of 17 studies[111] of adult populations. While the average daily exposure dose in the studies ranged from 1.2 - 29 μg Hg/day (average daily absorbed dose ranged from 1 - 23.2 μg Hg/day, based on 80% absorption of mercury via the lung), the average daily exposure doses in the majority of studies were in the 1-5 μg Hg/day range, or slightly higher. Also, in the final rule, FDA relied upon EPA's RfC (0.3 μg Hg/m³) and the ATSDR's MRL (0.2 μg Hg/m³) as reference exposure levels (RELs) for mercury vapor. With respect to the RELs, FDA did consider body weight and used values of 70 kg for adults, 20 kg for a five year old child, and 10 kg for a one year old infant (74 FR 38688). FDA estimated that chronic exposure at the RfC level would result in an REL-associated dose (EPA d-REL)[112] of 4.9 μg Hg/day for an average adult and 2.3 μg Hg/day for an average five-year-old child. Similarly, a chronic dose at the MRL level would result in a dose (MRL d-REL) of 3.2 μg Hg/day for an average adult and 1.5 μg Hg/day for an average five-year-old child. In the final rule, FDA did not adjust these figures by the known absorption rate of mercury vapor in the lungs, which is 80%. By factoring in the 80% absorption rate, the agency now estimates these values should be 20% lower, i.e., 3.9 μg Hg/day (EPA d-REL) and 2.6 μg Hg/day (MRL d-REL) for an adult and 1.8 μg Hg/day (EPA d-REL) and 1.2 μg Hg/day (MRL d-REL) for a five-year-old child. These calculations indicate that patients with numerous amalgam-filled surfaces could be at or above the RELs, however, as the agency explained in the final rule (74 FR 38689), "*chronic exposure to air mercury concentrations several times higher than the MRL and the RfC would also generally not be expected to result in adverse effects, because of the conservative approach of incorporating uncertainty factors in the derivation of these reference levels.*" Although daily exposures at or above an REL over a lifetime do not

---

[110] Agency for Toxic Substances and Disease Registry (ATSDR) and Research Triangle Institute, Toxicological profile for mercury, U.S. Dept. of Health and Human Services, Public Health Service, Atlanta, Georgia, 1999.
[111] See "The Scientific Case Against Dental Amalgam," report from the International Academy of Oral Medicine and Toxicology. http://iaomt.org/scientific-case-mercury-amalgam/ and Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.
[112] The dose-associated, reference exposure level (d-REL) is calculated by multiplying the reference exposure level (REL) by 16.2 m3/day, the ventilation rate for an average adult (74 FR 38688), and 0.8, the known absorption rate of mercury vapor in the lungs.

Page 42 – Mr. Love and Mr. Reeves

necessarily indicate that adverse health effects will occur, doses far above the REL, by an order of magnitude or more, suggest that the probability of adverse health effects is more likely, especially in sensitive subpopulations. FDA has not found that daily doses of mercury vapor from dental amalgam exceed EPA or ATSDR RELs by an order of magnitude or more. Even though some amalgam patients could be exposed to daily doses of mercury vapor above the more conservative RELs noted in the petition, this alone does not necessarily indicate that adverse health effects from dental amalgam will occur. The agency also believes that the risk assessment information provided by the RELs must be taken in context with the available clinical data on dental amalgam. Since the weight of clinical evidence has not established an association between dental amalgam use and adverse health effects in adults and children age six and older, the agency believes that its current classification of dental amalgam provides a reasonable assurance of safety and effectiveness.

2.  **Failure to recognize or rectify the "inadequacy and non-valid nature of the EPA RfC or the ATSDR MRL," failure to quantify the full range of mercury vapor exposure across the entire population in all relevant age groups, and failure to identify the proportion of the amalgam-bearing population that exceeds reference exposure levels**

Your petition claims that FDA failed to recognize or rectify the "inadequacy and non-valid nature of the EPA RfC or the ATSDR MRL," which you allege are not recent and are out-of-date. Your supplement included the following exhibits to support your claim that current reference exposure levels (RELs) by EPA and ATSDR are outdated and need to be revised: Richardson et al. (2011) (Ex. 2), Richardson et al. (2011) (Ex. 3), Richardson (2009) (Ex. 4), Love (2011) (Ex. 10), and Koral (2013) (Ex. 22). FDA has reviewed these exhibits and believes they highlight the uncertainties in a dental amalgam risk assessment, specifically with regard to both an exposure assessment and acceptable reference exposure levels. Richardson et al. (2011) (Ex. 2) is a study that provides estimates of the number of amalgam filled surfaces stratified by age group for U.S. populations. This analysis reveals that some populations have large numbers of amalgam filled surfaces, which would result in higher exposure to mercury vapor. This study was discussed (pre-publication) at a Dental Products Panel meeting in 2010 (see below). FDA agrees that stratification of the exposure estimate across various subpopulations of amalgam bearers would provide a more accurate assessment than a range of exposures across the entire population. Stratification may help identify groups with higher mercury exposure because of higher numbers of amalgam filled surfaces who may be exposed at levels above RELs. FDA notes, however, that exposures exceeding RELs do not necessarily mean that adverse health effects will appear and that the weight of clinical evidence has not established an association between the use of dental amalgam and adverse health effects in adults and children age six and older.

Richardson et al. (2011) (Ex. 3) is an unpublished report concerning the synergistic effects of exposure to lead, mercury, and methyl mercury. This report provides no new

Page 43 – Mr. Love and Mr. Reeves

information for FDA to consider as FDA reviewed similar information[113] at the time of rulemaking. Richardson (2009) (Ex. 4) is a critique of current RELs and advocates a lower REL for elemental mercury based on a more conservative selection of uncertainty factors (UFs). FDA reviewed this information and discussed its findings at a Dental Products Panel meeting in 2010 (see below). Love (2011) (Ex. 10) are personal communications with EPA, which provide insight into the EPA's selection of UFs for the REL for elemental mercury. FDA reviewed this information and agrees it identifies some of the uncertainties with regards to the selection of UFs for the REL for elemental mercury. Koral (2013) (Ex. 22) is a review article of the uncertainties in risk assessments for dental amalgam. FDA reviewed this article but believes it provides no new information beyond what was discussed at the Dental Products Panel meeting in 2010 (see below).

As you are aware, following receipt of your petition, FDA convened a meeting of the Dental Products Panel on December 14-15, 2010,[114] which included experts in toxicology, neurotoxicology, immunology, epidemiology, and pediatrics to discuss and make recommendations on this and other scientific issues raised in your petition as well as in other petitions received by FDA concerning FDA's final rule on dental amalgam.[115] In preparation for the panel meeting, FDA initiated a directed agency assignment to three experts on the panel on the issues you raised regarding FDA's risk assessment for dental amalgam. The directed agency assignment provided these experts with a series of questions and asked them to present their findings in a report and at the panel meeting.[116] At the panel meeting, the responses to the questions generally concluded that there were limitations with regard to the EPA RfC, especially with respect to the selection of uncertainty factors (UFs), but that exposures exceeding the RfC do not necessary mean adverse health effects will appear. The responses also indicated that the point-of-departure (POD) approach with the application of UFs may be unsuitable for elemental mercury, given that a no observed adverse effect level (NOAEL) has not been defined, which presents  uncertainties with regards to the toxicity thresholds for chronic, low level mercury vapor exposure from dental amalgam. The responses stated that low dose linear modeling approaches, such as a benchmark dose (BMD) model, would be a more suitable method for assessing risk for this species of mercury.

With regard to exposure assessment, some panelists recommended that FDA not rely on average exposure across a population (1 - 5 µg Hg/day for 7 - 10 fillings) but should stratify exposure for each subpopulation. The panel concurred with the directed agency

[113] Liu, J. et al., ''Toxic effects of metals,''Casarett & Doull's Toxicology: The Basic Science of Poisons, Chapter 23, pp. 931–979, McGraw-Hill Medical, New York, New York, 2008.
[114] See http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory Committee/DentalProductsPanel/ucm235085.htm.
[115] Complete transcripts of the meeting may be found here: http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory Committee/DentalProductsPanel/ucm235085.htm.
[116] The directed agency assignment and the expert responses may be found here: http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory Committee/DentalProductsPanel/ucm235085.htm.

Page 44 – Mr. Love and Mr. Reeves

assignment experts that urinary mercury levels are the most accurate biomarker of exposure to mercury vapor. With regard to bioaccumulation, the panel discussed various biomarkers, including fecal mercury, porphyrin profiles, and imaging but could not reach a consensus on the most appropriate biomarker of mercury bioaccumulation. With regard to reference exposure levels, the panel did not recommend a specific REL but asked FDA to reconsider its risk assessment and consider new REL(s) that take into account higher levels of uncertainty. Some panelists also recommended that FDA look beyond risk assessment approaches that rely on a single point of departure, e.g., LOAEL or NOAEL, and uncertainty factors to derive an REL and consider other approaches, such as benchmark dose. Additionally, some panelists recommended that FDA review the available literature for mercury vapor's effects on other critical endpoints, such as hearing loss and immunological effects, which were not considered in the derivation of the EPA REL. With regard to clinical studies, some panelists concluded that the clinical studies show there is no causal link between the use of dental amalgam and various clinical diseases in the general population but cautioned that the clinical studies do not adequately identify those who may be in a susceptible subpopulation. The panel discussed pregnant women and children under six as particularly susceptible subpopulations and stated that they might be at increased risk from exposure to mercury vapor but acknowledged that there is little to no data on these subpopulations. With regard to weighing clinical data versus risk assessments, the panel did not see these to be in conflict with each other but stated that they are complementary in assessing health risks. With respect to potentially sensitive populations, which FDA identifies as fetuses, breastfed infants, and children under six years of age, FDA has already acknowledged that *"[t]he developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed."* This statement is currently found in the "Information for Use" statement in the recommended professional labeling for dental amalgam.[117] Although daily exposures at or above an REL over a lifetime do not necessarily indicate that adverse health effects will occur, doses far above the REL suggest that probability of adverse health effects is more likely, especially in sensitive subpopulations. The panel also recommended that FDA's current Information for Use for dental professionals[118] be updated to reflect some of the uncertainties about a risk assessment for dental amalgam.

After considering the information in your petition, the directed agency assignments, and panel deliberation, the agency believes that there are limitations with regard to the EPA RfC and ATSDR MRL, especially with respect to the selection of uncertainty factors (UFs). More recent RELs have been presented by Richardson, Cal-EPA, and others, however, these RELs also incorporate uncertainty factors and have some of the same limitations. The agency continues to evaluate available information on the uncertainty factors and the development of other RELs for chronic mercury vapor exposure. FDA also believes that even though amalgam patients with numerous amalgam-filled surfaces

---

[117] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm.
[118] Found in the Special Controls Guidance Document:
www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm073330.pdf.

could be exposed to daily doses of mercury vapor above the available RELs, this alone does not necessarily indicate that adverse health effects from dental amalgam will occur. The agency also believes that the risk assessment information provided by the RELs must be taken in context with the available clinical data on dental amalgam. Since the weight of clinical evidence has not established an association between dental amalgam use and adverse health effects in adults and children age six and older, the agency believes that its current classification of dental amalgam provides a reasonable assurance of safety and effectiveness. FDA also agrees that certain potentially sensitive subpopulations (i.e., fetuses, breastfed infants, and children under six years of age) may be at higher risk of adverse health effects from mercury in dental amalgam, but FDA has already taken steps in its final rule and special controls guidance document to protect these subpopulations, as explained above.

### b. Review of the Literature

Your petition claims that the final rule is based on an inadequate review of the toxicological literature and fails to identify a methodical analysis of the weight of the evidence. As an example, you cite Mutter (2011) (Ex. 9) and Stejskal et al. (Ex. 26) to support your claim that the SCENIHR report,[119] which FDA cited in the final rule, "disregarded the toxicology of mercury and did not include the most important scientific studies in their review." FDA has reviewed these exhibits and disagrees with your assertion that the SCENIHR report is an inadequate literature review or that the final rule is based on an inadequate review of the literature. Stejskal et al. (Ex. 26) is a memorandum that reflects the personal opinion of the reviewer that the SCENIHR report is flawed and that amalgam is not safe for use. Mutter (2011) (Ex. 9) is a critique of studies not considered in the SCENIHR report. FDA has reviewed the information provided in Stejskal et al. and Mutter and disagrees with their conclusions that the SCENIHR report is flawed. The majority of studies cited by Mutter (2011), or ones similar in study design and outcomes, have been previously considered by FDA and provide no conclusive evidence for an association between dental amalgam mercury exposure and adverse health effects. FDA believes the SCENIHR report accurately reflects the weight of the scientific evidence regarding purported health effects from the use of dental amalgam. FDA did not rely on this report for its conclusions in the final rule but performed its own review[120] of the scientific literature independent of SCENIHR and reached similar conclusions. FDA cited SCENIHR as an example that the agency's conclusions were supported by an independent investigation by another scientific body.

FDA disagrees with your claim that the final rule is based on an inadequate review of the toxicological literature and fails to identify a methodical analysis of the weight of the evidence. In issuing the final rule, the agency conducted an independent, systematic review of the scientific literature, considered available valid scientific evidence, and identified the methodology for selecting studies to consider. Prior to issuing the final rule, FDA carefully

---

[119] The Safety of Dental Amalgam and Alternative Dental Restoration Materials for Patients and Users – Preliminary Report, Scientific Committee on Emerging and Newly Identified Health Risks (SCENIHR), European Commission, Health and Consumer Protection DG, 2007.
[120] See FDA White Paper and Addendum at http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/ucm171115.htm.

examined extensive information (74 FR 38697) related to the safety and effectiveness of dental amalgam. This information included a comprehensive safety assessment of dental amalgam performed by the U.S. Public Health Service, U.S. government research related to dental amalgam, several national and international comprehensive reviews of scientific information about the risks and benefits of the device, comprehensive safety assessments of dental products that contain mercury by international health organizations and foreign countries, and the scientific literature reviewed by the Panel. FDA also reviewed more than 3,200 comments combined, many of which contained scientific journal articles, submitted to dockets FDA-2001-N-0067 (for FDA's proposed rule on dental amalgam; this docket was later folded into FDA-2008-N-0163), FDA-2006-N-0543 (comments relating to the September 6 & 7, 2006 joint panel meeting on dental amalgam, formerly docket number 2006N-0352), and FDA-2008-N-0163 (reopening of the comment period on FDA's proposed rule on dental amalgam).

FDA reviewed more than 200 scientific articles published from 1997 to 2008, on the potential health effects of dental amalgam ("White Paper and its Addendum").[121] In addition, to support the review of primary studies published from 1997-2008, FDA evaluated the most recent U.S. government agency reviews of mercury toxicity published by ATSDR[122] and EPA.[123] FDA also considered information and assessments reviewed in the proposed rule, and other risk assessments developed since the publication of the proposed rule, including the 2004 Life Sciences Research Office (LSRO) Report.[124] In an effort to determine if any very recent articles would have an impact on FDA's analysis, FDA conducted a literature search for 2008 – July 2009 (even though FDA had already reviewed studies published through October 2008). Three databases (PubMed, Biosis, and Embase) were searched with key words, such as "mercury," "toxicity," "mercury vapor," "adverse effect," "dental," etc. Several studies from this search had already been reviewed in the FDA Addendum to the White Paper.[125] After review of the total of 70 abstracts from the search,

---

[121] FDA Update/Review of Potential Adverse Health Risks Associated with Exposure to Mercury in Dental Amalgam, National Center for Toxicological Research, Food and Drug Administration, August 2006; Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf

[122] Agency for Toxic Substances and Disease Registry (ATSDR) and Research Triangle Institute, Toxicological Profile for Mercury, U.S. Dept. of Health and Human Services, Public Health Service, Atlanta, Georgia, 1999.

[123] United States Environmental Protection Agency (EPA), "Integrated Risk Information System (IRIS) Screening-Level literature Review" – Mercury, elemental, 2002.

[124] Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004. The LSRO report examined studies published from 1996 through 2003. In conducting its review, LSRO engaged an independent panel of academic experts in the fields of immunotoxicology, immunology, and allergy; neurobehavioral toxicology and neurodevelopment; pediatrics; developmental and reproductive toxicology; toxicokinetics and modeling; occupational health and epidemiology; pathology; and general toxicology.

[125] FDA Update/Review of Potential Adverse Health Risks Associated with Exposure to Mercury in Dental Amalgam, National Center for Toxicological Research, Food and Drug Administration, August 2006; Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf

Page 47 – Mr. Love and Mr. Reeves

FDA determined that no studies had been published in 2008- July 2009 that would change
FDA's findings about the health effects of dental amalgam, as reflected in the White Paper.
The White Paper Addendum also discusses the methodology of the literature review,
explaining the databases that FDA searched, use of case studies and reports, etc.

For these reasons, FDA disagrees with your assertion that the final rule is based on an
inadequate review of the toxicological literature and fails to identify a methodical analysis of
the weight of the evidence.

## c. Benefits of Removal of Amalgam

Your petition claims that there are health and environmental benefits of removal of dental
amalgam. To the extent that your petition, as originally filed, references studies to support
this claim, you did not provide the studies as exhibits for FDA to review. Your supplement
included the following exhibits to support your claim: Sjursen et al. (2011) (Ex. 18),
Prochazkova et al. (2004) (Ex.19), Lindh et al. (2002) (Ex. 20), Wojcik et al. (2006) (Ex.21),
Fleming & Janosky (2009) (Ex. 24), and Maxson (2012) (Ex. 25), Skjelvik et al. (2012) (Ex.
23). FDA has reviewed these exhibits and finds that they either do not provide any new
scientific information for FDA to evaluate, or do not adequately support your claim of health
and environmental benefits to removal of dental amalgam. Sjursen et al. (2011) (Ex. 18) is a
study of patients who reported a reduction in health complaints after removal of all amalgam
fillings. This study presents limited information because many of the reported improvements
are self-diagnosed. FDA had already considered Prochazkova et al. (2004) (Ex.19) in issuing
the final rule (Ref. 63). Lindh et al. (2002) (Ex. 20) is a retrospective study involving
patients with health complaints. A questionnaire was given after removal of amalgam and
concomitant antioxidant therapy to determine changes in symptoms or quality of life. This
study is inconclusive because it includes too many variables, including antioxidant therapy,
self-diagnosis, and placebo effect, to attribute the findings to the removal of dental amalgam.
Wojcik et al. (2006) (Ex.21) is a study of patients that attributes chronic fatigue, memory
impairment, and depression as symptoms of mercury toxicity and concludes that patients
with a genetic polymorphism (apolipoprotein E-4) are more susceptible to mercury toxicity.
Your petition also reports that this study found that removal of dental amalgam fillings, when
combined with treatment, resulted in a significant symptom reduction. FDA considered this
reference in the FDA White Paper and Addendum[126] and found that because symptom
improvement was only seen in groups with combined amalgam removal and substantial
concomitant therapy, which was not well defined, it is not possible to determine if amalgam
was the source of symptoms. FDA acknowledged in the final rule (74 FR 38693) that some
patients have reported improvement in their symptoms after removal of amalgam fillings.
The final rule states (74 FR 38693), "*according to some of the studies that were reviewed,
some patients develop adverse tissue reactions such as dermatological conditions or lesions*

---

[126] FDA Update/Review of Potential Adverse Health Risks Associated with Exposure to Mercury in Dental
Amalgam, National Center for Toxicological Research, Food and Drug Administration, August 2006; Addendum to
FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July
2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/U
CM173908.pdf

*of the skin, mouth, and tongue as a result of exposure to dental amalgam.*[127] *In mercury-allergic individuals, clinical improvements were reported after dental amalgam restorations were removed. Other studies reported that dental amalgam may exacerbate preexisting autoimmune disease in mercury-allergic individuals.*[128] *After dental amalgam restorations were removed, the health status of these patients reportedly improved.*" In general, in the absence of demonstrated allergy to one of the components of dental amalgam or medical necessity, FDA does not recommend removal of sound dental amalgam restorations.

Skjelvik et al.(2012) (Ex. 23) is a review of Norway's experiences with the phase-out of dental amalgam. Fleming & Janosky (2009) (Ex. 24) and Maxson (2012) (Ex. 25) are cost estimates for a ban on dental amalgam. This information is not directly relevant because FDA has concluded that the available information does not support a phase-out or ban of dental amalgam.

## D. CONCLUSION

For the reasons discussed above, FDA is denying your petition. Even so, FDA continues to evaluate the safety of dental amalgam and will take any further actions that are warranted.

Sincerely,

Leslie Kux
Associate Commissioner for Policy

---

[127] Kanerva L. et al., "A multicenter study of patch test reactions with dental screening series," Amer. J. Contact. Dermat, Vol. 12 (2), pp. 83-87, 2001and Laeijendecker R. et al., "Oral lichen planus and allergy to dental amalgam restorations," Archives of Dermatology, Vol. 140 (12), pp. 1434-1438, 2004.
[128] Prochazkova J. et al., "The beneficial effect of amalgam replacement on health in patients with autoimmunity." Neuro. Endocrinol. Lett., Vol. 25 (3), pp. 211-218, 2004 and Yaqob A. et al., "Metal-specific lymphocyte reactivity is downregulated after dental metal replacement," Neuro. Endocrinol. Lett., Vol. 27 (1-2), pp. 189-197, 2006.

EXHIBIT A2 - Case No. 1:14-cv-00356

DEPARTMENT OF HEALTH & HUMAN SERVICES
Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD 20993-0002

Jan 27 2015

Citizens for Health et al.,
C/O James S. Turner, Esq.
SWANKIN & TURNER
1400 16th Street, NW, Suite 101
Washington, DC 20036

Re: Converted Citizen Petition of the September 2, 2009 Petition for Reconsideration Docket
No. FDA-2014-P-0907 (previously FDA-2008-N-0163).

Dear Mr. Turner:

This letter responds to your above referenced citizen petition (the petition) filed on June 19,
2014 with the Food and Drug Administration (FDA, the agency), which you later revised on
July 3, 2014. The petition was converted from a petition for reconsideration that was
originally submitted on September 2, 2009 on behalf of Citizens for Health et al. In the
petition, you request that the Commissioner of Food and Drugs take the following actions:

"1. Contraindicate mercury amalgam for children under age six, pregnant women, nursing
mothers, and persons who may have a health condition that makes them more sensitive
to mercury exposure, including individuals with existing high levels of mercury
bioburden.

2. Require warnings to all dental patients or their parents that amalgam contains
mercury, which is bioaccumulative and is associated with adverse effects in the brain
and kidneys.

3. Require warnings to all parents of minor dental patients that "the developing
neurological systems in fetuses and young children may be more sensitive to the
neurotoxic effects of mercury vapor."

4. Revise the consumer website associated with this rule in order to

(a) include in the Potential Risks section the warning that "the developing neurological
systems in fetuses and young children may be more sensitive to the neurotoxic effects
of mercury vapor"

(b) delete the reference to mercury amalgam as "silver fillings"

(c) explain the concept of bioaccumulation to consumers

(d) change the description of the clinical information on "pregnant women and their

developing fetuses, and on children under the age of 6, including breastfed infants" from "limited clinical information" to the Final Rule's description which was "very limited to no clinical information"

(e) explain that amalgam's primary component is mercury on the introductory page of the consumer website"

Please note that under 21 CFR 10.30(b), in addition to an "Actions requested" section, a citizen petition must also include a "Statement of grounds" section. Per the regulations, the "Statement of grounds" is to be "[a] full statement, in a well-organized format, of the factual and legal grounds on which the petitioner relies." While your petition does include a Statement of grounds that contains 38 separate points, the petition fails to indicate which requested action each individual point is meant to support. As such, it was left to FDA to discern which points were intended to support each requested action. If it appeared to FDA that an individual point was meant to support a specific request, FDA's response to that point is contained within the discussion of that requested action (see below). However, there are several points that do not appear to correspond to a requested action. To the extent that new issues are raised by these points, they are discussed individually at the end of this letter.

For the reasons discussed below, FDA is denying your requests to contraindicate use in sensitive populations; require certain specified warnings to all dental patients; and require warnings to all parents of minor dental patients that "the developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor." However, FDA is granting your requested changes to our consumer website, except for your request to remove reference to "silver fillings." Further, even though we are denying your petition in part, FDA continues to evaluate the safety of dental amalgam and will take action as warranted.

## Background

How best to regulate dental amalgam is a complex question of risk and benefit. Dental amalgam has several advantages as a restorative material. It has a broad range of applicability in clinical situations, is easy to use, and is relatively insensitive to variations in handling technique and oral conditions. It also provides high strength, durability, and marginal integrity – features that may help prevent recurrent decay.[1] However, dental amalgam contains elemental mercury and releases mercury vapor. At high enough levels, mercury vapor is a neurotoxicant and can have adverse health effects. A central question in assessing the risk of dental amalgam is whether the levels of mercury vapor released from dental amalgam are associated with adverse health effects and, if so, to what extent. FDA has taken several actions in recent years to ensure a reasonable assurance of safety and effectiveness for dental amalgam. In 2002, FDA issued a proposed rule (67 FR 7621) that proposed reclassification of dental amalgam and its components into class II, subject to a special controls guidance document entitled "Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy." Following the proposed rule, FDA

---

[1] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.

Page 3 – Mr. James S. Turner

published a White Paper[2] in 2006 that reviewed the literature on the safety of mercury vapor exposure from dental amalgam. Later in 2006, FDA sought the advice of external experts at a joint meeting of the Dental Products Panel and the Peripheral and Central Nervous System Drugs Advisory Committee. In response to the recommendations of the 2006 panel and a review of over 1,800 public comments regarding dental amalgam (Docket FDA 2006-N-0352), FDA updated its White Paper with an Addendum in 2009,[3] and found no new information that would change the conclusions of earlier FDA assessments, that exposures to mercury vapor from dental amalgam are not associated with adverse health effects. However, FDA acknowledges that there is very limited to no clinical information available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed. There is, however, information that indicates that certain individuals with a pre-existing hypersensitivity or allergy to mercury may be at risk for adverse health effects from mercury vapor released from dental amalgam. FDA's findings were presented in the preamble to the final rule reclassifying dental amalgam into class II that was issued on August 4, 2009 (74 FR 38686). In conjunction with the final rule, FDA published the Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy – Guidance for Industry and FDA Staff, on July 28, 2009. In the final rule, FDA concluded that the special controls sufficiently mitigate the risks of dental amalgam such that the special controls and the general controls provide a reasonable assurance of the safety and effectiveness of dental amalgam.

Shortly before and following issuance of the 2009 final rule, FDA received several petitions (dockets FDA-2009-P-0610, FDA-2009-P-0357, and FDA-2010-P-0056), including this one, requesting that the agency take several additional actions on dental amalgam.[4] After receiving the petitions, FDA began a plan of evaluating the concerns raised, which included review of these petitions and the information they provided the agency, directed agency assignments with experts in toxicology and risk assessment, review of the mercury allergy literature, reviews of the amalgam literature, and an advisory committee meeting. In December 2010, FDA convened a meeting of the Dental Products Panel to gather input from the panel on exposure assessments for mercury vapor from dental amalgam, reference exposure levels (RELs) for mercury vapor, and the adequacy of the clinical studies on dental amalgam.[5] In general, the panel discussed uncertainties with current risk assessments for dental amalgam and believed it would be helpful to reconsider the REL (RfC) derived by EPA in 1995. The panel also discussed that there may be certain populations that are more sensitive to mercury exposure than the general population. In addition, the panel found that a review of the available literature showed there is no causal link between the use of dental amalgam and various clinical diseases in the general population.

---

[2] FDA draft White Paper,
http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/ucm171117.htm.
[3] Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf.
[4] FDA is issuing responses to each of these petitions simultaneously today.
[5] Panel meeting transcripts and meeting materials,
http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/DentalProductsPanel/ucm235085.htm.

EXHIBIT A2 - Case No. 1:14-cv-00356

Page 4 – Mr. James S. Turner

In responding to the citizen petitions regarding dental amalgam, FDA has considered the information presented in the petitions, as well its previous literature reviews and the panel deliberations. While FDA does not believe additional action is warranted at this time for the reasons explained below, the agency continues to evaluate the literature on dental amalgam and any other new information it receives in light of the 2010 panel recommendations, and will take further action on dental amalgam as warranted. The agency is, however, granting requests made in this petition to update FDA's dental amalgam website. These changes are described in detail below.

### A.  Request to Contraindicate Use in Sensitive Populations

Your first request asks FDA to "[c]ontraindicate mercury amalgam for children under age six, pregnant women, nursing mothers, and persons who may have a health condition that makes them more sensitive to mercury exposure, including individuals with existing high levels of mercury bioburden."

Your petition quotes FDA's final rule reclassifying dental amalgam (final rule), which states (74 FR 38694): "The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor."[6] You express concern that FDA has not provided adequate studies that affirmatively demonstrate that dental amalgam does not pose increased risks to these and other sensitive populations, including persons who may have health conditions that make them more sensitive to mercury Additionally, you point out that FDA's final rule (74 FR 38694) acknowledges that there is "very limited to no clinical information available" regarding long-term health outcomes in children under the age of six, developing fetuses, and infants who are breastfed."

You also claim that FDA's final rule gives no indication that the agency considered dental amalgam's contribution to a person's total mercury bioburden or mercury's bioaccumulative effect, and that "FDA's pre-rule website recognized that 'individuals with existing high levels of mercury bioburden' compose one of the populations with 'a health condition that makes them more sensitive to mercury exposure." Your petition states that "[t]he rule refers repeatedly to 'daily doses' of mercury, but does not ever address the fact that these 'daily doses' can be trapped in the human body, especially in the brain and kidneys, for months due to mercury's bioaccumulative nature. It is unclear that FDA even considered this issue when it decided that mercury amalgam did not require warnings or contraindications for children, pregnant women, nursing mothers, and individuals with a high mercury bioburden." (item 14). Based on the above, you conclude that FDA's decision not to contraindicate for certain subpopulations has no basis in science.

FDA disagrees with your claim that FDA should contraindicate the use of dental amalgam in children under age six, pregnant women, nursing mothers, and persons who may have a health condition that makes them more sensitive to mercury exposure, including individuals with existing high levels of mercury bioburden. Contraindications are used to describe situations in which the device should not be used because the risk of use clearly outweighs any possible benefit (see *Device Labeling Guidance #G91-1 (blue book memo)*). The benefits of dental

---

[6] Final Rule for Dental Amalgam, http://www.gpo.gov/fdsys/pkg/FR-2009-08-04/pdf/E9-18447.pdf

Page 5 – Mr. James S. Turner

amalgam, which have been established,[7] include strength, durability, marginal integrity, suitability for large surfaces and wet environments, and ease of use. In the final rule (74 FR 38691), FDA reviewed the available scientific evidence for potentially sensitive subpopulations and does not believe the risk of the use of dental amalgam clearly outweighs the benefit in any patient population such that a contraindication is warranted, except "in persons with a known mercury allergy," for which FDA has already recommended a contraindication (74 FR 38695). FDA does not believe the information that you included in your petition warrants further action at this time regarding contraindications.

1. **Children under the Age of Six**

In the final rule (74 FR 38692) FDA considered the potential health effects of dental amalgam on children under the age of six. In terms of toxicodynamics, FDA acknowledges that infants and children might have an inherent higher sensitivity to the effects of mercury vapor compared to adults; however, FDA found no clinical studies that evaluate the effects of mercury vapor exposure from dental amalgam in children under six years of age. In terms of toxicokinetics, FDA estimated (74 FR 38689) that the daily dose of mercury from amalgams in children under the age of six years old would not be higher than the estimated daily dose for adults (1-5 µg/day). FDA expects that the daily dose in children will be lower than the estimated dose for adults, since although the dose per kg body weight will be higher in children due to body weight differences between children and adults, children less than six have fewer and smaller teeth and lower ventilation rates, as compared to adults. The Agency for Toxic Substances and Disease Registry (ATSDR) Minimal Risk Level (MRL) and the United States Environmental Protection Agency (EPA) Reference Concentration (RfC) represent reference exposure levels (RELs) derived using studies and uncertainty factors and are intended to be protective against adverse health effects in all populations, including potentially sensitive subpopulations, such as young children. By definition, the RfC represents the daily exposure to mercury vapor that is likely to be without an appreciable risk of deleterious health effects during a lifetime and is derived to be protective against adverse health effects in sensitive subpopulations, such as developing fetuses and children. [8,9]

At the time FDA issued the final rule, FDA concluded that children under age six are not at risk for adverse health effects from mercury vapor released from dental amalgam. Even so, FDA included the following language in the "Information for Use" section in the recommended professional labeling for dental amalgam: "The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and

---

[7] Dental Amalgam: A Scientific Review and Recommended Public Health Service Strategy for Research, Education and Regulation; Public Health Service, U.S. Department of Health and Human Services, January 1993.
[8] Agency for Toxic Substances and Disease Registry (ATSDR) and Research Triangle Institute, Toxicological profile for mercury, U.S. Dept. of Health and Human Services, Public Health Service, Atlanta, Georgia, 1999. United States Environmental Protection Agency (EPA), "Integrated Risk Information System (IRIS) Screening-Level literature Review" – Mercury, elemental, 2002.
[9] The 2010 panel discussed the need to reconsider the uncertainty factors used by USEPA to derive the RfC for chronic exposure to mercury vapor. The agency continues to evaluate available information on the uncertainty factors and the development of other RELs for chronic mercury vapor exposure..

Page 6 – Mr. James S. Turner

their developing fetuses, and children under the age of six, including infants who are breastfed."[10]

Subsequent to the final rule, FDA held an advisory committee meeting in December 2010 to discuss and make recommendations on this and other issues related to FDA's final rule on dental amalgam.[11] This panel meeting was held to discuss issues raised in your petition and others (petitions filed to FDA-2008-N-0163 and FDA-2009-P-0357) regarding the safety of dental amalgam. Several panel members expressed concern about the sensitivity of this and other potentially vulnerable populations to the effects of mercury vapor. Of particular concern to the panel was the lack of clinical data available regarding health outcomes in these populations. FDA has acknowledged that there is very limited to no clinical information relevant to these populations. Subsequent to the panel meeting, FDA has been monitoring literature on dental amalgam, including literature discussing sensitive populations, and will continue to evaluate new information as it becomes available.

At this time, FDA does not believe that the available scientific data supports a finding that the risks of using dental amalgam in children under six clearly outweigh any possible benefits for this patient population such that a contraindication is warranted. Therefore, the agency is denying your request to contraindicate the use of dental amalgam for children under the age of six.

### 2. Pregnant Women

In the final rule (74 FR 38691), FDA considered the potential health effects of dental amalgam on pregnant women. FDA found that very few available studies have evaluated the effects of elemental mercury exposure on pregnancy outcomes in humans. Although mercury has the ability to cross the placental barrier, the limited human data do not demonstrate an association between exposure to the mercury in dental amalgam and adverse reproductive outcomes such as low birth weight babies or increased rates of miscarriage. In a retrospective study,[12] no strong association or clear dose-response relationship between occupational exposure to chemical agents or restorative materials and the risk of miscarriage was observed. In a study of female factory workers producing liquid mercury thermometers, exposures to a median concentration of 90 µg $Hg/m^3$, which is 300 times higher than the EPA RfC of 0.3 ug $Hg/m^3$ (maximum exposure reported was 600 $\mu g/m^3$), resulted in no significant differences in stillborn or miscarriage rates between exposed and unexposed subjects.[13] The mercury vapor concentrations to which these workers were exposed were over an order of magnitude higher than those associated with dental amalgam. Very few well-controlled animal studies or human epidemiological studies have evaluated the potential effect of low-level mercury vapor exposure on fetal development,

---

[10] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm

[11] *See* http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory Committee/DentalProductsPanel/ucm235085.htm for transcripts and meeting materials.

[12] Lindbohm, M.L. et al., "Occupational exposure in dentistry and miscarriage," *Occupational Environmental Medicine,* Vol. 64 (2), pp. 127-133, 2007.

[13] Elghany, N.A. et al., "Occupational exposure to inorganic mercury vapour and reproductive outcomes," *Occupational Medicine,* Vol. 47 (6), pp. 333-336, 1997.

especially at exposures experienced by dental amalgam bearers. In one retrospective study[14], no association was found between the number of amalgam fillings in women and low birth weight of their babies. Further, a study of pregnant rats exposed to very high concentrations of mercury vapor during gestation indicated no adverse effects on reproductive outcomes (increased fetal resorptions, decreased litter size and pup body weights) except at the highest exposure that resulted in maternal toxicity.[15]

Although the data are limited, FDA concluded in the final rule that the existing data do not suggest that fetuses are at risk for adverse health effects due to maternal exposure to mercury vapors from dental amalgam. Even so, FDA did include the following language in the "Information for Use" section in the recommended professional labeling for dental amalgam: "The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed."[16]

As stated above, subsequent to the final rule, FDA held an advisory committee meeting in December 2010 to discuss and make recommendations on this and other issues related to FDA's final rule on dental amalgam.[17] Several panel members expressed concern about the sensitivity of this and other potentially vulnerable populations to the effects of mercury vapor. Of particular concern to the panel was the lack of clinical data available regarding health outcomes in these populations. FDA has acknowledged that there is very limited to no clinical information relevant to these populations. Subsequent to the panel meeting, FDA has been monitoring literature on dental amalgam, including literature discussing sensitive populations, and will continue to evaluate new information as it becomes available. Since that panel meeting, FDA has been monitoring literature on dental amalgam and will continue to evaluate new information as it becomes available.

At this time, FDA does not believe that the available scientific data supports a finding that the risks of using dental amalgam in pregnant women clearly outweigh any possible benefits for this patient population such that a contraindication is warranted. Therefore, the agency is denying your request to contraindicate the use of dental amalgam for pregnant women.

### 3. **Nursing Mothers**

In the final rule (74 FR 38692), FDA considered the potential health effects of dental amalgam on breastfed infants.[18] FDA acknowledged that mercury present in a nursing mother's body is

---

[14] Hujoel, P.P. et al., "Mercury exposure from dental filling placement during pregnancy and low birth weight risk," American Journal of Epidemiology, Vol. 161(8), pp. 734-740, 2005.

[15] Morgan DL, Chanda SM, Price HC, Fernando R, Liu J, Brambila E, O'Connor RW, Beliles RP, Barone Jr S: "Disposition of inhaled mercury vapor in pregnant rats: Maternal toxicity and effects on developmental outcome." *Toxicol Sci*, 2002; 66:261-273.

[16] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm.

[17] *See*
http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory Committee/DentalProductsPanel/ucm235085.htm for transcripts and meeting materials.

[18] We understand your request to contraindicate the use of dental amalgam in nursing mothers concerns the potential risks to breastfed infants.

Page 8 – Mr. James S. Turner

transmitted to her infant through breast milk.[19] An absorbed dose of mercury vapor is metabolized in the body to ionic mercury, e.g., mercuric chloride, which is the form of mercury in tissues, including breast milk. Several studies reviewed in the 2004 Life Sciences Research Office Report (LSRO)[20] evaluated concentrations of total mercury in breast milk. In some of the reviewed studies, the number of amalgams correlated with the concentration of total mercury in breast milk.[21] However, the LSRO report concluded from its review that inorganic mercury absorption through breast milk is not a significant source of mercury exposure to infants. In an additional analysis, a study[22] determined the concentration of breast milk mercury attributable to dental amalgam. In this study, the concentration of mercury in subjects with dental amalgam restorations was subtracted from the level in subjects without dental amalgam restorations. The level of mercury attributable to amalgam was 0.09 μg Hg/L. A standard value used to estimate daily breast milk consumption is 0.85 L/day (74 FR 38692). Based on this value, the typical daily dose of inorganic mercury to a breastfeeding infant from an individual with dental amalgam restorations would be 0.075 μg Hg/day. For a 5 kg infant, the daily exposure to inorganic mercury from breastfeeding would be 0.015 μg Hg/kg/day. The estimated concentration of mercury in breast milk attributable to dental amalgam exposure is low and is an order of magnitude below the EPA Reference Dose (RfD) of 0.3 μg Hg/kg/day for oral intake of ionic mercury, the primary form of mercury in breast milk after exposure to mercury vapor. A study of pregnant rats exposed to very high concentrations of mercury vapor during gestation indicated no adverse effects in offspring post-weaning on a multitude of neurological and neurobehavioral tests.[23]

In the final rule, FDA concluded that the existing data support a finding that infants are not at risk for adverse health effects from the breast milk of women exposed to mercury vapors from dental amalgam. Even so, FDA did include the following language in the "Information for Use" section in the recommended professional labeling for dental amalgam: "The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed."[24]

---

[19] Maternal exposure to elemental mercury vapor is expected to affect the concentration of inorganic mercury in breast milk. The EPA has set a Reference Dose (RfD) for oral exposure to inorganic mercury at 0.3 μg Hg/kg/day. (United States Environmental Protection Agency (EPA), "Integrated Risk Information System (IRIS) Screening-Level literature Review" – Mercuric chloride, 2002). This value represents the daily exposure to inorganic mercury that is likely to be without an appreciable risk of deleterious health effects during a lifetime. Reference values are derived to be protective against adverse health effects in sensitive subpopulations, such as developing fetuses and children.

[20] Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004.

[21] Drexler, H. et al., "The mercury concentration in breast milk resulting from amalgam fillings and dietary habits," *Environmental Research*, Vol. 77, pp. 124-129, 1998.

Drasch, G. et al., "Mercury in human colostrum and early breast milk. Its dependence on dental amalgam and other factors," *J. Trace Elem. Med. Biol.*, Vol.12, pp. 23-27, 1998.

Oskarsson A. et al., "Total and inorganic mercury in breast milk in relation to fish consumption and amalgam in lactating women," *Archives of Environmental Health*, Vol. 51 (3), pp. 234-241, 1996.

[22] Vimy M.J. et al., "Mercury from maternal "silver" tooth fillings in sheep and human breast milk: A source of neonatal exposure," *Biol. Trace Elem. Res.*, Vol. 56 (2), pp.143-152, 1997

[23] Herr DW, Chanda SM, Graff JE, Barone SS, Jr., Beliles RP, Morgan DL: Evaluation of sensory evoked potentials in Long Evans rats gestationally exposed to mercury (Hg0) vapor. Toxicol Sci 2004; 82(1):193-206.

[24] http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073311.htm.

Subsequent to the final rule, FDA held an advisory committee meeting in December 2010 to discuss and make recommendations on this and other issues related to FDA's final rule on dental amalgam.[25] Several panel members expressed concern about the sensitivity of this and other potentially vulnerable populations to the effects of mercury vapor.  Of particular concern to the panel was the lack of clinical data available regarding health outcomes in these populations. FDA has acknowledged that there is very limited to no clinical information relevant to these populations.  Subsequent to the panel meeting, FDA has been monitoring literature on dental amalgam, including literature discussing sensitive populations, and will continue to evaluate new information as it becomes available. Since that panel meeting, FDA has been monitoring literature on dental amalgam and will continue to evaluate new information as it becomes available.

At this time, FDA does not believe that the available scientific data supports a finding that the risks of using dental amalgam in nursing mothers clearly outweigh any possible benefits for this patient population such that a contraindication is warranted. Therefore, the agency is denying your request to contraindicate the use of dental amalgam for nursing mothers.

## 4.  Other Sensitive Individuals with High Mercury Body Burden

In the final rule, FDA considered the bioaccumulation of mercury. FDA acknowledged that mercury has been found to accumulate in the brain and kidneys (74 FR 38687).[26] FDA acknowledges that the total mercury body burden is derived from various sources, including occupational exposures, dental amalgam, fish consumption, and environmental exposure. In the final rule, FDA did not provide a comprehensive analysis of exposure to multiple species of mercury or define which individuals have a high body burden because there are no scientifically reliable estimates of such information.  Per FDA's guidance document, *Device Labeling Guidance #G91-1*,[27] a contraindication is a situation in which a device should not be used because the risk of use clearly outweighs any possible benefit.  Contraindications should be based on known information and not theoretical possibilities.

Subsequent to the final rule, FDA held an advisory committee meeting in December 2010 to discuss and make recommendations on this and other issues related to FDA's final rule on dental amalgam.[28] Since that panel meeting, FDA has been monitoring literature on dental amalgam and will continue to evaluate new information as it becomes available.

---

[25] *See* http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/DentalProductsPanel/ucm235085.htm for transcripts and meeting materials.

[26] Liu, J. et al., "Toxic effects of metals," Casarett & Doull's Toxicology: The Basic Science of Poisons, Chapter 23, pp. 931-979, McGraw-Hill Medical, New York, New York, 2008.
Clarkson, T.W. et al., "The Toxicology of Mercury and Its Chemical Compounds," *Critical Reviews in Toxicology*, Vol. 36, pp. 609-662, 2006.

[27] Available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm081368.htm.

[28] *See* http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/DentalProductsPanel/ucm235085.htm for transcripts and meeting materials.

Page 10 – Mr. James S. Turner

At this time, FDA does not believe that the available scientific data supports a finding that the risks of using dental amalgam in patient populations with high mercury body burden clearly outweigh any possible benefits for this patient population such that a contraindication is warranted. Therefore, the agency is denying your request to contraindicate the use of dental amalgam for individuals with a high body burden of mercury.

## B. Request to Require Patient Labeling

Your second and third requests ask FDA to require certain patient labeling. Specifically, you request the following:

1) Require warnings to all dental patients or their parents that amalgam contains mercury, which is bioaccumulative and is associated with adverse effects in the brain and kidneys.

2) Require warnings to all parents of minor dental patients that "the developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor."

In your petition, you quote FDA's final rule and note that there is "very limited to no clinical information regarding the long term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed." You argue that, because there is limited to no clinical information about these populations, the decision to use dental amalgam on them is not a complex matter that requires the expertise of a dental professional. You state that "[s]ince complicated scientific data on which dentists could base decisions is not available in the case of children under age six and the unborn, dentists and parents are left with an equal or superior ability to understand the remaining complexities…that are weighed when determining whether mercury amalgam is an appropriate filling material for their children" (internal quotation marks omitted). (item 31) As such, you request that FDA require patient labeling regarding mercury sensitivity directly to parents of minor dental patients.

Additionally, you contend that patients would be in a better position to discuss treatment options if they had direct information about dental amalgam. (item 19) You raise concerns that FDA's policy may actually encourage dentists to bypass this conversation, which could lead to deferred treatments and anxiety on the part of the patient. (item 20) You claim that patient labeling is needed because the administrative record does not support the idea that dentists, on their own, will convey information about dental amalgam to their patients. (item 22). Additionally, your petition says that the final rule is contrary to FDA's mission of advancing the public health by helping the public get accurate and neutral information (items 23, 24, 25), and as a result is allowing dentists to make decisions for their patients without proper patient input. (items 29, 32).

FDA's special controls guidance document for dental amalgam (*Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy – Guidance for Industry and FDA Staff*) recommends that dental amalgam's Information for Use section of the Labeling for Dental Professionals contain the following statement: "The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor. Very limited to no clinical information is available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including

Page 11 – Mr. James S. Turner

infants who are breastfed." Additionally, the special controls guidance document also recommends the following warning: "WARNING – CONTAINS MERCURY – may be harmful if vapors are inhaled." As you point out, however, this information is provided on professional labeling and is not required to be given directly to patients. The final rule (74 FR 38703) states the following:

"FDA believes that the recommended labeling statements in the special controls guidance document will provide dentists with important information that will improve their understanding of the devices and help them make appropriate treatment decisions with their patients. In addition, FDA notes that dental amalgam is a prescription device and, therefore, patients cannot receive the device without the involvement of a learned intermediary, the dental professional. Based on the reasons described above, FDA has concluded that it is not necessary to require that dentists provide this information to patients in order to provide reasonable assurance of the safety and effectiveness of the device."

Subsequent to the final rule, the question of whether patient labeling should be required for dental amalgam was considered at the FDA Advisory Committee meeting of the Dental Products Panel (panel) held on December 14-15, 2010.[29] This panel meeting was held to discuss issues raised in your petition and others (petitions filed to FDA-2008-N-0163 and FDA-2009-P-0357) regarding the safety of dental amalgam. Several members of the panel suggested that patient labeling would have some benefit. Since that panel meeting, FDA has been monitoring literature on dental amalgam and will continue to evaluate new information as it becomes available. However, FDA does not believe the information that you included in your petition warrants further action at this time regarding patient labeling.

At this time, FDA continues to hold the view it expressed in the final rule, and while we are denying your request to include patient labeling with the specific language you identified, FDA is continuing to consider what changes, if any, are needed with respect to patient labeling.

## C. Request to Revise FDA's Dental Amalgam Webpage

Your final request asks that FDA make the following changes to its consumer website:

1. include in the Potential Risks section the warning that "the developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor"

As stated above, at this time FDA does not believe that providing this statement to patients is necessary to provide a reasonable assurance of the safety and effectiveness for dental amalgam. However, FDA has acknowledged the statement, "the developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor," and has included it as recommended professional labeling for dental amalgam. This statement is currently found in the Potential Risks section in the hyperlink for the Information for Use

---

[29] *See*
http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory Committee/DentalProductsPanel/ucm235085.htm for transcripts and meeting materials.

statement in the special controls guidance document (found above). Therefore, because such language is consistent with FDA's recommended professional labeling, FDA is granting your request to include this statement in the Potential Risks section of our consumer website.

2. delete the reference to mercury amalgam as "silver fillings"

Your petition asserts that it is deceptive to describe dental amalgam as "silver fillings" because consumers will generally understand "silver" to be a description of the material as opposed to the color. You state that it is FDA's duty to correct this misconception.

FDA's dental amalgam website states that "[d]ental amalgam is a mixture of metals, consisting of liquid mercury and a powdered alloy composed of silver, tin, and copper. Approximately 50% of dental amalgam is elemental mercury by weight. Dental amalgam fillings are also known as 'silver fillings' because of their silver-like appearance." This language explicitly informs users that dental amalgam contains mercury. FDA believes the reference to the term "silver fillings" is necessary in order to ensure that consumers who have only heard dental amalgam referred to as "silver fillings" understand that those fillings do contain mercury. Therefore, the agency is denying your request to delete the reference to mercury amalgam as "silver fillings." However, to reduce the potential for misunderstanding, we intend to add the following sentence after the reference to silver fillings: "Despite the name, 'silver fillings' do contain elemental mercury."

3. explain the concept of bioaccumulation to consumers

You claim that FDA's website fails to accurately describe the risks of amalgam because it does not acknowledge that amalgam is only one source of mercury and that mercury is bioaccumulative. You claim that, by not explaining this concept, FDA's website is misleading consumers who may not understand that dental amalgam may be only one source that contributes to an individual's total mercury bioburden.

Because FDA agrees that such an explanation may be informative for patients that are interested in learning more about the properties of mercury, we are granting your request to include the following information to our consumer website:

> Bioaccumulation refers to the build-up or steadily increasing concentration of a chemical in organs or tissues in the body. Mercury from dental amalgam and other sources (e.g., fish) is bioaccumulative. Studies of healthy subjects with amalgam fillings have shown that mercury from exposure to mercury vapor bioaccumulates in certain tissues of the body including kidneys and brain. Studies have not shown that bioaccumulation of mercury from dental amalgam results in damage to target organs. For more information about bioaccumulation, please see Related Resources.

Additionally, the agency will add links to other U.S. Government agency websites such as ATSDR[30] and EPA,[31] to provide further information on the bioaccumulation of mercury species in the body.

---

[30] See "How can mercury enter and leave my body?" at
http://www.atsdr.cdc.gov/PHS/PHS.asp?id=112&tid=24#bookmark04.
[31] See "How are people exposed to mercury?" at http://www.epa.gov/hg/exposure.htm.

Page 13 – Mr. James S. Turner

4. change the description of the clinical information on "pregnant women and their developing fetuses, and on children under the age of 6, including breastfed infants" from "limited clinical information" to the Final Rule's description which was "very limited to no clinical information"

FDA agrees that changing the phrase "limited" to "very limited to no" would make the information more consistent with the language of the final rule. We are changing the description to state "very limited to no clinical data."

5. explain that amalgam's primary component is mercury on the introductory page of the consumer website"

FDA agrees that that the introductory page could be more descriptive to include the composition of dental amalgam. Therefore, we are granting your request to change the introductory page of the consumer website to identify the composition of dental amalgam, whose primary component is elemental mercury.

### D. Other Issues Raised in the Petition

To the extent that your petition requests additional agency actions that do not correspond to the specific actions requested in Section B of your petition, FDA's response to those requests can be found below. FDA has also responded to certain points raised in your petition that do not request a specific action.[32]

### 1. Review of Scientific Literature

Your petition claims that the final rule is not based on science and neglected studies demonstrating the hazards of mercury exposure from dental amalgam. FDA disagrees with your claim.

Prior to issuing the final rule, FDA carefully examined extensive information (74 FR 38697) related to the safety and effectiveness of dental amalgam. This information included a comprehensive safety analysis of dental amalgam performed by the U.S. Public Health Service, U.S. government research related to dental amalgam, several national and international comprehensive reviews of scientific information about the risks and benefits of the device,

---

[32] Your allegation that FDA's final rule is tainted, because of a conflict of interest on the part of Commissioner Hamburg is without merit. At the outset of her tenure, in consultation with FDA's ethics professionals, the Commissioner put appropriate recusals in place to address conflicts and potential conflicts. When she began her tenure, the Commissioner attended various briefings, including a briefing at which dental amalgam was covered; she did not, however, provide input on the dental amalgam decision making process and was merely the recipient of information as to the content and status of the rulemaking. Commissioner Hamburg did not personally and substantially participate in the dental amalgam rulemaking, as was confirmed in the 2010 memorandum from the Department of Health and Human Services Office of the Inspector General.

The petition also alleges that other FDA staff were biased in their handling of the final rule. These allegations, too, are unfounded. Moreover, FDA decision-making processes have multiple layers of review to help ensure their integrity. The final rule and special controls guidance document reflect FDA's careful and impartial consideration of all of relevant information before the Agency at the time of the issuance of the rule.

comprehensive safety analyses of dental products that contain mercury by international health organizations and foreign countries, and the scientific literature reviewed by the September 6-7, 2006 Panel meeting.[33] FDA also reviewed the more than 3,200 comments combined, many of which contained scientific journal articles, submitted to dockets FDA-2001-N-0067 (for FDA's proposed rule on dental amalgam; this docket was later folded into FDA-2008-N-0163), FDA-2006-N-0543 (comments relating to the September 6 & 7, 2006 joint panel meeting on dental amalgam, formerly docket number 2006N-0352), and FDA-2008-N-0163 (reopening of the comment period on FDA's proposed rule on dental amalgam).

As part of the rulemaking, FDA reviewed more than 200 scientific articles, published from 1997 to 2008, on the potential health effects of dental amalgam ("Addendum to the White Paper").[34] In addition, to support the review of primary studies published from 1997-2008, FDA evaluated the most recent U.S. government agency reviews of mercury toxicity published by ATSDR[35] and EPA.[36] FDA also considered information and evaluations reviewed in the proposed rule, and other evaluations developed since the publication of the proposed rule, including the 2004 Life Sciences Research Office (LSRO) Report.[37] In an effort to determine if articles published subsequent to 2008 but prior to issuing the final rule would have an impact on FDA's analysis, a literature search was conducted for 2008 – July 2009 (even though FDA had already reviewed studies published through October 2008). Three databases (PubMed, Biosis, and Embase) were searched with key words, such as mercury, toxicity, mercury vapor, adverse effect, dental, *etc*. Several studies from this search had already been reviewed in the Addendum to the White Paper.[38] After review of the 70 abstracts from the search, FDA determined that none of the studies published in 2008-2009 contained new information that would change FDA conclusions about the health effects of dental amalgam.

For these reasons, FDA does not agree that its final rule was not based on science, as you contend.

2. **Mercury Allergies**

---

[33] This panel meeting was held to discuss FDA's review of the amalgam literature in a draft White Paper.

[34] Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf

[35] Agency for Toxic Substances and Disease Registry (ATSDR) and Research Triangle Institute, Toxicological Profile for Mercury, U.S. Dept. of Health and Human Services, Public Health Service, Atlanta, Georgia, 1999.

[36] United States Environmental Protection Agency (EPA), "Integrated Risk Information System (IRIS) Screening-Level literature Review" – Mercury, elemental, 2002.

[37] Review and Analysis of the Literature on the Potential Adverse Health Effects of Dental Amalgam, Life Sciences Research Office, July 2004. The LSRO report examined studies published from 1996 through 2003. In conducting its review, LSRO engaged an independent panel of academic experts in the fields of immunotoxicology, immunology, and allergy; neurobehavioral toxicology and neurodevelopment; pediatrics; developmental and reproductive toxicology; toxicokinetics and modeling; occupational health and epidemiology; pathology; and general toxicology.

[38] Addendum to FDA Draft White Paper, Addendum Review in Response to Advisory Panel Comments and Recommendations, July 2009.
http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/DentalProducts/DentalAmalgam/UCM173908.pdf

Your petition requests that FDA clarify the concept of mercury allergy and provide additional information to patients regarding dental amalgam's mercury content so that patients have the opportunity to discuss this sensitivity with their dentist.

Following publication of the final rule, FDA conducted a review of the literature on mercury allergies. FDA's findings[39] were published prior to the panel meeting held on December 14-15, 2010, where FDA concluded that, "overall, mercury allergy is a rare condition with no obvious risk factors." In addition, this issue was also discussed at that panel meeting. For further details on this subject we refer you to FDA's mercury allergy literature review and the panel transcripts that may be accessed at the following FDA web address:

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/Medica lDevicesAdvisoryCommittee/DentalProductsPanel/ucm235085.htm.

Based on FDA's literature review and the discussion at the panel meeting, FDA currently believes that the current special controls for dental amalgam, which recommend a contraindication against use of dental amalgam in persons with a known mercury allergy, provide a reasonable assurance of safety and effectiveness for this device. As described above, contraindications are used to describe situations in which the device should not be used because the risk of use clearly outweighs any possible benefit.

Further, we believe the information contained at the website "CDER Mercury Allergy Consult"[40] clearly explains the concept of mercury allergies.  However, in an effort to make this information more accessible to consumers, the agency will add this information to the dental amalgam website.

3. **Corrosion – Contact with Other Types of Metals**

Your petition provided a comment that the labeling requirement for dental amalgam, "do not place the device in contact with other types of metals," is unclear. FDA disagrees with your comment and believes that the special controls to address the risk of corrosion are adequate.

The special controls to address the risk of corrosion are recommendations for: (i) specific labeling and (ii) a performance test for corrosion potential.

i. Specific Labeling Recommendation
   The special controls guidance recommends the following specific labeling:
   *Precaution:* Do not place the device in direct contact with other types of metals.
   This labeling precaution recommendation will alert dental professionals of a potential material incompatibility between dental amalgam and other metal restoratives that may be present in the mouth, such as stainless steel, titanium, base metal alloys, and noble metal

---

[39] *See* "CDER Mercury Allergy Consult" file at
http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisory Committee/DentalProductsPanel/ucm235085.htm.
[40]
http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevice sAdvisoryCommittee/DentalProductsPanel/UCM236366.pdf

alloys. It will help ensure that a dental amalgam device is not placed in contact with a metal that will cause the device to corrode.

ii. Performance Test Recommendation

The special controls guidance recommends that dental amalgam devices be tested to assess their corrosion potential. Specifically, the guidance recommends that dental amalgam devices be tested in conformance with the ISO 24234:2004(E) performance standard. This standard calls for an evaluation of corrosion byproducts, identifying the type and amount of substances leached from the device when corrosion occurs.

The recommended performance test will provide information about what chemical products could be expected to be leached if the device were to corrode. This information will enable FDA, through a premarket notification (510(k)) submission, to determine if the device is acceptable and is comparable to legally marketed devices.

FDA believes that this labeling recommendation is sufficient to alert dental professionals of a potential material incompatibility between dental amalgam and other types of metal restoratives that could be present in the mouth, and to help ensure that dental amalgam is not placed in contact with other metals that will cause the device to corrode. Furthermore, FDA believes that the performance test recommendation will help ensure that dental amalgam's corrosion potential is limited. As such, FDA is declining to make the recommended change to this labeling.

## 4. Effects of Zinc in Amalgam

Your petition provided a comment that FDA should not have removed the proposed warning about zinc in the product labeling for dental amalgam. Specifically, you claim that FDA needs to provide further explanation about the use of dental amalgam in cases of difficult moisture control.

FDA believes a warning concerning zinc content is not necessary to provide reasonable assurance of safety and effectiveness of this device, and that the benefits of inclusion of zinc, including decreased oxidation, marginal breakdown, and high survival rates,[41] outweigh the risks of delayed expansion as a result of moisture contamination. In general clinical practice, dentists are aware that moisture contamination can adversely affect the quality of a restoration[42] and use dry field techniques to mitigate this risk. Further, the final rule improved the information dentists receive regarding the composition of dental amalgam, including zinc, because it required disclosure of all chemical components on the label that are present in a concentration greater than 0.5%. Because zinc is provided in concentrations exceeding 0.5%, its exact percentage is, therefore, required information on the label for dental amalgam devices.

For these reasons, we are declining your request to include a warning about the effects of zinc in the product labeling for dental amalgam.

## 5. Continued Use of Amalgam

---

[41] Anusavice et al., "Compositional Effects on the Survival of Amalgam Restorations," Dental Amalgam, *Phillips' Science of Dental Materials*, Eleventh Edition, Elsevier, 2003.
[42] Ibid.

Page 17 – Mr. James S. Turner

Your petition claims that that the final rule discourages a decrease in mercury exposure contrary to FDA's general mercury policy and the United States' national policy.

FDA does not have a "general mercury policy." However, the agency is statutorily required to classify medical devices based on the level of regulatory control necessary to provide reasonable assurance of the safety and effectiveness of the device. In the final rule, FDA reclassified the components of dental amalgam into class II and designated a special control guidance document to establish sufficient regulatory controls to provide such reasonable assurance. The final rule is meant to place dental amalgam in the appropriate regulatory class, which FDA is legally required to do.

FDA also disagrees with your assertion that the final rule will "create a rise in mercury exposusure." While developing its final rule, the Agency determined, "During 2008, there were an estimated 154.1 million dental restorations in the United States (Ref. 84). This number represents a decrease of almost 12 million restorations from 2005, with the decrease associated with better dental care. We assume that recent trends to reduce the use of dental amalgam as a restorative material will continue as patients and dentists take advantage of improved alternative materials for restorative and cosmetic purposes." (74 FR 38708) The final rule alone does not change the intended use of dental amalgam or its alternatives, and is not expected to increase the existing levels of use. Based on the trends discussed above, FDA expects the use of dental amalgam as a restorative material to continue to decrease.

### Conclusion

For the reasons discussed above, your petition is granted, in part, and denied, in part. Even so, FDA continues to evaluate the safety of dental amalgam and will take action as warranted.

Sincerely,

Leslie Kux
Associate Commissioner for Policy

**EXHIBIT B - Case No. 1:14-cv-00356**



**FDA Safety communication:  Reducing Exposure to Mercury Vapor Released**

**From Dental Amalgam ("Silver Fillings")**

**Date Issued:  Jan XX, 2012**

**Audience:**

- Dentists and dental care professionals who place dental amalgams
- All consumers, but especially:
    - Pregnant and nursing women
    - Parents and guardians of infants and children under age 6
    - People with mercury allergy or sensitivity
    - People with neurological disease
    - People with kidney disease

**Medical Specialties:**  Dentistry, Dental Hygiene, Pediatric Dentistry, Pediatrics, Ob/Gyn,

Neurology

**Device:**

Dental amalgam, also known as "silver fillings," is a kind of dental filling material used to fill cavities caused by tooth decay and to restore the structure and surfaces of a decayed or broken down tooth.  Dental amalgam filling material is a solid compound composed of several metals. About half of an amalgam filling is elemental mercury by weight.  The other half is an alloy of silver, tin, copper and sometimes zinc.  A dental amalgam filling continuously releases low levels of mercury in the form of mercury vapor.

Mercury vapor can cause health problems, particularly to the nervous system but the severity of effects depends on the amount of mercury released and exposure duration.

There is no direct evidence that the levels of mercury released from dental amalgam are

harmful for the general population. However, some subpopulations, such as pregnant and nursing women, children under the age of 6, people with mercury allergy or sensitivity, or people with neurological or renal (kidney) disease may be more susceptible to potential health risks from mercury exposure than the general population.

**Purpose:**

The purpose of this safety communication is:

- To provide dentists, consumers and medical professionals with definitive guidance and additional recommendations to reduce mercury exposure from dental amalgam fillings for sensitive subpopulations; and
- To communicate to dentists, medical professionals and the public the risks associated with mercury vapor released from dental amalgam fillings.

**Summary of Problem and Scope:**

Dental amalgam fillings contain mercury, which is released at low levels over time in the form of mercury vapor. Mercury vapor is released continually throughout the life of an amalgam filling. The amount of vapor released decreases as the filling ages, but chewing, tooth grinding or exposing and amalgam filling to hot liquid or food can temporarily increase the amount of vapor released. Mercury vapor levels are highest during and immediately following placement and removal of dental amalgam fillings and can be increased during and shortly after professional cleanings.

The primary route of mercury vapor exposure released from dental amalgam fillings is by inhalation and absorption into the body through the lungs. The body excretes some of this mercury while the remainder is distributed throughout the body and may accumulate in certain tissues, particularly the brain, kidney and liver. Mercury in the blood of a pregnant woman is also distributed throughout her body, but some passes into the blood of the developing fetus.

**A number of studies have been conducted to determine if exposure to mercury vapor from dental amalgam is related to adverse health effects. These studies do not provide conclusive evidence linking exposure to mercury vapor from dental amalgam with adverse health effects**

**EXHIBIT B - Case No. 1:14-cv-00356**

in the general population. **Based upon the current state of the scientific evidence, the FDA believes the amount of mercury vapor released from dental amalgam poses minimal risks for the adverse health effects in the general population.**

Although there is no direct evidence of harm from dental amalgam in the general population, information reviewed by the FDA over the past year presents concern for certain sensitive subpopulations, such as pregnant women and their developing fetuses, children younger than 6 years and other higher risk subgroups who may be more susceptible to potential adverse effects from mercury exposure.

In particular, there is uncertainty about the level of mercury exposure from dental amalgam. In addition, there is limited, if any, clinical data on health effects resulting from exposure to mercury vapor from dental amalgam in these more sensitive subpopulations.

## Guidance for Dental Professionals:

To avoid potential and unnecessary health risks to the most sensitive subpopulations and because there are alternative dental restorative materials currently available-such as composite resins-that do not contain mercury, the FDA provides the following guidance regarding the use of dental amalgam fillings:

**Dentists should not use dental amalgam fillings in patients with known hypersensitivities or allergies to mercury or other components of dental amalgam.** Some individuals have an allergy or sensitivity to mercury or the other components of dental amalgam. Dental amalgam may cause these individuals to develop oral lesions or other contact reactions.

**Dentists should not place new dental amalgam fillings in pregnant women.**

**EXHIBIT B - Case No. 1:14-cv-00356**

Placement or removal of dental amalgam during pregnancy results in a temporary increase in mercury exposure, which is associated with increased mercury levels in fetal cord blood and increased exposure to the developing fetus.

**Dentists should not place dental amalgam fillings in nursing women, children younger than 6 years and any individual with pre-existing kidney or neurological disease.** The developing neurological systems of breast-feeding infants and children may be more sensitive to the neurotoxic effects of mercury exposure. In addition, the use of dental amalgam in those persons with pre-existing kidney or neurological disease may further compromise already impaired renal and neurological systems.

**Additional Recommendations:**

**The FDA recommends against the removal of functional amalgam fillings in any individual, including pregnant women, unless deemed medically necessary by a physician in consultation with the patient's treating dentist.** However, the FDA recognizes that patients often present to a dentist requesting removal of dental amalgam fillings under a variety of circumstances, for example, cosmetic appearance, as well as owing to health concerns with or without a concurrent health problem. As part of the dental practice of informed consent, dentists should discuss the benefits and risks of using dental amalgam and restorative alternatives with their patients to allow the patient to make informed choices regarding their treatment options. The ultimate decision about what dental restorative material to use is one that should be made between patients and their dentist.

In some cases, dental amalgam may be the most suitable restoration for certain cavities, and should remain available to dentists for appropriate dental health care. However, alternative materials, such as composite resins that do not contain mercury, can also be used to fill cavities. The FDA believes that these alternative materials would best be offered as the first line of restorative care minimizing the use of dental amalgam.

**Information use in FDA's Guidance and Recommendations:**

**EXHIBIT B - Case No. 1:14-cv-00356**

The FDA published a final rule on Aug. 4, 2009, reclassifying dental amalgam from a Class I (low risk) to a Class II (moderate risk) medical device. The FDA also issued a Class II Special Controls guidance document for manufacturers of dental amalgam that outlines the specific performance data and labeling information. The FDA concluded that, based upon valid scientific evidence (including a review of the clinical literature and a 2006 assessment of potential adverse health risks from exposure to mercury vapor released from dental amalgam fillings), the special controls, in conjunction with the general controls, provided a reasonable assurance of the safety and effectiveness of dental amalgam.

After publishing the final rule on dental amalgam, the FDA received several petitions raising questions about the adequacy of the agency's risk assessment approach utilized in the 2009 final rule. In response to questions raised in the petitions, the FDA consulted with experts in toxicology and risk assessment regarding the levels of mercury vapor exposure from dental amalgam and how those levels compare with acceptable reference exposure levels[1] (RELs) established to protect public health.

---

[1] Reference Exposure Level (REL)-An REL represents an exposure concentration (with uncertainty spanning perhaps an order of magnitude) at or below which no adverse health effects are anticipated in the general human population (including sensitive subpopulations) following exposure to a chemical for a defined period of time. RELs are based on the most sensitive relevant adverse health effects reported in the medical and toxicological literature. An REL derived for mercury vapor that is related to long-term mercury exposure from dental amalgam represents the exposure concentration that is not likely to

These experts, who were asked to consider FDA's risk assessment and the merits of other approaches (attach link M1) questioned whether current standards for assessing the risk from

**EXHIBIT B - Case No. 1:14-cv-00356**

mercury vapor exposure are protective enough and pointed out that the FDA's risk assessment did not account for body weight differences between children and adults.  They presented their analyses at a December 2010 panel meeting (attach link M2) where members also raised questions about the adequacy of previous risk assessments for dental amalgam.

As a means of mitigating the risks of mercury exposure from dental amalgam, the panel offered the following recommendations:

- The risks of mercury vapor exposure from dental amalgam need to be communicated effectively to the public, dentists and medical professionals;
- Restorative options need to be thoroughly discussed with patients and informed consent obtained prior to initiating treatment;
- The FDA should consider warnings against the use of dental amalgam in pregnant women, young children, and those with kidney dysfunction, neurological impairment or allergy to mercury and other components of dental amalgam fillings.

The FDA is providing new guidance and recommendations on the use of dental amalgam because of the general lack of clinical data on exposure to mercury vapor from dental amalgam in sensitive subpopulations.

The FDA believes that certain subpopulations:  pregnant women, infants of nursing mothers, patients with known hypersensitivities or allergies to mercury or other components of dental amalgam, children under the age of 6, and patients with neurological or renal (kidney) disease may be at greater risk for adverse health effects as a result of exposure to mercury released from dental amalgam fillings.  Accordingly, FDA believes placement of new amalgam fillings should be avoided in these subpopulations.

---

cause adverse health effects for exposure over a lifetime, including the general population and sensitive subpopulations.  The REL is not a threshold of toxicity, that is, adverse health effects would not be expected in patients exposed at the REL.  The daily dose of a chemical associated with the REL serves as an indicator of the likelihood that adverse effects will occur when compared to the range of daily doses of the compound that patients are exposed to.  Daily exposures above and REL over a lifetime do not necessarily indicate that adverse health effects will occur, but doses far above the REL suggest that adverse health effects are more likely to occur.

**EXHIBIT B - Case No. 1:14-cv-00356**

The FDA continues to believe that exposure to mercury vapor from dental amalgam poses minimal risk for adverse health effects for the general population.  This conclusion reflects numerous scientific studies that have failed to show an association between exposure to

mercury vapor and dental amalgam and adverse health effects in the general population and children over six.  In particular:

- Studies examining associations between mercury exposure from dental amalgam and neurodegenerative diseases (the progressive loss of brain and/'or nerve functions, such as Alzheimer's disease, Parkinson's disease, and Multiple Sclerosis) and diseases of the immune system have been inconclusive.
- Epidemiological studies have shown no association between amalgam mercury exposure and neuropsychological and neurobehavioral deficits (memory, cognition, motor functions, hand steadiness) or renal (kidney) injury in the general population with amalgam fillings.
- Dental professionals exposed to mercury vapor in the occupational setting may be at higher risk  for exposure during removal of dental amalgam fillings or if dental amalgams are improperly used, stored, mixed or handled.  The FDA believes the use of proper removal and installation techniques in conjunction with attention to mercury hygiene serves to mitigate this risk to both the dentist and patient.  However, some studies have provided evidence for neurological deficits in dentists (for example, decreased hand steadiness) at low levels of mercury exposure.
- Controlled clinical trials studying children who had dental amalgam fillings placed as early as age 6 have not shown an association between dental amalgams and adverse health outcomes utilizing the parameters studied.  However, the children's health was assessed no more than seven years after placement.

## Reporting Problems to the FDA:

Prompt reporting of adverse events can help the FDA identify and better understand the risks associated with medical devices.  If you suspect a problem with dental amalgam fillings, we encourage you to file a voluntary report through MedWatch, the FDA Safety Information and Adverse Event Reporting program.

**EXHIBIT B - Case No. 1:14-cv-00356**

**Contact Information:**

If you have questions about this communication, please contact the Division of Small Manufacturers, International and consu8mer Assistance (DSMICA) at <u>DSMICA@FDA.HHS.GOV,</u> 800-638-2041 OR 301-796-7100.

*This document reflects the FDA's current analysis of available information, in keeping with our commitment to inform the public about ongoing safety reviews of medical devices*

**EXHIBIT C - Case No. 1:14-cv-00356**

**I. RELEASE OF MERCURY VAPOR**

A. Dental amalgam contains elemental mercury and releases mercury vapor. At high enough levels, mercury vapor is a neurotoxicant and can have adverse health effects.

      i.      Mercury vapor is released from mixed dental amalgam.

      ii.     Dental amalgam contains elemental mercury and releases mercury vapor.

      iii.    Eighty percent of the mercury inhaled into the lungs is absorbed into the bloodstream.

B. The issue of mixture risk assessment is complex.

      i.      FDA does not discount the possibility of synergism or additivity of toxins when patients are simultaneously exposed to more than one chemical or drug.

      ii.     FDA does not know the extent to which mercury becomes even more toxic in the presence of lead, aluminum, methyl mercury, or other toxins that may already be present in the tissues of a dental patient. However, FDA acknowledges that this potential exists.

      iii.    People are exposed to mercury from different sources. Dental amalgam is only one of those sources.

**II. PATIENT EXPOSURE TO MERCURY FROM AMALGAM FILLINGS.**

A    "Mercury vapor concentrations are highest immediately after placement and removal of dental amalgam but decline thereafter." However, patients with ten or fewer fillings will continue to directly absorb from their fillings one to five micrograms of mercury per day.

B.    It is very difficult to make accurate quantitative estimates of mercury release from dental amalgam and the amount absorbed into the body.

**III. EFFECTS ON PREGNANT WOMEN/FETUSES AND OTHER SENSITIVE PERSONS**

A. Pregnant Women and fetuses

      1.     There is limited to no clinical information available regarding long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed.

      2.     There is… information [indicating] that certain individuals with a pre-existing hypersensitivity or allergy to mercury may be at risk for adverse health effects from mercury vapor released from dental amalgam. Dentists typically do not

**EXHIBIT C - Case No. 1:14-cv-00356**

test their patients for such hypersensitivities or allergies before restoring teeth with dental amalgam.

3.   Very few well-controlled animal studies or human epidemiological studies have evaluated the potential effect of low-level mercury vapor exposure on fetal development, especially at exposures experienced by dental amalgam bearers.

4.   Very few available studies have evaluated the effects of elemental mercury exposure on pregnancy.

5.   Mercury has the ability to cross the placental barrier.

6.   Mercury present in a nursing mother's body is transmitted to her infant through breast milk.

**FDA did recommend professional labeling warning for dental amalgam addressing possible sensitivity to mercury by fetuses and young children.**

1.   Very few well-controlled animal studies or human epidemiological studies have evaluated the potential effect of low-level mercury vapor exposure on fetal development, especially at exposures experienced by dental amalgam bearers.

2.   There is limited to no clinical information concerning the effects of prenatal exposure from maternal sources of mercury vapor at relevant concentrations.

Certain potentially sensitive subpopulations (*i.e.*, fetuses, breastfed infants, and children under six) may be at higher risk for adverse health effects from mercury in dental amalgam,

"The developing neurological systems in fetuses and young children may be more sensitive to the neurotoxic effects of mercury vapor.  Very limited to no clinical information is available regarding the long-term health outcomes in pregnant women and their developing fetuses, and children under the age of six, including infants who are breastfed."

B. OTHER SENSITIVE PERSONS

1.   FDA reviewed the available scientific evidence for potentially sensitive subpopulations and does not believe that the risk of the use of dental amalgam clearly outweighs the benefit "in persons with a known mercury allergy," for which FDA has already recommended a contraindication (toxicodynamics).

2.   FDA acknowledges that infants and children under six might have an inherent higher sensitivity to the effects of mercury vapor compared to adults;

3.   FDA found no clinical studies that evaluate the effects of mercury vapor exposure from dental amalgam in children under 6.

**IV.  MERCURY BIOACCUMULATION**

**EXHIBIT C - Case No. 1:14-cv-00356**

A.   FDA agrees with your claim that mercury bioaccumulates in certain tissues of the body.

    1.   Mercury bioaccumulates in the kidneys, brain, and fetus and that the kidneys accumulate the highest organ concentration of mercury following exposure to mercury vapor.  The concentration of mercury in the kidneys has been associated with the number of dental amalgams placed.

    2.   There is limited to no clinical information concerning the effects of prenatal exposure from maternal sources of mercury vapor at relevant concentrations.

    3.   FDA concludes "the existing data do not suggest FDA recommended professional labeling warning for dental amalgam addressing possible sensitivity to mercury by fetuses and young children.

B.   In issuing its final rule, FDA concluded that it "is aware that, in autopsy studies, mercury has been found to accumulate in the brain.  However, it is difficult to draw conclusions from autopsy studies regarding a potential association between exposure to dental amalgam and adverse health outcomes without information concerning the individual's lifetime history of exposure to mercury in fish and other environmental sources."

C.   FDA acknowledged that mercury has been found to accumulate in the brain and kidneys.  FDA acknowledges that the total mercury body burden is derived from various sources, including occupational exposures, dental amalgam, fish consumption, and environmental exposure.

D.   High levels of maternal mercury vapor exposure were associated with the accumulation of mercury in fetal tissues. (Final Rule, page 6, ¶ Animal Studies)

**V.    RISK TO DENTAL PROFESSIONALS**

A.   Dental professionals may be exposed to mercury vapor in the workplace during the preparation, placement, and removal of dental amalgam.

B.   Very few available studies have evaluated the effects of elemental mercury exposure on pregnancy outcomes in humans.

**VI.    GENERAL TOXICITY INSIDE BODY/NEUROLOGICAL EFFECTS**

A.   Mercury toxicity has been demonstrated in a variety of organ systems in laboratory studies and that the central nervous system and the kidneys are both target organs sensitive to mercury vapor.

B.   "FDA recognizes that dental amalgam releases low levels of mercury, and that there are scientific data showing mercury vapor, at high enough exposures, to be a neurotoxicant and nephrotoxicant."

C. FDA acknowledges that mercury exposure at high levels can result in adverse health effects to the neurological system.

**VII.   KIDNEY DYSFUNCTION**

A. FDA acknowledges that mercury exposure from dental amalgam results in increased mercury levels in tissues, including in the kidneys, and that exposure to mercury from various other sources at high levels can result in adverse health effects to the renal system, FDA acknowledged in the final rule that mercury toxicity has been demonstrated in a variety of organ systems in laboratory studies and the central nervous system and the kidneys are both target organs sensitive to mercury vapor. FDA further states in the final rule, "FDA recognizes that dental amalgam releases low levels of mercury, and that there are scientific data showing mercury vapor, at high enough exposures, to be a neurotoxicant and a nephrotoxicant."

B. FDA specifically acknowledges that kidneys and the central nervous system are both target organs sensitive to mercury vapor.

**VIII   HEARING LOSS**

A. The panel discussed [an epidemiological study associating mercury fillings with hearing loss that] may have significance but that other studies in a larger patient population are needed to corroborate the effects seen in this study.

**IX.   ALLERGY, HYPERSENSITIVITY, OR AUTOIMMUNE**

A. While FDA acknowledges that some individuals are hypersensitive or allergic to mercury and/or other metals, the agency's view is that such reactions are rare and may be attributed to immediate type allergic reactions to one or more components of dental amalgam other than mercury.

B. FDA concluded in the preamble to the final rule that the existing data indicate that certain individuals with a pre-existing hypersensitivity or allergy to mercury may be at risk for adverse health effects from mercury vapor released from dental amalgam.  In order to mitigate this risk, FDA established a Class II special controls guidance on dental amalgam and recommended labeling stating that it should not be used in persons with a known mercury allergy.

C. The classification regulation for dental amalgam, 21 C.F.R. 872.3070, provides that the special control for dental amalgam is FDA's "Class II Special Controls Guidance Document: Dental Amalgam, Mercury, and Amalgam Alloy."  Although the special controls listed in that guidance document are described as recommendations, the guidance document makes clear that "any firm currently marketing, or intending to market, dental amalgam, mercury, or amalgam allow will need to address the issues covered in this special controls guidance.

4

**EXHIBIT C - Case No. 1:14-cv-00356**

The firm must show that its device addresses the issues of safety and effectiveness identified in this guidance, either by meeting the recommendations of this guidance or by some other means that provides equivalent assurances of safety and effectiveness– In conclusion, inorganic mercury exposure may cause adverse effects on the immune system. However, there is no evidence that autoimmune disease is provoked in humans by mercury exposure from amalgam fillings.  In some patients with allergy to mercury, clinical improvement is seen after removal of amalgam fillings.  There is some evidence that exposure to mercury influences pro-inflammatory cytokine levels, but the clinical implications are not clear.

D.  "FDA concludes that existing data indicate that certain individuals with a pre-existing hypersensitivity or allergy to mercury may be at risk for adverse health effects from mercury vapor released from dental amalgam."

E.  FDA identified exposure to mercury, allergic response including adverse tissue reaction, contamination, mechanical failure, corrosion, and improper use as some of the potential risks to health associated with the use of dental amalgam devices.  FDA established special controls to address and mitigate each of these risks described in the Class II (specific labeling and biocompatibility testing).

X.  **INADEQUACY OF ATSDR MRL**

A.   FDA has reviewed the exhibits and believes they highlight many of the uncertainties in a dental amalgam risk assessment, specifically with regard to both an exposure assessment and acceptable reference exposure levels.

B.  FDA also believes that even though amalgam patients with numerous amalgam-filled surfaces could be exposed to daily doses of mercury vapor above the available RELs, this alone does not necessarily indicate that adverse health effects from dental amalgam will occur.

C.  The responses also indicated that the point-of-departure approach with the application of UFs may be unsuitable for elemental mercury, given that a no observed adverse effect level has not been defined, which presents uncertainties with regards to the toxicity thresholds for chronic, low level mercury vapor exposure from dental amalgam.

D.  Although daily exposures at or above an REL over a lifetime do not necessarily indicate that adverse health effects will occur, doses far above the REL suggest that probability of adverse health effects is more likely, especially in sensitive subpopulations.

XI.  **DENTAL INFORMATION SHOULD GO TO PATIENTS IN PATIENTS INFORMATION INSERT.**

A.  Since the weight of clinical evidence has not established an association between dental amalgam use and adverse health effects in adults and children age six and older, the agency

EXHIBIT C - Case No. 1:14-cv-00356

believes that its current classification of dental amalgam provides a reasonable assurance of safety and effectiveness.  FDA also agrees that certain potentially sensitive subpopulations may be at higher risk of adverse health effects from mercury in dental amalgam, but FDA has already taken steps in its final rule and special controls guidance document to protect these subpopulations.

B.   The warning in the specific labeling about the presence of mercury in dental amalgam and the disclosure of mercury content by weight is intended to alert dental professionals of the potential for exposure to mercury vapor and remind them of the need for protective measures.

C.   As explained in the final rule, the purpose of the information for use statement is to help dental professionals plan appropriate treatment recommendations for their patients by providing them with FDA's current assessment of the most current, best available evidence regarding potential risks to health from mercury vapor released from dental amalgams.

D.   FDA believes that the recommended labeling statements in the special controls guidance document will provide dentists with important information that will improve their understanding of the devices and help them make appropriate treatment decisions with their patients.

E.   FDA notes that dental amalgam is a prescription device and, therefore, patients cannot receive the device without the involvement of a learned intermediary, the dental professional.  Therefore, FDA has concluded that it is not necessary to require that dentists provide this information to patients in order to provide reasonable assurance of the safety and effectiveness of the device.

F.   Information for Use found in the Guidance Document is intended as a recommended label for products containing mercury which should be passed on to patients.

## XII.  INFORMATION FOUND IN THE HHS DRAFT DOCUMENT.

- Mercury vapor can cause health problems, particularly to the nervous system but the severity of effects depends on the amount of mercury released and the exposure duration.
- Mercury vapor is released continually throughout the life of an amalgam filling.  The amount of vapor released decreases as the filling ages, but chewing, tooth grinding or exposing an amalgam filling to hot liquid or food can temporarily increase the amount of vapor released.
- Mercury in the blood of a pregnant woman is distributed throughout her body, but some passes into the blood of the developing fetus.
- Information reviewed by the FDA over the past year presents concern for sensitive subpopulations, such as pregnant women and their developing fetuses, children younger than 6 years old and other higher risk subgroups who may be more susceptible to potential adverse effects from mercury exposure.
- Dentists should not place new dental amalgam fillings in pregnant women.

**EXHIBIT C - Case No. 1:14-cv-00356**

- o   Placement or removal of dental amalgam during pregnancy results in a temporary increase in mercury exposure, which is associated with increased mercury levels in fetal cord blood and increased exposure to the developing fetus.
- Dentists should not place dental amalgam fillings in nursing women, children younger than 6 years old and any individual with pre-existing kidney or neurological disease.
  - o   The developing neurological systems of breast-feeding infants and children may be more sensitive to the neurotoxic effects of mercury exposure. In addition, the use of dental amalgam in those persons with pre-existing kidney or neurological disease may further compromise already impaired renal and neurological systems.
- The FDA recommends against the removal of functional amalgam fillings in any individual, including pregnant women, unless deemed medically necessary by a physician in consultation with the patient's treating dentist.
- FDA believes that use of alternative materials (*i.e.* non-amalgam based fillings) would be best offered as the first line of restorative care.

                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
----------------------------X
MOMS AGAINST MERCURY et al,
                 Plaintiffs      Civil Action No. 04-334
                 v.
**ANDREW VON** ESCHENBACH, et al.,
                 Defendants,
----------------------------X   Washington, D.C.
                                Friday, May 16, 2008
                                  10:30 A.M.
                  TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:      **Charles Gailey Brown, III, ESQ.**
                         1725 K Street, NW
                         Suite 511
                         Washington, DC 20006
                         (202) 884-0315


For the Defendants:      **Drake S. Cutini, ESQ.**
                         DEPARTMENT OF JUSTICE
                         Office of Consumer Litigation
                         P.O. 386
                         Washington, DC 20044
                         (202) 307-0044

                         Jeffrey M. Senger, ESQ.
                         Wendy S. Vicente, ESQ.
                         FDA- Office of General Counsel
                         5600 Fishers Lane
                         Rockville, MD  20857
                         (301) 827-1137


Court Reporter:          Lisa Walker Griffith, RPR
                         U.S. District Courthouse
                         Room 6507
                         Washington, D.C.  20001
                         (202) 354-3247



Proceedings recorded by mechanical stenography,
transcript produced by computer.

**EXIHIBIT D - Case No. 1:14-cv-00356**

P R O C E E D I N G S

THE DEPUTY CLERK:  This is civil action 07-2332.  Mom's against Mercury et. al. versus Andrew Von Eschenbach, et. al.

I am going to ask counsel to please identify themselves for the record.

MR. BROWN:  Your Honor, I'm Charles G. Brown, counsel for plaintiffs, Mom's against Mercury, et al.

THE COURT:  Good morning.

MR. CUTINI:  I'm Drake Cutini from the Justice Department, for the defendants.  With me is Wendy Vicente and Jeffrey Senger from the Food and Drug Administration.

THE COURT:  We are here now on two motions.  One is a motion to dismiss for jurisdiction and lack of standing brought by the defendants; and then, a motion for preliminary injunction.

The plaintiffs are asking me to take this device off the market, the amalgam that is used for fillings, pending the outcome of this case.

Let me say to begin with, maybe this will help us move along.  For jurisdictional purposes, and I think the government really knows this deep down, I

**EXIHIBIT D - Case No. 1:14-cv-00356**

have jurisdiction under 706-1.  It is clearly a proper suit for a failure to act.  That is what it is.

I don't have jurisdiction independently under the various FDA statutes that are cited at this time any way, because they have not done it.  This is a, the ultimate issue that gets decided here and the Circuit has given me a lot of help on this in a sense.

There is only one issue before me, ultimately. The bottom line is has the FDA been unreasonable in its delay in terms of acting on classifying this dental amalgam which the acronym is E. A. A. D. M. in caps, which is encapsulated amalgam alloy and dental Mercury.  Everybody agrees that it includes Mercury used for fillings.  Plaintiffs take the position that it should be classified as a class three device.  The FDA has not actually classified the amalgam even though its component parts are classified as a class one and/or class two.

So it is regulated as a class two, but they have not done, and we all agree it has been 32 years. Those facts are not particularly disputed.  But so, one, that's where the Court's jurisdiction is.  It does not rest anywhere else.  I'm here under a 706 APA claim for unreasonable failure to act.

**EXIHIBIT D - Case No. 1:14-cv-00356**

Once we get the contours established, this is not a NEPA type claim.  Or this is not an arbitrary capricious action because they have not acted.  This is your classic failure to act.  There are two cases. Both of them are rather recent from the D. C. Circuit.

It would be nice if people would actually read the governing law.

Everybody would like the Court to decide that this is a harmful device or not a harmful device or pull it off the market, or not pull it off the market. That's not the Court's jurisdiction.  I don't have the power to decide those things.

All I can decide at the end of the day is whether there has been an unreasonable delay in the resolution of such a decision.

It has clearly been defined actually quite recently under the D. C. Circuit's case.  It is called Mashpee Wampanoag W. A. M. P. A. N. O. A. G. Tribal Council versus Norton.  That is reported at 356,  F3d, 1094.  That's the Circuit 2003.

That is one.  And since then, there has actually been a more recent case that just came down called Kauffman versus Mukasey, that's 2000 Westlaw, 2774 at page two.

**EXIHIBIT D - Case No. 1:14-cv-00356**

When an agency is compelled to, by law to act but the manner of its action is left to the agency's discretion, the Court can compel the agency to act. Although it has no power to specify what the action must be.

They're telling me that at the end of the day, the plaintiffs, the best that they can get from a Court is an order to act. That may be fine. That is their remedy. So, but that is what this case is.

I'm actually amazed at how I've had pages and pages of pleadings. And we don't really seem to be focusing on the real issues here and the power of the Court, which is limited by the APA.

I don't have the power to pull this drug off the market. I simply do not. *** I might think you should have it off the market or as a class three, but it is irrelevant if I think that. The best you can win here at the end of the day is FDA act. What that means in practical terms is something else. But in any case, so, let's address the standing. But I would like to at least define what the legal contours, parameters are of the case.

We are proceeding under 706-1, if you, once defined as such can figure out why they don't have standing, I'm happy to hear it.

**EXIHIBIT D - Case No. 1:14-cv-00356**

I have jurisdiction.  It is a proper case to say here, you have not acted, you should act.  That is the classic, unreasonable delay case.

I cannot under the law pull the drug.  I couldn't do it even if you won the lawsuit.  I don't have that power.  There is not a case that you have given me that gives me that power.  The D. C. Circuit is very clear. The notion that judges can do whatever they well please is just a fallacy.

It is a fallacy that appears to be engaged in by the political arena, as well.  We don't operate that way.  There are rules of jurisdiction.  There are rules under the APA.  So I want to make it clear it has nothing to do with what I think about the harmfulness of this amalgam, nothing.  As soon as everybody would proceed to understand what the contours of the case are, we might be able to do something useful.  But we're on a side show right now.

You can address the standing issue, but I've never understood your arguments, frankly, sir.  I think you are missing the main issue here.

MR. CUTINI:  May it please the Court, I am Drake Cutini on behalf of the defendants.

Respectfully, Your Honor, the APA is not a grant of jurisdiction.

**EXIHIBIT D - Case No. 1:14-cv-00356**

THE COURT:  Well, I understand.  But it is 1331 coupled with 706-1.  I have jurisdiction to decide a case of unreasonable delay.

MR. CUTINI:  Respectfully, we disagree and believe that plaintiffs still must show that they have standing under Article III of the Constitution.

THE COURT:  I agree.

MR. CUTINI:  They have not made sufficient allegations to demonstrate that.  Particularly, with respect to the second two prongs of the traditional injury analysis causation and redress ability.

THE COURT:  Well, can we get over the injury in fact?  Why don't they have a clear case of exposure to enhanced risk?  How else could you ever get into Court in a case like this if these people can't do it?

MR. CUTINI:  For purposes of this motion, we're not conceding that any of these injuries were, are continuing or caused by dental amalgam, but for purposes of this motion at the pleading stage, we're not going to dispute injury in fact at this point.

THE COURT:  Because, as we all admit, it is not for me to decide the merits of the case at this moment.  They have an incredibly strong case of standing for purposes of injury in fact, and enhanced risk of exposure to harm.  And I would, for the record,

**EXIHIBIT D - Case No. 1:14-cv-00356**

I mean, there is D.C. Circuit law.  And nobody cited it to me.  We have spent our time looking up cases.

I started with the Second Circuit case of Bower versus Veneman and where the injury in fact was far more speculative than here.  But just looking at the case law from our Circuit, Mountain States Legal Foundation versus Glickman, certainly.

Public Citizen versus Foreman.  A D.C. case from the District Court, Cutler versus Kennedy.  They have shown, made ample showing for standing purposes of enhanced risk of exposure to harm, therefore, an injury in fact and the injury is certainly particularized to the plaintiffs.  I only have to find there are people, workers and dentists, people who have suffered in fact and are suffering continuing.

*So, I don't understand, how is it that a case like this, if they don't have the ability to proceed, how could anybody ever challenge, tell me, who could challenge your unreasonable failure to act if it can't be these people?*

*MR. CUTINI:  I don't know, well, I know that these people cannot.  The reasons are and maybe nobody can.  The reasons are the* <u>uniqueness</u> *of the situation here.  This product has been regulated as a*

**EXIHIBIT D - Case No. 1:14-cv-00356**

*class two device.  It is on the market legally.  There is nothing illegal about its current marketing.*

THE COURT:  But you were supposed to go back and classify it after, because it was a pre-amendment.

MR. CUTINI:  Correct.

THE COURT:  And you have not.

MR. CUTINI:  That is correct.

THE COURT:  So you have not acted.  I don't think there is any issue.  It is by default that it is a class two.

MR. CUTINI:  It's class two because some of the predicate devices, amalgam alloy is class two. But they still have to show that their harm, alleged harm which we are not conceding but not disputing at this point, was caused by FDA's activities with respect to dental amalgam.  And further, that the classification would redress that alleged injury.

THE COURT:  Well now, let's go back.  You are positing that the only way they could show causation and readdress ability is by showing that they would win ultimately before you, that it would be a class three.  Is that what you're saying?

MR. CUTINI:  No, no, if they won, we're not saying they have to win to have standing.  If they won, there is no showing that any of the alleged injuries

**EXIHIBIT D - Case No. 1:14-cv-00356**

would be redressed.  In fact, in responding to our motion to dismiss, they describe redress ability principally as an informational injury.

THE COURT:  I'm not going to get hung up on all of your, both sides were on complete tangents. This is not an informational standing case.  This is a standing case.  Think about it in terms of NEPA for a moment.  It is the best way to look at it.

You can come in as a plaintiff and say you didn't have notice and comment.  You didn't permit us to participate.  You didn't act.  There was a series of things.  The law does not require plaintiff to show that had you acted they would have gotten the kind of relief that would remove the environmental harm.  That is not, it's called procedural standing.

They have a right to say I have a right under the APA to participate in the administrative process. However, whatever those rights are, it can be, you know, through the notice and comment, it can be through what is going on here.  But to win a case like that on standing purposes, the law does not require them to show, had they had notice and comment, the regulation would have gone their way.  So why doesn't that take care of us?

**EXIHIBIT D - Case No. 1:14-cv-00356**

MR. CUTINI:  We're not saying that.  Under

Luhan versus Defenders of Wild Life, I believe it's

footnote eight.  It said even if the allegation is a

procedural injury, they still must show some type of

harm from that procedural injury.

THE COURT:  You've already told me that we're

moving on from harm.  We're going to causation and

redress ability.

MR. CUTINI:  That's correct for purposes of

this motion.  They have not shown, what they have

alleged the redress will be if the FDA, or if they win

this lawsuit, is that there will be better information

out there, and maybe they will receive better medical

care and --

THE COURT:  How about they may receive a

classification from the FDA?

MR. CUTINI:  That's not an injury.  That's

simply --

THE COURT:  Sir, you keep going back to the

injury.  They want the following remedy.  They want

you to classify.  They want you to stop dragging your

feet and classify it.  *** Then, if you say it is a

class two, then they can appeal that.  We all know

that.  They're just saying if you act then we could

well get what we want, which is a class three

**EXIHIBIT D - Case No. 1:14-cv-00356**

classification.  Or we could get at least to pregnant

women, as children, whatever; that's what they're

saying.

MR. CUTINI:  The lack of classification is

not an injury.  What they alleged some of the

plaintiffs, one of the plaintiffs has alleged she has

had miscarriages, that is an injury.

We don't concede that that was caused by

dental amalgam, but that is a type of injury.  Or

another plaintiff alleged some type of physical harm.

That is an injury.  Simply not classifying this is not

an injury.  That is a type of procedural injury.

THE COURT:  That means no one could come to

court.  I won't buy that.  It is not legally right.

MR. CUTINI:  They have to have causation,

they have to demonstrate causation and redress ability

and they have not alleged.

THE COURT:  Go back to NEPA.  There is not a

person that has to allege that in fact you would make,

you would make the environment safer for the snail

guarder.  You still get to Court.

MR. CUTINI:  They didn't get to Court in

Luhan versus Defenders of Wild Life.  So they can't

simply allege harm to the environment as standing.

They have to allege --

**EXIHIBIT D - Case No. 1:14-cv-00356**

THE COURT:  No, that is the injury.  You suffer because the animals that you like are suffering and you watch it.  That is clear.  But you keep going back to injury in fact.  Go to the redress ability and causation.

MR. CUTINI:  Well, in Luhan they, I believe in that case, the Court did not dispute that what they alleged as an injury was an injury.  But they said this would not be redressed, I believe that's what the Court held by a ruling in your favor.  That's what we have here.  The only redress they alleged is that there might be better information out there that might be to --

THE COURT:  *** You are not listening to me.  You might get a class three.  That's what they're alleging.  Give me a classification.  Do what you are under the law required to do.  What happens if they get class three?  They get more protections than they're getting now.  Whether or not it would cure anybody's past injuries isn't the issue.  Would it protect people like the people in the dental office who are part of the plaintiff class, et cetera?  Why wouldn't it have redressed that?  They might get a class three.

**EXIHIBIT D - Case No. 1:14-cv-00356**

MR. CUTINI:  That's all speculative whether it would be a class two or a class three, we don't know that.  And it would not be removed from the market whether it was a class two or a class three. So --

THE COURT:  No class threes ever get removed from the market after the period of time?

MR. CUTINI:  If the, the manufacturer either does not apply, what happens when something is classified as a class three is that the FDA issues a regulation calling for a pre-market approval applications or PMAs.  It remains on the market while those are submitted. If it is not submitted, then that manufacturer can no longer sell the product.*** But if that manufacturer submits a PMA, the product remains on the market pending review of the PMA.

THE COURT:  And if the PMA is not successful, then what happens?

MR. CUTINI:  In that situation, it would be removed.  But that is extremely speculative.  And the only harm again from this is maybe insurance would pay or doctors would provide us --

THE COURT:  Only harm for what?

MR. CUTINI:  From classification of any sort. That's what they allege to be their redress is that we

**EXIHIBIT D - Case No. 1:14-cv-00356**

would get better treatment from doctors.  Again, that
injects a third party.

THE COURT:  How about the people who say that
my continued exposure to this causes health risk,
enhanced, increased risk of exposure to an unsafe
product.  So if you keep it on there -- yes, I know
that we don't have any guarantees that you are going
to take it off the market.  But it is one of the
possibilities from a class three classification.

It has been debated apparently within your
agency for 20 years, whether or not it should be this
or that.  You have never ruled one way or another.
One can say, in fairly good faith, that maybe people
have the right to have you rule and not drag your feet
for 32 years.  But that is not where we are today.
We're at a standing issue.

MR. CUTINI:  Again, it is highly speculative
what sort of reduction this would have.

THE COURT:  But you are saying that, your
argument, it's lone logic is that no one can sue you
for failure to act.  If these people can't, no one
could.

MR. CUTINI:  In this situation, this is a
unique product.  It is legally on the market, it is
regulated as a class two.  It has been proposed by the

**EXIHIBIT D - Case No. 1:14-cv-00356**

FDA to continue regulating it as a class two.  There
is just no injury that they have alleged that would be
addressed by that or that would be caused by activity
from the FDA  The special controls that they talk
about are highly discretionary with the FDA.

THE COURT:  I know.  But, okay.

MR. CUTINI: ****  There is no special control
that is required; no particular special control that
they have alleged would be imposed on this.  And part
of the issue in this case is because of the uniqueness
of the product where it stands right now.

THE COURT:  What does that mean?  The
uniqueness of the product --

MR. CUTINI:  Because it is already on the
market legally on the market, regulated as a class two,
that it, what has been proposed and if they win, it
will be classified either as a class two or as a class
three. Whichever way it is classified, it is not going
to address their injuries.  It's highly speculative
whether it will.

THE COURT:  You don't buy the analogy to the
environmental field in other words?  Massachusetts
versus the EPA, Supreme Court.  Have you read Bower
versus Veneman, the Second Circuit?

**EXIHIBIT D - Case No. 1:14-cv-00356**

MR. CUTINI:  Not that I recall.  But I do recall in Luhan simply alleging a procedural injury is not sufficient.  I believe in that case, the court said –

THE COURT:  Well, you need an injury in fact.

MR. CUTINI:  And you need redress ability and causation.  Those were the factors missing as I recall.

THE COURT:  Often because there is a third party involved.  We don't have a third party here.

Okay.  Thank you.  I must find the government's -- you didn't, *nobody argued the right standing analysis here, frankly.*  I find the position of the government just befalling on standing.  I understand other things.  I am absolutely lost.  The law is absolutely clear where this is an injury in fact for standing purposes.

They have done it here.  They have done it under D. C. Circuit law.  It drives everything else in a way.  One would refer to Bower versus Veneman, which is a much weaker case than the standing showing here at 352 F3d 625.**

It is also clear that standing requirements for causation and redress ability get relaxed, so to speak, when you have a case like this.  This is not, you have exposure to an enhanced risk of disease that

**EXIHIBIT D - Case No. 1:14-cv-00356**

would qualify as an injury in fact from drug safety.
That's the claim.  I'm not litigating the merits of
that.  For standing purposes, there is a lot less to
be shown especially at this stage.

You don't have to show, because if you had to
show that for redress ability and causation, once
you've shown a real injury in fact, with a concrete,
credible fear of harm from exposure to this product,
you have debated apparently internally for many years
whether that is right or wrong.

But the debate alone, I mean it's been banned
in other countries, there is a lot of literature.  The
debate alone says they've got standing.  They have
credible fear of harm from exposure to this.  So as a
result to then say, well, by the way, that injury in
fact can't be redressed because you cannot predict
what the FDA will do.  Nobody can because they have
not done it.

But that isn't the law, you don't have to
show ultimate success or what would happen.  You don't
even have to show that you would, you know, there is a
90 percent chance that this would be taken off the
market.  That's not what standing is all about.  The
procedural standing clearly shows you have, the

**EXIHIBIT D - Case No. 1:14-cv-00356**

question is whether or not your remedy, i.e., getting the FDA to act.

If they succeed in getting an order saying go ahead and do it now, act expeditiously, 32 years is too long, it's an unreasonable delay, the argument is that they would have an opportunity to try to convince you if you had to act to make a decision that would be favorable to them.

Causation is, you don't the match, there are dozens of cases. I wish we had more time. It's a very interesting area. But they have sufficiently, once they made the conclusion, once they have shown that they have, face a reasonable fear of increased risk of injury or future injury sufficient for purposes of injury in fact, you go on.

You can't require, otherwise, you've turned the law on its head in a case like this. There would be no environmental law ever because you never know what the NEPA analysis would show. If you get what you want is a full, in a NEPA case, a full environmental impact statement. That's one of the kinds of remedies. You were unreasonable to say an EPA would be sufficient.

So, but nobody knows what the full environmental impact Statement would ever show. It

**EXIHIBIT D - Case No. 1:14-cv-00356**

does not tell you whether even you would get the

highway removed.  Or you would get no more bombing out

in the ocean.  It is that you are entitled to proceed

with a chance that you may well prove.

        But if you look at ** the Massachusetts EPA,

that's a Supreme Court case at 127 Supreme Court

F.1453, when a litigant is vested with a procedural

right, and I view this as a procedural right, i.e., to

have the process get going.  That litigant has

standing.  If there is some possibility that the

requested relief will prompt the injury causing party

to reconsider the decision that allegedly harmed the

litigant.  That's Supreme Court precedent.

        The D. C. Circuit goes on and says, "A

litigant who alleges a deprivation of a procedural

protection to which he is entitled never has to prove

that if he had received the procedure, the substantive

result would have been altered.  All that is necessary

is to show that the procedural step was connected to

the substantive results."  The Sugar Cane Growers Coop

of Florida versus Veneman, reported at 289 F. 3rd, 89,

pages 94 and 95.

        Similarly, the causation analysis is also

quite different than the government is arguing here.

It is not required that there be a match between the

**EXIHIBIT D - Case No. 1:14-cv-00356**

statutory objective behind the agency regulation, and
the alleged injury can facilitate finding a causal
link between the agency's conduct and the injury,
Arent versus Shalala.  This case is very much like the
D. C. case of Cutler versus Kennedy.  I found that
very helpful.

          In any case, the motion on standing grounds,
I regret to say I really feel the government has
wasted a lot of time on the wrong issue.

          I mean, what is reasonable delay, et cetera,
et cetera may well be, but I find the standing
question quite simple.  Once they get to the injury in
fact, they're in court.  To keep the door closed is to
say that nobody can ever come in and do anything under
706-1 because nobody ever knows when you act what
you'll do.  By definition, that's a loser.

          They have a high showing here of injury in
fact.  So, that this motion to dismiss, I have
jurisdiction under 706-1 and 1331.  I probably don't
under some of the FDA laws, I understand that.  Plus,
they have not acted.  But you would tie up the world
with your analysis.  No one could ever challenge.  You
could sit on your duties.  You have a duty to act
under the law.  Therefore, you are saying I have a
duty but nobody can challenge me for not doing it.

**EXIHIBIT D - Case No. 1:14-cv-00356**

Illogical and legally unacceptable and wrong under Supreme Court laws.

So I'm willing now to listen to the plaintiff on the P.I.  But I think I've told the plaintiff what problem is here.  So the motion to dismiss is denied.

The defendant better start thinking about how we're going to move this along.  I can't decide the ultimate issue of what is reasonable or unreasonable. But they're well on their way to convincing anybody that 32 years is a long time.

Okay.

You too, though.

How can I order the product taken off the market?  You couldn't get that if you want.

MR. BROWN:  You've convinced me, Your Honor. What we would like is an order requiring FDA to classify on a date certain like 30 days, or 60 days, because they can do it.

THE COURT:  You just said, I won the lawsuit. They haven't had a chance to go the merits yet. You're in the door that's all you're in.  How can you win the lawsuit before they have a chance to say it's unreasonable?

I hope in the future everybody will read the right law.  Like start with the D. C. Circuit.  It

**EXIHIBIT D - Case No. 1:14-cv-00356**

says: It is a fact intensive, "what is reasonable is a fact intensive analysis." That means that they're entitled to have a dispute, issues of fact or they can try to show why it is reasonable. You can't just say, well, today you win.

MR. BROWN: Well, we believe, we've met the prerequisites to a preliminary injunction. The probability of harm is enormous. Today, the focus here does not really have to be moving this to a class three. The issue with the class two, and that's where they say they're going to end up in their brief is fine, is special controls. A class two has to have special controls.

Now, here is the brilliant and devious way that FDA has this product on the market now. They say the powder, the old way, the old pharmacist system is regulated, the powder doesn't have Mercury in it. So the special controls, it's a class two, has no mention of Mercury. The bottle of Mercury, amazingly is a class one, like a bed pan or a--

THE COURT: You are arguing to me what you argued to the FDA  That's not the issue for me.

MR. BROWN: I'm explaining, Your Honor, that the FDA gives no disclosure whatsoever of the Mercury. They have done that for 32 years. That's the policy

**EXIHIBIT D - Case No. 1:14-cv-00356**

of the dentists at FDA.  They know that if they get,

put in the special controls, that it has Mercury, the

ball game is over.

I know there are limits but they could put in

contraindications for pregnant women alone, a

disclosure to everybody, whatever they put in.  If

they don't put the Mercury in the special controls at

all, as they are trying to do from the 2002 rule, they

know they lose that on appeal.  So the lawyers know

they're going to lose the way it is written.  The

dentists don't want to disclose the Mercury.

So the special controls will contain the

Mercury.  We have a probability of success on the

merits.  We have enormous irreparable harm.  Every day

the pregnant women who are injured by this and FDA's

policy is never tell anybody about it.  That is their

policy today and it continues year after year.

They are now in their third public comment

period.  It's a total sham.  They did the last one in

2006.  They said they're still reading the materials.

They want to send a sixth U. S. president out of town

with it unfinished, two years to look at this record.

Their position on Mercury changes every year.  Now

they have said, well it probably injures pregnant

**EXIHIBIT D - Case No. 1:14-cv-00356**

women but they're a sub-set.  To me, the probability
of harm --

THE COURT:  Sir, it is not a probability of
harm in that sense.

MR. BROWN:  I mean probably success and
irreparable harm, I'm sorry.

THE COURT:  I understand that.  But that is
not the issue, again.  The question here is not
whether people are going to be hurt or not hurt.  For
standing purposes, that's quite different.

The question is whether there has been
unreasonable delay which is a fact inquiry whether
there is a likelihood of success on the merits has to
do with whether or not you'll get a better ruling than
you got now.  Maybe, maybe not.  Those things, I can't
find that sitting here today, you are entitled to the
ultimate relief you've asked for.  I couldn't possibly
find that.

You are arguing based on the horrors of the
product.  That is not the issue.  I wish, you would
you like to think that a Court could just come in and
say take it off the market, classify it as this, give
it special controls.  I don't have that power.  All I
can give you at the end of the day after a roaring
success is tell them to do something quick.  That's it.

**EXIHIBIT D - Case No. 1:14-cv-00356**

MR. BROWN:  That's what we're asking, Your Honor.

THE COURT:  I can't do it today.

MR. BROWN:  Well, we believe we have probability of success on the merits after 32 years. The courts would order, and under 98 percent probability will order FDA to classify.  We believe we've met the other prerequisites, the balance of equities, the irreparable harm.

THE COURT:  You are the one who says in your papers, that there are many material issues of fact, on causation and redress ability.

MR. BROWN:  Yes, we do.

THE COURT:  On the irreparable harm issue alone, your own pleading says that there are issues of fact at issue.  So that, even if the sort of aura, and I just can't emphasize enough that I'm not persuaded by the quote "horrors," it does not do it.

I am constrained by the law.  Irreparable injury has to do with whether or not their failure to act is, again, if I order then to act, we'll redress the problem, and will be causative to make people's life better.  That is somewhat speculative to say the least.  And now, after 32 years, it is a little hard to say that if they act tomorrow versus three months

**EXIHIBIT D - Case No. 1:14-cv-00356**

from now or four months from now or whatever it is,
that a P.I. is necessary.

You are actually asking for the ultimate
relief in the case.  And you are not entitled to it at
this stage.  So the preliminary injunction will be
denied.  It is absolutely clear.  First, to ask me to
take the product off the market.  As I say, I don't
have the power.  And this isn't, that's a mandatory
injunction that goes way beyond my jurisdictional
grant here.  The only thing you can get at the end of
the day is an order to act.  Not an order to act as
follows.

So if you could keep that in mind, I will
please ask both sides to read the relevant law.  But
the Mashby case says, "Resolution of a claim of
unreasonable delay is ordinarily a complicated and
nuanced task requiring consideration of the particular
facts and circumstances before the Court."  You assume
because it is awful and harmful that it therefore
translates into unreasonable delay.

That is not the law at all.  That does not
motivate anybody including the Court.

I would like to say it would.  If I were a
personal or private citizen, it might.  But I have to
consider the debate out there, whether or not what

**EXIHIBIT D - Case No. 1:14-cv-00356**

they have in place does much or it doesn't do anything.
Whether or not there are reasons for their side.  So
you can't control just because you have people on your
side that say X, there is a debate and there is a
debate about whether changing it to three will make a
difference here or there, and whether the action of
having them act sooner than later is, that would
constitute irreparable harm in the interest of the
public interest.  And it cannot by driven even if you
would like it to be, solely by your point of you as to
the science.  It's not possible.  So, the P.I. is
denied.

        We're moving this on an expedited basis,
though.  I don't see any reason not to.

        Do you have an administrative record you want
to file here?  This is on a record.  We're not here to
decide the ultimate --

        MR. BROWN:  Oh, this goes on record, Your
Honor.  This is all record, no discovery then.  No
depositions.

        THE COURT:  I don't see why there would be.
I don't know why there would be.  You have not done
anything for 32 years.  In some way or another you
have to be able to say based on the record that exists
why that is reasonable.

**EXIHIBIT D - Case No. 1:14-cv-00356**

The other suggestion that I've for you folks is to come up with a timetable, agree to it and get going. I mean, why litigate what timetable the Court is going to impose at the end of the day, if I find in favor of the plaintiffs.

Don't send me anything ever again, that does not go to the other side. I will give it to them. It totally violates every ethical rule in the book. Something came to me by fax to say that settlement had fallen apart. That violates every conceivable, it was written by Mr. Brown.

MR. BROWN: Your Honor, right on the front page, under your name is CC'ed to your clerk, to Mr. Cutini and to Ms. Vicente, not on the fax page but by e-mail. You will see right there your name, and right under it, to Mr. Cutini.

THE COURT: I don't accept letters, period.

MR. BROWN: You would suggest that the government ought to want to settle this before the hearing, I thought you suggested that. So I wanted you to know we had tried. But I absolutely did not communicate to you without them. They have that letter by e-mail.

**EXIHIBIT D - Case No. 1:14-cv-00356**

THE COURT:  They don't know you communicated it to me.  Don't ever do that.  Ever.  It violates every rule in the book.

Also, I don't want to get anything.

MR. BROWN:  Just to make sure on record, Your Honor, they did receive a copy by e-mail, I'm sure they did because it is right there.

THE COURT:  Is that –

MR. CUTINI:  Yes, we did receive a copy of the letter by e-mail but we do object that they said they submitted settlement discussions.

THE COURT:  I agree.  I don't want settlement discussions to me.  There is nothing that can come to me.  First of all, I only accept pleadings.  If you want me to do something, you file a motion.  The law is very clear that I'm not here to settle.  I cannot get intimately involved in a settlement.  I can send you to somebody.

But to in some fashion, give me information about settlement by fax is to me is rather extraordinary, if not verging on unethical.  I can't file that on ECF.  I don't want to receive anything that can't go into ECF other than letters written on behalf of defendants at sentencing.  That's the only kind of information that I would ever accept that I ––

**EXIHIBIT D - Case No. 1:14-cv-00356**

and I don't feel it is proper to put settlement stuff in the public record.  So you can't avoid the public record by sending me little faxes without even telling them.

        If they agreed to send me that for some reason, but that's not helpful.  I have to decide this case.  To in some fashion, perhaps color my view or give me background information that is not subject to their dispute, please, that's totally unacceptable and not ethical, in my view.

        MR. BROWN:  I apologize, Your Honor.

        THE COURT:  Is there some schedule that you can arrive at between now and Tuesday to move this along or to go to settlement?  I'll send you to a magistrate judge or a mediator immediately.  But we're looking for a schedule.  You can give me an administrative record to justify 32 years.

        But I guarantee you that I will move quickly if need be.  You'll have to break your back coming up with the administrative record it seems to me.  How are you ever going to put together 32 years of delay to justify it.  You may actually, I understand it is a very highly disputed issue.  But you could say the time has come.

**EXIHIBIT D - Case No. 1:14-cv-00356**

MR. CUTINI:  We can discuss a schedule with
Mr. Brown and submit it to the Court.

THE COURT:  You'll have to understand the
schedule.  The schedule for what?

MR. CUTINI:  I'm not sure, I guess submitting
the administrative record.

THE COURT:  I would like you to get together
with some kind of mediator type and come up with a
schedule for the FDA to do something.  You have a duty
to act.  It is only a question of when.  I don't much
see the purpose in litigating whether or not you do it
in four months or five, seven or -- you can come up
with an agreement and a consent decree and do it.  And
you won't have to file an administrative record and
have somebody rule that it will take five months to
rule, say you are going to have pleadings.  The law is
clear on what is unreasonable delay, these factors.
You'll have all these pleadings.  Then, you could land
up with an order to act at the end of it.

I think that when the public safety is at
issue that you shouldn't be taking this position.
Your client should rethink it.  They should do what
the law requires.  Nobody says how they're supposed to
act or what they're supposed to do.  They're supposed

**EXIHIBIT D - Case No. 1:14-cv-00356**

to just do it.  At that point, they can challenge what
decision under proper procedures.

So there are one or two things.  Yes, we'll
have a schedule.  You'll get this administrative
record in, in your pleadings real quick, because we're
on an expedited schedule.  Or alternatively, you'll
come up with the very thing that they're trying to do
is have some kind of timetable for your client to meet
its obligations to the public.  Their obligations may
be to continue the classification as two.  I'm never
going to rule on that, until some classification,
somebody may have to rule on that later on.  But
that's not the issue.  I think that the client, who is
the FDA lawyer?

MR. SENGER:  Jeff Senger for the FDA, Your
Honor.

THE COURT:  I don't understand your client.
They have had a lot of time to mull this issue over.
Maybe the science is getting better.  But they could
issue a ruling.  Do they have to propose a rule or
they have one out there now?

MR. SENGER:  The proposed rule that was
issued and we just reopened comment on it several
weeks ago.

THE COURT:  When is that comment period over?

**EXIHIBIT D - Case No. 1:14-cv-00356**

MR. SENGER:  I believe it is 60 days or 90 days.

THE COURT:  When is that over?

MS. SENGER:  July 28.

THE COURT:  Then how long would it take you to issue your, make a final rule?  The final rule then goes out, what is the usual law, procedure?

MR. SENGER:  It is a complicated thing.  The last time we did this, Your Honor.

THE COURT:  But we're not going to be guided about what you did last time.  That's the point here. That's the whole point, here.  You don't have that leisure.

MR. SENGER:  Yes, Your Honor.  Very well.  We are committed to moving this forward as quickly as we can, consistent with the public health issues and the enormous amount of public scrutiny and the practical consequences that are involved.

The last time we went forward on this was 2006.  Two years ago, we received about 2,500 comments which is indicative of the complexity of the issue, the enormous public interests, the public policy issues and scientific issues involved.  We've had multiple advisory committees on it.  We need to get it

**EXIHIBIT D - Case No. 1:14-cv-00356**

right.  We need to be careful.  We need to consider

all of the comments we received.

     It is difficult to predict with certainty

what we will hear in response to our latest reopening,

which asked a number of questions on the costs of

different options, the alternative if it is not dental

Mercury amalgams is it composite amalgams, other types

of substance. What are the practical consequences of

that?  Are those safe? Are those less safe, are they

more safe?  Do they cost more?  What are the effects

on people in different incomes?

     THE COURT:  Let's be frank, sir, on a blank

slate here.  You've been grappling with the problem

for years.  So you are going to get comments, and you

may get another 2,500.  I suggest that a lot of them

will be similar to the ones you've said before.  You

have not the slightest clue and are unwilling to get

your agency to say we're going wrap this up.  Is that

what I hear?

     MR. SENGER:  No, absolutely not, Your Honor.

We're moving forward as quickly as possible. We

appreciate the significance of the issues. We

appreciate Your Honor's comments about this has been

quite a bit of time, and there have been a number of

reasons that are responsible for that.  And believe me,

**EXIHIBIT D - Case No. 1:14-cv-00356**

Your Honor, we have raised this to the highest levels within the Executive Branch.

THE COURT:  Who is the highest level within the agency on this particular issue?

MR. SENGER:  I don't know that there is a specific person.  The process requires clearance by the Department of Health and Human Services, and then, by the Office of Management and Budget.  For the government to issue something like this requires clearance from among all the agencies.  Everyone gets an opportunity to weigh in on a situation such as this.  We're moving as quickly as we can.  I appreciate the Court's comments.

THE COURT:  You have two choices here.  You can litigate it.  If you loose, you are going to have to do it overnight, this is silly.  Or you come up with a schedule.  This is government at its worst.  Really, sir, yes, you have to consider all the things.  But you can't keep saying that for 30 years or since the '80s.

You inadvertently did not classify it in the first instance.  So, you are already on quicksand.  That was in the '80.  I am suggesting to you that you cannot continue to say what you are saying consistent with the rule of 706-1.  It is just not, it is

**EXIHIBIT D - Case No. 1:14-cv-00356**

government jargon.  I know you are trying to help the

public interest.  I know you have to consider all

these things.  But you can't just keep saying it.

At some point, the people who are in this

agency have to step up and make a decision.  You get

the sense that they can't do it for whatever number of

reasons they have their theories.  But I'm not going

to engage in that.

I want you to come back here next week.  I

want a schedule.  I want the FDA to figure this out.

If not, I am going to decide it on the pleadings

before Labor Day.  So, either way, you can do it on

your own terms in consultation with the plaintiff.

I've had dozens of EPA cases, that's failure

to act, and clean air, other environmental harms where

the agency has stepped up to do what they're supposed

to.

Sometimes we had to give a little on the

schedule that they agreed to because there was one

component that had to be by law heard from.  I

understand   that.  But if you can't get your agency

to do what they're legally required to do, and nobody

is telling them what the answer is, we're just saying,

get off it now.

**EXIHIBIT D - Case No. 1:14-cv-00356**

There is a potential public safety issue to be resolved. If you feel, after all your consideration of 40 million comments, that you are unable to do it, then you'll say, we're going to keep it where it is. We don't have the smarts to figure it out. Nobody can. That's our decision. You'll put it in better language than that.

It will come by way of an arbitrating capricious claim at that point or whatever. You can't do what you're doing. You can't keep saying it needs to be studied more and more and more. And we the agency are unable, unwilling or cannot, we're not capable of it or we have too many conflicting points of view represented because we're beholding to this agency or this constituency. I don't' know what your problem is.

But it isn't to say well, we need more comments, more time, more agency input, more constituency input. You went through it 2002. You've reopened it now, 90 days. So we know the comment period closes. So, your schedule kicks off then.

So we'll be back here. If you can't settle it yourselves, with a schedule agreed to, I will impose a litigation schedule that the government, if they can't get the administrative record together on

**EXIHIBIT D - Case No. 1:14-cv-00356**

time, according to whatever schedule I put together,
too bad, you won't be able to rely on it.  You are
entitled to have the Court consider whether your delay
is unreasonable.  But it's hard to see at the end of
the day, how 32 years, it has sort of a presumptive
ring to it.  Don't you think?

            Maybe you'll be right, maybe the product is
not unsafe.  But why can't you decide it.  Doesn't the
public have the right to a decision by the experts who
have the information?

            So, we will be back.  I suggest you think
reasonably.  He has the comment period.  It is already
there.  You can't stop that.

            So, I'm ordering you to, if you need a
mediator or help on this, let me know, but we're
coming back.  I'd like you to stand up and say that
you've come up with the following schedule, your
agency will live with it and we'll do it, and make a
decision.  Like they're required by law to do.  If you
can't do that and you want to stand up and say what
you just said again, I will do what I have to do to
move the case along.

            The motion to dismiss is denied.  The motion
for P.I. is denied.  We'll go on an expedited basis.

**EXIHIBIT D - Case No. 1:14-cv-00356**

By Wednesday 21, you will have had enough time to talk to plaintiff's counsel and come up with a proposed schedule that the FDA will live with.  It is not going to do you any good to make sure that they don't do it right, because the dentists will come in here and say well, they didn't do it right.

MR. CUTINI:  That's right.

THE COURT:  So, don't cut off your nose to spite yourself.  Because it is a procedural issue, don't forget.  It's not whether you have the better merits case on harm.  I want you to focus on the right issue, please, sir.  They can lose here and the dentists could win say if that's who your opponents are.  I don't know who your opponents are.

Assuming that they don't come up with a reason carefully considered opinion, whether you like the bottom line or not, you don't want it to be subject to attack for procedural inadequacies. So what you want is a timetable here that is going to produce their best analysis.  Whatever it is.  And that at least procedurally, it will be not subject to attack.  Substantively, it could well be as arbitrary and capricious.  That is something else.  Okay.

**EXIHIBIT D - Case No. 1:14-cv-00356**

MR. BROWN:  Your Honor, I am out of the
country next week on my schedule.  I don't know if we
could do this the week after.

THE COURT:  No, not very well.  Let's see.
Don't talk to me about delay then.  The 29th we could
do it or the 30th.  I would prefer the 29th I'm not here
Tuesday and Wednesday.  But if you are out of the
country next week, who is going to talk to them?
That's what I wonder.  Can you communicate with them,
the other side?

MR. BROWN:  Yes, absolutely.

THE COURT:  Even though you are not here?

Is it, Sanger. S. A. N.?

MR. SENGER:  That's with an A., Your Honor, S.
E. N. G. E. R.

We are, the Court has suggested mediation.

THE COURT:  No, no, I want to see whether you
can't step forward and do what the government is
supposed to do, come up with an agreement with the
other side.  I will then, if you can't, I'll put you
on a parallel track of both mediation and litigation.

MR. SENGER:  I suspect mediation could be
helpful here, Your Honor.

THE COURT:  Call Facciola, if he is not
physically here that's a problem.

**EXIHIBIT D - Case No. 1:14-cv-00356**

Why can't the government come up with something without help?

MR. SENGER:  Your Honor, respectfully, we are willing to accept the Court's earlier suggestion of the possibility of mediation and to consult with plaintiff's counsel on that and proceed.  It may be helpful in the remedy the Court is seeking.

THE COURT:  I could do this in 10 minutes.  I have to tell you, I'm disappointed that the government doesn't see the public interest at issue.

MR. BROWN:  Your Honor, could I ask, does that mean the government will not give us a schedule? Even  now, they aren't even going to go back and ask the commissioner for a schedule.  Is that what they're saying here?

THE COURT:  I don't know.  But that's all right.  I can take care of that.

(There was a pause in the proceedings.)

THE COURT:  Okay.  Counsel, your going out of the country makes things very difficult.  But the magistrate judge is available.  I will refer it to Magistrate Judge Facciola to see if he can't help you come up with a schedule.  Remarkably disappointing that people can't work things like this out.

**EXIHIBIT D - Case No. 1:14-cv-00356**

I suggest you try to do it yourselves.
Otherwise, you can go the 23rd at 2:00, the 27th at 2:00.
I want a schedule.  If you can't reach one, you only
have until either the 29th, 30th or 2nd.

At that point in time, I will impose my
litigation schedule.  So it is up to you.

Are you, when are you able to sit down with a
mediator?

MR. BROWN:  I can sit down on the 27th.

THE COURT:  2:00.

MR. BROWN:  That's fine, Your Honor.

THE COURT:  Defense counsel?

MR. CUTINI:  Yes.

THE COURT:  All right.  I want you to go down
to the Magistrate Judge forthwith from here.  I will
do the referral for settlement.

Tell them that you will take the 27th at 2:00.

Before that though, I would think that you
would, the government would come up with a proposal.
You are in the situation which you have a better sense
than they do, that you can both live with and we call
it expedited.  Not your usual 32-year schedule.  We're
now on a short fuse.  If you can't prove your case
then you get the fuse any way.  So why don't you use

**EXIHIBIT D - Case No. 1:14-cv-00356**

this opportunity to exercise some discretion regarding your own schedule.

Then, we will be back here on the 9th.  I'm giving the Magistrate Judge until the 9th to figure out whether, no, the 2nd, the 2nd, is fine.  June 2 in the afternoon.  At that point in time either you have come up with a stipulation basically settling this matter because you have agreed to a schedule for when they're going to act.  That is the end of the lawsuit.  That's all there is to it.  That's what settles the lawsuit. If you don't, we'll have a very quick schedule with the paper.  And I'll decide whether your delay in acting --

On the 2nd, if you are having any trouble Mr. Senger,

MR. SENGER:  Yes, Your Honor.

THE COURT:  The highest level ought to come here with you because I'll talk to them.  If you need somebody to, for the Court to convince, I will be happy to convince somebody to buy into a reasonable schedule that you and the plaintiffs have worked out. I don't know who the person I, who is the decision-maker here.  Who is the head of the FDA now?

MR. CUTINI:  Andrew von Eschenbach.

**EXIHIBIT D - Case No. 1:14-cv-00356**

THE COURT:  If you think it is necessary, I can always invite him to attend.

Okay.  We will be back either having settled the matter by 2:30 on the 2nd of June, or we will get going in litigation.  Okay.  The motion for P.I. is denied.

The parties are required to go down now to Magistrate Judge Facciola to confirm that appointment. Settlement discussions are going to start now.

No more letters or faxes to the Court.

MR. BROWN:  Okay, Your Honor.  I apologize for doing that.

THE COURT:  I feel as though anything like that, I have to report.  Okay.

Thank you.  Have a good day.  We'll be back at 2: 30 on the 2nd.  Hopefully, you will have solved this case.  Be reasonable.  It's not going to do you any good to cut off your nose here.  Thank you.

MR. BROWN:  Thank you, Your Honor.

MR. CUTINI:  Thank you, Your Honor.

(Whereupon, at 11:22 A.M., the hearing concluded.)


**CERTIFICATE OF REPORTER**

**EXIHIBIT D - Case No. 1:14-cv-00356**

I, Lisa Walker Griffith, certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

_____

Lisa Walker Griffith, RPR            Date